# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**MIDLAND-ODESSA DIVISION**

| | | |
|---|---|---|
| REDSTONE LOGICS LLC, | § | |
| | § | |
|  - *Plaintiff*, | § | |
| | § | |
| v. | § | |
| | § | Case. No. 7:24-cv-00231-ADA-DG |
| QUALCOMM INC. and QUALCOMM | § | |
| TECHNOLOGIES, INC. | § | |
| | § | |
| - *Defendants*. | § | |
| | § | |

**DEFENDANTS QUALCOMM INCORPORATED'S AND QUALCOMM**
**TECHNOLOGIES, INC.'S OPENING CLAIM CONSTRUCTION BRIEF**

# **TABLE OF CONTENTS**

**Page**

I.   INTRODUCTION ............................................................................................ 1

II.   LEVEL OF ORDINARY SKILL IN THE ART ............................................... 3

III.   OVERVIEW OF THE '339 PATENT............................................................. 3

IV.   DISPUTED TERMS REQUIRING CONSTRUCTION .................................. 5

   A.   Term 1: "the first clock signal is independent from the second clock signal" .................. 5

      1.   The plain meaning of "independent" cannot be "different" in the context of clocks in a multicore processor or the '339 Patent's specification ........................................ 5

      2.   The prosecution history confirms that the Asserted Claims do not claim two clock signals derived from a single reference oscillator clock .................................. 8

   B.   Term 2: "located in a periphery of the multi-core processor" .......................................... 13

   C.   Term 3: "located in a common region that is substantially central to the first set of processor cores and the second set of processor cores" ........................................................ 17

V.   CONCLUSION................................................................................................ 21

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                    **Page(s)**

*Amgen Inc. v. Coherus Biosciences Inc.*,
    931 F.3d 1154 (Fed. Cir. 2019)...................................................................................11

*Aylus Networks, Inc. v. Apple Inc.*,
    856 F.3d 1353 (Fed. Cir. 2017)...................................................................................11

*Bd. of Regents of the Univ. of Tex. Sys. v. BENQ Am. Corp.*,
    533 F.3d 1362 (Fed. Cir. 2008)...................................................................................20

*Interval Licensing LLC v. AOL, Inc.*,
    766 F.3d 1364 (Fed. Cir. 2014)......................................................................16, 17, 19

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
    572 U.S. 898 (2014).......................................................................................13, 16, 17

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
    521 F.3d 1351 (Fed. Cir. 2008)...................................................................................13

*Personalized Media Commc'ns, LLC v. Apple Inc.*,
    952 F.3d 1336 (Fed. Cir. 2020)...................................................................................12

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) ..................................................................9

*Redstone Logics LLC v. NXP USA, Inc.*,
    Case No. 7:24-cv-00028-ADA-DTG (W.D. Tex. 2024) ......................................... iv, 5, 7, 11

*SimpleAir, Inc. v. Sony Ericsson Mobile Communs. AB*,
    820 F.3d 419 (Fed. Cir. 2016).....................................................................................20

*Tech Props. Ltd. LLC v. Huawei Techs. Co.*,
    849 F.3d 1349 (Fed. Cir. 2017)...................................................................................11

*Trs. of Columbia Univ. v. Symantec Corp.*,
    811 F.3d 1359 (Fed. Cir. 2016)............................................................................10, 11

**TABLE OF EXHIBITS**

| Exhibit | Description |
|---------|-------------|
| 1 | April 4, 2025 Declaration of Dr. John Villasenor In Support of Defendants' Opening Claim Construction Brief |
| A | U.S. Patent No. 8,549,339 ('339 Patent)[1] |
| B | ON Semiconductor's application note AND8248/D (*Stys*) |
| C | U.S. Patent No. 7,538,625 (*Cesky*) |
| D | U.S. Pat. App. Pub. No. 2009/0106576 (*Jacobowitz*) |
| E | U.S. Pat. App. Pub. No. 2009/0138737 (*Kim*) |
| F | '339 Patent file history excerpt: Office Action (Aug. 29, 2012) |
| G | '339 Patent file history excerpt: Examiner Interview (Nov. 27, 2012) |
| H | '339 Patent file history excerpt: Applicant's Response to Office Action (Nov. 29, 2012) |
| 2 | Excerpt from Redstone's Responsive Claim Construction Brief filed in *Redstone Logics LLC v. NXP USA, Inc.*, Case No. 7:24-cv-00028-ADA-DTG, (W.D. Tex. 2024) ("*NXP Litigation*") |
| 3 | Excerpt from Claim Construction Order in the *NXP Litigation* |
| 4 | Excerpt from Redstone's *Markman* hearing presentation in the *NXP Litigation* |
| 5 | Excerpt from the *Markman* hearing transcript in the *NXP Litigation* |

---

[1] Exhibits A through H are exhibits to the April 4, 2025 Declaration of Dr. John Villasenor In Support of Defendants' Opening Claim Construction Brief (Ex. 1).

# I.    INTRODUCTION

The Asserted Claims of U.S. Patent No. 8,549,339 (the "'339 Patent")[2] generally relate to a "multi-core processor" where first/second "set[s] of processor cores" are each "configured to dynamically receive" a corresponding first/second "clock signal" and "supply voltage." *See,* e.g., '339 Patent, Cl. 1. But the claims do not broadly cover all such arrangements. Rather, to obtain allowance, each asserted independent claim was amended to further require, among other things, that "the first clock signal ***is independent*** from the second clock signal" (the "Independent Term," *see infra*, Section IV.A), as shown below:[3]

> 1. A multi-core processor, comprising:
>
> a first set of processor cores of the multi-core processor, wherein each processor core from the first set of processor cores is configured to dynamically receive a first supply voltage and a first <u>output</u> clock signal <u>of a first phase lock loop (PLL) having a first clock signal as input</u>;
>
> a second set of processor cores of the multi-core processor, wherein each processor core from the second set of processor cores is configured to dynamically receive a second supply voltage and a second <u>output</u> clock signal <u>of a second PLL having a second clock signal as input, wherein the first supply voltage is independent from the second supply voltage, and **_the first clock signal is independent from the second clock signal_**</u>; and
>
> an interface block coupled to the first set of processor cores and also coupled to the second set of processor cores, wherein the interface block is configured to facilitate communication between the first set of processor cores and the second set of processor cores.

'339 Patent, Cl. 1 (underline denoting prosecution amendments; Independent Term in bold/italics).

In a related proceeding, Plaintiff Redstone Logics LLC ("Redstone") contended that "the applicant made it clear that the use of 'independent' is best understood as ***simply meaning 'different.'***" Ex. 2 at 2; *see also id.* at 7 (contending that if "'***independent***' needs clarification"

---

[2] The '339 Patent is Dkt. 1-1 and is also attached as Ex. A to the April 4, 2025 Declaration of Dr. John Villasenor In Support of Defendants' Opening Claim Construction Brief.

[3] All emphases added unless otherwise noted.

1

then "it **merely means 'different.'"**). Qualcomm agrees that this language requires different signals, but both the plain and ordinary meaning and intrinsic record require more than "merely" different signals. First, in a simple hypothetical system described further below, two clock signals can be "different"—but not "independent." This confirms that those terms are not synonymous in this context and that replacing "independent" with "different" as Plaintiff urges improperly alters and broadens the plain meaning.

Second, during prosecution and in response to a rejection, the applicant asserted: "In addition, [in the claims] **the first clock signal is independent from the second clock signal**. **Instead**, *Kim* discloses the apparatus comprising a multi-core processor [] having **a single clock source**." Ex. H (Applicant's Resp.) at 10–11. As discussed below, *Kim*[4] discloses exactly what Plaintiff seeks to include and the applicant distinguished—a clock system with two **different** clock signals fed from a "**single** clock source." Having clearly and unequivocally stated that arrangement was not good enough to meet "independent," Federal Circuit law requires holding Redstone to the applicant's public statement. Moreover, Redstone's excuses—this was just one of multiple distinctions and the applicant did not need to say what it said—are each insufficient as a matter of law under Federal Circuit precedent. Accordingly, Qualcomm's construction should be adopted.

Separately, certain dependent Asserted Claims are also invalid because they are indefinite. Specifically, certain dependent Asserted Claims describe the location of structures using terms that do not refer to any particular location or provide any guidance on the metes and bounds of any such region (*i.e.*, "in a **periphery** of the multi-core processor" (claim 5) and "in a **common region** that is **substantially central** to the first set of processor cores and the second set of processor cores" (claim 14)). In the related proceeding, the Magistrate Judge correctly determined that the

---

[4] As used herein, "*Kim*" refers to U.S. Pat. App. Pub. No. 2009/0138737.

"substantially central" claims are indefinite, but, respectfully, erred in determining that the "periphery" claims are not indefinite.

## II.    LEVEL OF ORDINARY SKILL IN THE ART

A person of ordinary skill in the art ("POSITA") at or around the relevant time of the alleged invention would have had at least a bachelor's degree in electrical engineering, computer engineering, computer science, or a similar field, as well as at least 2 years of academic or industry experience designing or analyzing electronic circuits, semiconductors, processors, or power management, and related firmware and software, or the equivalent. A POSITA with a higher level of education may have fewer years of academic or industry experience, or vice versa. Ex. 1, Declaration of Dr. John Villasenor Regarding Claim Construction ("Villasenor Decl.") at ¶ 25.

## III.   OVERVIEW OF THE '339 PATENT

The '339 Patent relates to an arrangement of clock and voltage sources supplied to different groups of processor cores in a multi-core processor. '339 Patent at Abstract; 1:61-2:40. The '339 Patent explains that prior art multi-core processors required that "[e]ach processor core in a conventional multi-core processor generally shares the same supply voltage and clock signal to simplify the interfaces between the processor cores." '339 Patent at 1:7-14. To that end, the '339 Patent proposes that each processor core group has an independent power profile powered with a separate supply voltage and that each processor core group obtain a clock output signal from a phase locked loop ("PLL") that receives a clock input signal from an "independent clock domain." *Id.* at 2:27-31, 4:1-17, Fig. 3.

This approach is illustrated below in annotated Fig. 3 of the '339 Patent, which depicts three independent clock signals, "the clock signal 1, the clock signal 2, [and] the clock signal 3" (annotated in green), providing independent inputs to "the respective phase lock loops (PLLs)" 1, 2, and 3. *Id.* at 4:1-17, Fig. 3.

3



**FIG. 3**

*Id.*, Fig. 3 (annotated).

Consistent with Fig. 3, each asserted independent claim (claims 1 and 21) of the '339 Patent recites "a first phase lock loop (PLL) having a first clock signal as input" and "a second PLL having a second clock signal as input" wherein "the first clock signal is independent from the second clock signal." *Id.* at claims 1 and 21.

4

## IV.    DISPUTED TERMS REQUIRING CONSTRUCTION

### A.    Term 1: "the first clock signal is independent from the second clock signal"

| '339 Patent Claim(s) | Redstone's Proposed Construction | Defendants' Proposed Construction |
| --- | --- | --- |
| Claims 1, 21 | Plain and ordinary meaning, as urged in the related proceeding, "'independent' is best understood as simply meaning 'different.'" *Redstone Logics LLC v. NXP USA, Inc.*, Case No. 7:24-cv-00028-ADA-DTG, (W.D. Tex., Jan. 8, 2024) ("*NXP Litigation*"). | Plain and ordinary meaning, which requires that the first and second clock signals depend from different reference oscillator clocks |

The parties agree that this term requires different signals. The principal dispute between the parties is therefore whether the different signals of the Independent Term may originate from a single, shared reference oscillator clock (also known as a clock source), or whether independent clock signals must originate from separate reference oscillator clocks. The plain and ordinary meaning, the knowledge of a POSITA, and the prosecution history each separately dictates not just different clock signals but different clock signals with separate reference oscillator clocks.

### 1.    The plain meaning of "independent" cannot be "different" in the context of clocks in a multicore processor or the '339 Patent's specification

It is axiomatic that two clock signals may be "different" but not "independent," which confirms that Redstone's plain and ordinary meaning of "independent" is incomplete and wrong. Even before considering confirmatory disclaimer and discussions in the intrinsic record, practical examples illustrate why clock signals that are "different" may nevertheless share a dependency.

As background, each core in a multicore processor requires a clock timing reference to operate. Villasenor Decl. at ¶ 35. Before and after the '339 Patent, there were at least two known approaches to generate multiple, *different* clock signals to be supplied to components within a

5

microprocessor. *Id.* at ¶¶ 36-42, 44-46, 50-55. Both approaches begin with the understanding that clock signals typically originate from one or more external reference oscillator clocks. *Id.*

A **single reference oscillator approach** may provide multiple different clocks derived from—and **dependent on**—the same reference oscillator source. *See id.* at ¶ 44. For example, the output of a single reference oscillator clock can be split and its frequency divided or multiplied to create two or more different clock signals having different frequencies (*id.*), as depicted:



**Figure A** – Single reference oscillator suppling two components with different frequencies dependent upon single source (Osc$_1$)

Figure A shows an arrangement where the clock signal from the single reference oscillator (Osc$_1$) is split and processed by two separate dividers that alter the clock frequency ($f_1$) generated by the reference oscillator in a fixed manner—here, by one half and one quarter—resulting in an input to Component 1 with a frequency of $f_1/2$ and an input to Component 2 with a frequency of $f_1/4$. *Id.* Clock signals at $f_1/2$ and $f_1/4$ **do not** meet the plain and ordinary meaning of "independent" because they remain dependent on the same input, namely clock frequency $f_1$ provided by reference oscillator Osc$_1$. *Id.* The frequencies $f_1/2$ and $f_1/4$ are plainly different, yet if the clock frequency ($f_1$) of the reference oscillator (Osc$_1$) decreases, the frequencies of the $f_1/2$ and $f_1/4$ clock inputs to Components 1 and 2 will necessarily decrease given their common dependency, *viz.*, reference oscillator Osc$_1$. *Id.* Even if each divider is variable, the outputs remain dependent on the same common input frequency $f_1$, such that a change to $f_1$ causes a change to $f_1/2$ and $f_1/4$. This example demonstrates that two clock signals, such as $f_1/2$ and $f_1/4$, may be different but not independent;

6

Redstone's attempt to replace "independent" with "different" must be rejected as it does not reflect the plain and ordinary meaning of "independent." Given Redstone's apparent intent to rewrite the claim under the guise of "plain and ordinary meaning," Defendants' proposed clarification of the plain and ordinary meaning is necessary.

During the *NXP Litigation* claim construction hearing, Redstone contended that independence could be generated in the Figure A context by simply unfixing the denominator of the depicted dividers, such that the frequency scaling impact of the dividers could vary and, according to Redstone, introduce independence in the resulting clock signals:



**Figure B** – Excerpt from Redstone's *Markman* Presentation in the *NXP Litigation*

Ex. 4 at 17; Ex. 5 at 17. Even if two or more factors may affect the frequency of the resulting clock signals, that fails to negate the fact that each of these clock signals remains dependent upon the same reference oscillator. Villasenor Decl. at ¶ 45. As can be seen in Redstone's above image, the resulting clock signals are at frequency $f$/Y and $f$/Z. As in the simplified example above, if the frequency $f$ of the reference oscillator were to increase or decrease, so too would the mathematically related frequencies of $f$/Y and $f$/Z—regardless of the values of Y and Z. This is because both clocks are dependent upon clock frequency $f$ of the reference oscillator; that is, they are not independent clock signals. *Id.*

A second known approach to generate multiple, different clock signals for use in a microprocessor that existed at the filing of the '339 Patent is a **multiple reference oscillator approach**—which aligns with the sole approach disclosed in the '339 Patent. *See, e.g.*, '339 Patent

at Fig. 3 (depicting "clock signal 1," "clock signal 2," and "clock signal 3" as separate signals); *see also* Villasenor Decl. at ¶ 46. A multiple reference oscillator approach provides multiple clock signals that are **not dependent** on the same reference oscillator, as shown:



**Figure C** – Two reference oscillators generating independent clock signals

In this approach, changing the clock frequency $f_1$ of reference oscillator $Osc_1$ has no impact on the clock frequency $f_2$ provided to Component 2. *Id.* And, changing the clock frequency $f_2$ of reference oscillator $Osc_2$ has no impact on the clock frequency $f_1$ provided to Component 1. *Id.* Simply put, when separate reference oscillators are used, the resulting clock signals are independent.

Redstone's previous argument that the single reference oscillator approach (depicted in Figures A and B *supra*) can generate independent clock signals is wrong because it ignores the necessary dependence that exist on the single reference oscillator. Accordingly, its position that "independent" means "simply different" is wrong and contrary to the plain and ordinary meaning of "independent." By contrast, Qualcomm's proposed clarification of the plain and ordinary meaning of the Independent Term that "the first and second clock signals depend from different reference oscillator clocks" is consistent with the plain and ordinary meaning, the knowledge of a POSITA, and the '339 Patent's own Figure 3 disclosure.

### 2. The prosecution history confirms that the Asserted Claims do not claim two clock signals derived from a single reference oscillator clock

The '339 Patent's file history underscores that the plain and ordinary meaning of the Independent Term is not satisfied with first and second clock signals that are merely "different" as

opposed to signals that are truly "independent." *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005) (*en banc*) ("the prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention"). The applicant distinguished the ***single*** reference oscillator approach from the Independent Term in statements made during prosecution, particularly regarding the *Kim* reference identified by the examiner. These intrinsic record statements confirm that the plain and ordinary meaning of the Independent Term requires "different reference oscillator clocks."

*Kim* discloses a single reference oscillator configuration, like the example in Figure A, *supra*. Specifically, *Kim* discloses a ***single*** clock source 270 (*i.e.*, a reference oscillator) that feeds a "main PLL 260," which includes "one ***or more frequency dividers***" to generate multiple ***different*** clock signals, as shown by the four colored lines below:



FIG. 2

Ex. E (*Kim*) at Fig. 2 (annotated), [0024]–[0025]; *see also* Villasenor Decl. at ¶¶ 53–54. As with the single reference clock example in Section IV.A.1, *supra*, clock signals 262, 264, 266, and 268 are ***different***, but they are not ***independent*** because they are all multiples of the same original frequency from clock source 270. Villasenor Decl. ¶¶ 54-55. Each of clock signal 262, 264, 266,

9

and 268 is a separate input to one of PLL 216, 226, 236, or 236. A change to the frequency of clock source 270 will impact each of clock signals 262, 264, 266, and 268, such that they are not independent of each other. *Id.*

During prosecution, the applicant addressed *Kim.* Ex. H at 10-12 (Applicant's Resp.); *see also* Ex. F at 6-9 (Office Action). The applicant made two separate representation, each beginning with "in addition":

| File History – Response to Office Action 8/29/2012 |
|---|
| In addition, *Kim* also fails to disclose or teach a first set of processor cores and second set of processor cores configured to dynamically receive a first output clock signal of a first PLL having a first clock signal as input and a second output clock signal of a second PLL having a second clock signal, respectively. In addition, the first clock signal is independent from the second clock signal. Instead, *Kim* discloses the apparatus comprising a multi-core processor (i.e., 100 in FIG. 1 or 200 in FIG. 2) having a single clock source (i.e., 170 in FIG. 1 or 270 in FIG. 2). The clock signal from this single clock source is then processed (i.e., divided or multiplied) and provided to each of the cores. See *Kim*, paragraphs [0024]-[0025] and FIGs 1 – 2. |

Ex. H (Applicant's Resp.) at 10–11. The second representation makes clear applicants' position: Despite *Kim*'s Figure 2 disclosing clock signals 262 and 264 that are ***different*** based on separate dividers in main PLL 260, that is not good enough to meet the "independent" language because they originate from "a single clock source," namely clock source "270." *Id.* By reciting the "independent" language and distinguishing that language ("[i]nstead") from *Kim's* disclosure of multiple different clock signals fed by a "single clock source," the applicant expressly disclaimed a construction of the Independent Term that would encompass two different signals processed from a single clock source, *i.e.*, an oscillator. This representation forecloses any possibility that "independent" could mean "simply different." The applicant's representation distinguishing *Kim* results in disavowal, as no magic words are required. *See Trs. of Columbia Univ. v. Symantec*

10

*Corp.*, 811 F.3d 1359, 1364 (Fed. Cir. 2016) (rejecting the "argument that the presumption of plain and ordinary meaning 'can be overcome in only two circumstances: [when] the patentee has **expressly** defined a term or has **expressly** disavowed the full scope of the claim in the specification and the prosecution history.'" (alteration and emphases in original)).

Redstone may contend here, as it did in the *NXP Litigation*, that the above disclosure should be ignored because the applicant distinguished *Kim* on additional grounds unrelated to its lack of independent clocks, including because *Kim* purportedly did not disclose sets of processor cores. *See* Ex. 2 at 5, 6. This argument does not provide a basis as a matter of law to ignore the applicant's disavowal. As the Federal Circuit has explained, "the scope of surrender is not limited to what is absolutely necessary to avoid a prior art reference; patentees may surrender more than necessary" and "[w]hen this happens, we hold patentees to the actual arguments made, not the arguments that could have been made." *Tech Props. Ltd. LLC v. Huawei Techs. Co.*, 849 F.3d 1349, 1359 (Fed. Cir. 2017); *see also Amgen Inc. v. Coherus Biosciences Inc.*, 931 F.3d 1154, 1159 (Fed. Cir. 2019) (noting that "while [the patentee] did assert multiple reasons for why [the prior art] is distinguishable, our precedent instructs that estoppel can attach to each argument"); *Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1359 (Fed. Cir. 2017) ("[W]e explained, in the context of disclaimer, that the prosecution history 'includes all express representations made by or on behalf of the applicant to the examiner to induce a patent grant . . . includ[ing] amendments to the claims and arguments made to convince the examiner.'" (some alterations in original, citation omitted)).

The applicant's representations not only amount to a clear disclaimer of a single reference oscillator arrangement, but must also be considered in the context of determining the plain and ordinary meaning of the "Independent Term." This is because prosecution history "may be critical

in interpreting disputed claim terms because it contains the complete record of all the proceedings before the Patent and Trademark Office, including any express representations made by the applicant regarding the scope of the claims." *Personalized Media Commc'ns, LLC v. Apple Inc*., 952 F.3d 1336, 1340 (Fed. Cir. 2020). "Accordingly, even where prosecution history statements do not rise to the level of unmistakable disavowal, they do inform the claim construction." *Id*. (quotations omitted). "For example, an applicant's repeated and consistent remarks during prosecution can define a claim term by demonstrating how the inventor understood the invention." *Id*. "Similarly, an applicant's amendment accompanied by explanatory remarks can define a claim term by demonstrating what the applicant meant by the amendment." *Id*. And that is exactly what occurred here.

Thus, even if the representations regarding *Kim* did not amount to a disavowal—which they did—they inform the meaning of "independent" clock signals. The applicant used "independent" repeatedly both throughout the response and specific to *Kim* in explaining why the examiner's art was insufficient. And, the applicant separately argued that *Kim* and its multiple different clocks feeding different PLLs was distinguishable because it employed a single clock source. *See* Ex. H at 11 (Applicant's Resp.) ("As discussed above, neither Jacobowitz nor Kim discloses having sets of processor cores ***configured to receive multiple and independent clock signal***."); *id.* at 10–11 (explaining the "***first clock signal is <u>independent</u> from the second clock signal***" and "***[i]nstead,*** Kim discloses the apparatus comprising a multi-core processor (i.e., 100 in FIG. 1 or 200 in FIG. 2) having ***a <u>single</u> clock source***"). The applicant chose to use the word "independent," not "different," on multiple occasions in distinguishing *Kim* and other references, and the applicant explained that instead of independent first and second clock signals, *Kim* employed a single clock source, *i.e.*, oscillator 270. Ex. H at 9–11. Thus, the Court should reject

Redstone's "merely different" argument because it is inconsistent with inconsistent with the plain and ordinary meaning of the Independent Term, as confirmed by repeated statements in the prosecution history.

Accordingly, given the parties' clear dispute as to plain and ordinary meaning, and consistent with the intrinsic record, respectfully, the Court should find that the plain and ordinary meaning requires more than merely different clocks but also that the first and second clock signals depend from different reference oscillator clocks. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008) ("plain and ordinary meaning" construction "may be inadequate . . . when reliance on a term's "ordinary" meaning does not resolve the parties' dispute.")

**B.** **Term 2: "located in a periphery of the multi-core processor"**

| '339 Patent Claim(s) | Redstone's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| Claim 5 | Plain and ordinary meaning | Indefinite |

The term "located in a periphery of the multi-core processor" is indefinite because it fails to inform a POSITA, with reasonable certainty, when a component is "located in a periphery of the multi-core processor" and when it is not. *See Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). This ambiguity results from claim 5's use of the vague term "periphery" coupled with the lack of any required physical relationship between the components of the multi-core processor, which may be spaced apart from each other.

In order to determine whether a "control block[]" is "located in the periphery of the multi-core processor," as claim 5 requires, one must first identify the components of the multi-core processor and their arrangement. The '339 Patent presents a simple example of a multi-core processor with all cores adjacent one another in a grid:



'339 Patent, Figure 1 (excerpt). But the processor cores in the "multi-core processor" of the Asserted Claims need not be arranged in such a grid—nothing within the claims themselves requires a grid arrangement. Villasenor Decl. at ¶ 69. Rather, a POSITA understands that the multiple processor cores may be placed around the semiconductor die, as shown below:



*Id.* at Figure C; *see also id.* at ¶ 69 ("A POSITA would understand that that the processor cores of a multi-core processor need not be located immediately adjacent to one another in the manner depicted in the patent's Figure 1.").

The below image selects two of the sets of cores and adds the claimed "interface block coupled to the first set of processor cores and also coupled to the second set of processor cores."

14

*See* '339 Patent, Cl. 1. The annotation depicts potential "peripheries" in yellow, red, and blue and locations A, B, and C where a control block may be placed:



Villasenor Decl. at Figure G; *see also id.* at ¶¶ 71-72. The yellow "periphery" is actually three separate boundaries, each immediately around a set of cores or the interface block. *Id.* at ¶ 72. The red "periphery" surrounds the same components as well as the circuitry that connects these components. *Id.* And, the blue "periphery" loosely encircles all these components and the other areas of the semiconductor die that lie between the components. *Id.*

But which of these options is the claimed periphery? A POSITA could not know with reasonable certainty, as the term "periphery" is subjective with no commonly understood meaning in the art, and the language of claim 5 provides no guidance to select between the yellow, red, blue, or some other unspecified periphery. *Id.* at ¶¶ 62, 72; *see also id.* at ¶ 68 (noting it is "unclear whether 'periphery of the multi-core processor' might be limited to regions *inside* the multi-core processor within some unspecified distance of the boundary of the multi-core processor, however that boundary might be defined, or whether [it] also includes components outside the multi-core processor but within some unspecified distance of its boundary.").

15

The '339 Patent's specification does not resolve the uncertainty regarding the scope of periphery. *Id.* at ¶¶ 71, 72. "[P]eriphery" appears only once in the specification: "A power profile associated with an individual processor core may be controlled through signals that may be received from *control blocks that are located in the periphery* of the multi-core processor." '339 Patent at 1:62-65. This usage of "periphery" merely parrots claim 5 and offers no additional guidance to a POSITA as to the meaning and scope of "periphery." Villasenor Decl. at ¶ 72.

While the periphery of the simplistic example in Figure 1 of the '339 Patent may be ascertainable, that does not render this claim limitation definite. *See Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1373–74 (Fed. Cir. 2014) ("With this lone example, a skilled artisan is still left to wonder what other forms of [the invention fall within the scope of the claim term].");  *see also Nautilus*, 572 U.S. at 911 ("It cannot be sufficient that a court can ascribe *some* meaning to a patent's claims." (emphasis in original)). Rather, a POSITA seeking to avoid claim 5 of the '339 Patent would not have reasonable certainty in the placement of a control block to ensure they were outside the claim's scope. For example, a control block at reference point B in the above image lies on the blue "periphery," is outside the red "periphery," and is spaced even further from the yellow "periphery." Villasenor Decl. at ¶ 72.

With sets of processor cores and an interface block spaced apart on the semiconductor die—an arrangement that would not be unusual (*id.* at ¶¶ 69-72)—a POSITA could not understand with reasonable certainty what constitutes the "periphery" of such a multi-core processor. *Id.* at ¶¶ 68, 71-73; *see also Nautilus*, 572 U.S. at 901. And, with the location of the periphery not reasonably ascertainable in real world situations, a POSITA cannot know whether a control block is (or is not) "located in a periphery of the multi-core processor." As such, this phrase is indefinite.

16

**C.     Term 3: "located in a common region that is substantially central to the first set of processor cores and the second set of processor cores"**

| '339 Patent Claim(s) | Redstone's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| Claim 14 | Plain and ordinary meaning | Indefinite |

The term "located in a common region that is substantially central to the first set of processor cores and the second set of processor cores" is indefinite because it fails to inform a POSITA, with reasonable certainty, both (1) when a component is "located in a common region," or not, and (2) when the "region" is "substantially central to the first set of processor cores and the second set of processor cores," or not. *See Nautilus*, 572 U.S. at 901 (requiring "reasonable certainty").

Beginning with the second ambiguity identified above, claim 14 requires "control blocks located . . . substantially central" to the sets of processor cores. "[S]ubstantially central" is a term of degree that, in the context of the '339 Patent's claims and specification, "fails to provide sufficient notice of its scope." *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014) ("As we have explained, a term of degree fails to provide sufficient notice of its scope if it depends 'on the unpredictable vagaries of any one person's opinion.'" (citation omitted)).

Looking first at the claims, independent claim 1 and dependent claim 14 provide no physical requirement for the individual processor cores of the claimed multi-core processor. As noted above in Section IV.B, one skilled in the art understands that the components of a multi-core processor may be located throughout the semiconductor die upon which they are typically formed; the processor cores need not be immediately adjacent in the manner shown in Figure 1 of the '339 Patent. *See also* Villasenor Decl. at ¶¶ 69-70. The below figure depicts one possible physical layout of the multi-core processor of the claims, with the sets of processor cores from '339 Patent Figure 1

17

placed towards the corners of the semiconductor die and the control blocks at the midpoint between the sets of processor cores:



Villasenor Decl., Figure H.

Even in such an arrangement, a POSITA would not know whether the control blocks are "substantially central" by virtue of being equidistant from each set of cores, or whether the control blocks are not substantially central given the separation of the processor cores from the control blocks. *Id.* at ¶ 85. The uncertainty within "substantially central" becomes more pronounced, however, if only two sets of processor cores are considered—as in the Asserted Claims. The figure below depicts the first and second sets of processor cores at the top of the die with control blocks near the middle:



18

*Id.*, Figure I.

A person skilled in the art would not know in the context of claim 14 whether (a) the depicted control blocks are "substantially central" because they are at the horizontal midpoint between the first and second sets of processor cores, or (b) whether the control blocks are not "substantially central" because they are not in the same vertical position as the sets of processor cores. *Id.* at ¶¶ 87, 88.

The specification of the '339 Patent similarly provides no guidance regarding the scope of "substantially central." *See Interval Licensing*, 766 F.3d at 1371 ("Where, as here, we are faced with a 'purely subjective' claim phrase, we must look to the written description for guidance." (citation omitted)). The term "central" and the phrase "substantially central" are never used in the patent's specification. And, while the term "substantially" appears twice, neither use concerns the physical relationship between control blocks and processor cores. *See* '339 Patent at 4:24-27 (denoting commonality between Figs. 3 and 4), 6:56-57 (providing boilerplate regarding "the use of substantially any plural and/or singular terms herein.").

Because claims 1 and 14, and the patent's specification, do not require a physical arrangement of the sets of processor cores, a person skilled in the art could not determine with reasonable certainty whether or not "control blocks" are "substantially central" to the sets of processing cores. "[L]ocated in a common region that is substantially central to the first set of processor cores and the second set of processor cores" is therefore indefinite.

An independent ground for indefiniteness arises from claim 14's use of "common region." Claim 14 requires "the first set of processor cores and the second set of processor cores are configured to receive one or more control signals from one or more control blocks located in a ***common region***." Though not a model of clarity, a POSITA understands this phrase means the

19

first and second sets of processor cores share a common region where control blocks are located. *See* Villasenor Decl. at ¶ 79. The claims provide no indication, however, of what constitutes a "region" corresponding to a set of processor cores or how such regions could be in "common." *Id.* at ¶¶ 80-81.

While one possible interpretation of a common region shared by first and second sets of processor cores could be that the sets of processor cores "overlap" in physical space, this interpretation conflicts with dependent claim 9, which depends from claims 1 and 8. Claim 9 (through its dependencies) requires a "first set of processor cores [] located in a first region," a "second set of processor cores [] located in a second region," and "the first region and the second region are overlapping regions." When construing claims, "[d]ifferent claim terms are presumed to have different meanings." *SimpleAir, Inc. v. Sony Ericsson Mobile Communs. AB*, 820 F.3d 419, 431 (Fed. Cir. 2016) (citing *Bd. of Regents of the Univ. of Tex. Sys. v. BENQ Am. Corp.*, 533 F.3d 1362, 1371 (Fed. Cir. 2008)). Therefore, "common region" in claim 14 must mean something other than overlapping, though such other meaning remains unclear. *See* Villasenor Decl. at ¶ 81.

The '339 Patent's specification does not resolve the ambiguity introduced by "common region" in claim 14. The patent's specification never uses the phrase "common region." And, while the specification describes an embodiment with two control blocks "arranged in a common area," that use is distinct from claim 14; there is no reference in the specification to sets of processor cores sharing a "common area." *Id.* at ¶ 82.

The phrase "located in a common region that is substantially central to the first set of processor cores and the second set of processor cores" is indefinite for two independent reasons: a POSITA cannot determine with reasonable certainty the scope of each of "common region" and "substantially central."

20

## V.     CONCLUSION

For the foregoing reasons, Defendants respectfully request the Court construe Term 1 as proposed by Defendants and find Terms 2 and 3 indefinite as set forth herein.

Dated: April 4, 2025

Respectfully submitted,

By*:     /s/ Richard S. Zembek*

Richard S. Zembek (SBN 00797726)
richard.zembek@nortonrosefulbright.com
Daniel S. Leventhal (SBN 24050923)
daniel.leventhal@nortonrosefulbright.com
NORTON ROSE FULBRIGHT US LLP
1550 Lamar Street, Suite 2000
Houston, Texas 77010
Tel:    (713) 651-5151
Fax:    (713) 651-5246

Eric C. Green (SBN 24069824)
eric.green@nortonrosefulbright.com
Brett A. McKean (SBN 24057994)
brett.mckean@nortonrosefulbright.com
NORTON ROSE FULBRIGHT US LLP
98 San Jacinto Boulevard, Suite 1100
Austin, Texas 78701
Tel:    (512) 474-5201
Fax:    (512) 536-4598

**COUNSEL FOR DEFENDANTS
QUALCOMM INCORPORATED AND
QUALCOMM TECHNOLOGIES, INC**.

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the foregoing document was served on counsel of record via the Court's electronic filing system on April 4, 2025.

*/s/ Richard S. Zembek*
Richard S. Zembek

# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**MIDLAND-ODESSA DIVISION**

| | | |
|---|---|---|
| REDSTONE LOGICS LLC, | § | |
| | § | |
|  - *Plaintiff*, | § | |
| | § | |
| v. | § | |
| | § | Case. No. 7:24-cv-00231-ADA |
| QUALCOMM INC. and QUALCOMM | § | |
| TECHNOLOGIES, INC. | § | |
| | § | |
| - *Defendants*. | § | |
| | § | |


**DECLARATION OF JOHN VILLASENOR, PH.D.**
**IN SUPPORT OF**
**QUALCOMM'S OPENING CLAIM CONSTRUCTION BRIEF**

# Table of Exhibits

**Exhibit A**    U.S. Patent No. 8,549,339 ('339 Patent)

**Exhibit B**    ON Semiconductor's application note AND8248/D (*Stys*)

**Exhibit C**    U.S. Patent No. 7,538,625 (*Cesky*)

**Exhibit D**    U.S. Pat. App. Pub. No. 2009/0106576 (*Jacobowitz*)

**Exhibit E**    U.S. Pat. App. Pub. No. 2009/0138737 (*Kim*)

**Exhibit F**    '339 Patent file history excerpt: Office Action (Aug. 29, 2012)

**Exhibit G**    '339 Patent file history excerpt: Examiner Interview (Nov. 27, 2012)

**Exhibit H**    '339 Patent file history excerpt: Applicant's Response to Office Action (Nov. 29, 2012)

I, Dr. John Villasenor, declare that I have personal knowledge of the facts set forth in this declaration and, if called to testify as a witness, could and would do so competently.

## I.      INTRODUCTION

1.      My name is John Villasenor. I have been retained on behalf of Qualcomm Incorporated and Qualcomm Technologies, Inc. (collectively "Defendant" or "Qualcomm") as an independent expert in the relevant art in connection with the above-captioned case.

2.      I have been asked to render opinions regarding technical aspects of the multi-core processors disclosed in U.S. Patent No. 8,549,339 ("the '339 Patent").

3.      My work on this matter is being billed at my customary rate of $1000 per hour. Also, I am being reimbursed for reasonable expenses I incur in relation to my services. My compensation does not depend upon the results of my analysis or the substance of my testimony. Nor does my compensation depend on the outcome of any proceeding that my work is used in.

## II.     QUALIFICATIONS

4.      I have either trained or worked in algorithms and architectures for computer processing of data, as well as the design of hardware for complex processing tasks, for approximately three decades. Appendix 1 to this Declaration is a true and correct copy of my Curriculum Vitae, which provides further details about my background and experience, including details regarding my publications and prior experience.

5.      My work focuses on innovative, high-performance communications, networking, media processing, and computing technologies and their broader implications. Well before the priority date of the '339 Patent, I performed research on the design of processors and the systems in which they are used, including work involving computational logic, memory, and interconnect.

6.     I have performed work on mapping complex computational processes into hardware implementations, subject to constraints on factors including speed, area, power consumption, memory access, and the precision of the computations.

7.     I received my B.S. in Electrical Engineering from the University of Virginia in 1985, and M.S. and Ph.D. in Electrical Engineering from Stanford University in 1986 and 1989, respectively.

8.     While at Stanford, I concentrated my research on digital signal processing and communications.

9.     Between 1990 and 1992, I worked for the Jet Propulsion Laboratory in Pasadena, CA, where I helped to develop techniques for imaging and mapping the earth from space. Since 1992, I have been on the faculty of the Electrical Engineering Department of the University of California, Los Angeles (UCLA). Between 1992 and 1996, I was an Assistant Professor; between 1996 and 1998, an Associate Professor; and since 1998, I have been a full Professor.

10.    For several years starting in the late 1990s, I served as the Vice Chair of the Electrical Engineering Department at UCLA. In addition to my faculty appointment in the UCLA Samueli School of Engineering, I hold faculty appointments (and have taught classes in) the UCLA School of Law, the Department of Public Policy within the UCLA Luskin School of Public Affairs, and in the UCLA Anderson School of Management. I am also the founder and faculty co-director of the UCLA Institute for Technology, Law, and Policy.

11.    In the UCLA Samueli School of Engineering, I have taught courses addressing digital signal processing, communications, computing, and networking, including consideration of the associated systems, algorithms, devices, and networks. In addition to my teaching, I have performed extensive research at UCLA over the past several decades on multiple aspects of digital

devices and systems, including device (including chip) design, integration and use of devices within the context of larger networks; acquisition, processing, and communications of data (including image and video data); communications and protocols used to convey information among devices; optimization to achieve goals including low power consumption and high speed; and mapping of algorithms onto hardware. My work has considered both hardware and software, and has included consideration of factors such as configuration and control of devices, protocols, the interaction among devices, allocation of processing tasks within devices, communication of data to, from, and within devices, and artificial intelligence.

12. My academic publications have appeared in peer-reviewed journals including IEEE Transactions on VLSI Systems, IEEE Transactions on Computers, IEEE Transactions on Reliability, IEEE Transactions on Signal Processing, ACM Computing Surveys, Journal of Statistical Software, IEEE Transactions on Communications, IEEE Transactions on Circuits and Systems for Video Technology, IEEE Transactions on Information Theory, IEEE Transactions on Image Processing, and in numerous peer-reviewed conference proceedings.

13. I am an inventor on approximately 20 issued U.S. patents in areas including information processing, data compression, communications, and cybersecurity. I have published over 175 articles in peer-reviewed journals and academic conference proceedings. I have also been asked on multiple occasions to provide congressional testimony on technology topics.

14. In addition to my work at UCLA, I am a nonresident senior fellow at the Brookings Institution in Washington, D.C. Through Brookings I have examined a wide range of topics at the technology/policy intersection including cybersecurity, wireless mobile devices and systems, and artificial intelligence. In addition to publishing in traditional academic venues such as engineering journals, engineering conference proceedings, and law reviews, I have published papers through

the Brookings Institution and articles and commentary in broader-interest venues including *Billboard*, the *Chronicle of Higher Education*, *Fast Company*, *Forbes*, the *Los Angeles Times*, the *New York Times*, *Scientific American*, *Slate*, and the *Washington Post*.

15.     I also have several decades of experience working in early-stage technology ventures. In that capacity, I have met with many companies and evaluated their existing and proposed technology. In multiple instances, I performed work over a multi-year period as a technical consultant to early-stage technology companies, contributing to their efforts to grow their product lines. In multiple cases, this involved work on advanced processing technologies. To take one example, I was a consultant to Broadcom for an extended period of years starting in the early 1990s. In that capacity, I worked on the design of groundbreaking chips for processing communications and multimedia (including video) information, including doing work relating to task allocation, power management, and communication of data to, from, and within such chips. My technology consulting experience has also involved work with other companies developing chips to meet stringent performance and power constraints.

## III.     MATERIALS CONSIDERED AND RELIED ON

16.     In forming my opinions, I have considered on:

- The specification, claims, and file history of the '339 Patent;

- The materials cited in this Declaration; and

- My background and experience in the field of computer processing.

## IV.     APPLICABLE LEGAL STANDARDS

17.     I am not a legal expert and offer no opinions on the law. However, I have been informed by counsel of certain legal standards that apply to claim construction, which I have used in arriving at my conclusions.

## A.     Claim Construction

18.     I understand that claim terms are generally given their ordinary and customary meaning, which is the meaning the terms would have had to a person of ordinary skill in the art ("POSITA") on the effective filing date of the patent. A POSITA is deemed to read the claim term not only in the context of the particular claim in which it appears, but in the context of the intrinsic record, including the specification and prosecution history.

19.     I understand that the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In other cases, the specification may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor.

20.     I understand that the prosecution history of a patent can often inform the meaning of the claim language by demonstrating how the applicant understood the invention and whether the applicant limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be. I understand that when the patentee unequivocally and unambiguously disavows a certain meaning to obtain a patent, the doctrine of prosecution history disclaimer narrows the meaning of the claim consistent with the scope of the claim surrendered. The doctrine of prosecution disclaimer is intended to ensure that claims are not construed one way in order to obtain their allowance and in a different way against accused infringers.

21.     I understand that the claims, the specification, and the prosecution history are intrinsic evidence. I understand that courts may also consider extrinsic evidence during claim construction such as expert and inventor testimony, dictionaries, and learned treatises, but that extrinsic evidence is generally given less weight than intrinsic evidence.

## B.     The Definiteness Requirement

22.     I understand that there is a definiteness requirement under 35 U.S.C. § 112, ¶ 2, which requires claims to particularly point out and distinctly claim the invention in the patent. I

understand that a claim is deemed indefinite, and thus invalid, if it fails to inform those skilled in the art about the scope of the invention with reasonable certainty when interpreted in light of the specification and the prosecution history.

## V.    LEVEL OF ORDINARY SKILL IN THE ART

23.    I understand that claim interpretation is from the perspective of a POSITA at the time of the invention.

24.    I have been informed that the earliest priority date alleged for the asserted claims of the '339 Patent, as listed on the cover page of the '339 Patent, is February 26, 2010.

25.    In my opinion, a POSITA at or around the relevant time of the alleged invention would have had at least a Bachelor's degree in electrical engineering, computer engineering, computer science, or a similar field, as well as at least 2 years of academic or industry experience designing or analyzing electronic circuits, semiconductors, processors, or power management, and related firmware and software, or the equivalent. A POSITA with a higher level of education may have fewer years of academic or industry experience, or vice versa.

26.    I was at least a POSITA under this definition as of the priority date.

27.    To the extent that Redstone Logics LLC ("Redstone") or any expert offering testimony on behalf of Redstone puts forward a statement regarding the level of ordinary skill in the art that differs from my opinion above, I reserve the right to respond.

28.    Unless otherwise stated, all of my opinions in this Declaration are offered from the perspective of a person of ordinary skill in the art as of the priority date of the '339 Patent. I had at least the education and experience of a POSITA as of this date by virtue of my approximately (as of that date) two decades training or working in algorithms and architectures for computer processing of data, including the design of hardware for complex processing tasks.

## VI.    UNDERSTANDING OF THE DISCLOSURE OF THE ASSERTED PATENT

### A.    U.S. Patent No. 8,549,339

29.    The '339 Patent relates to an arrangement of clock and voltage sources to different groups of processor cores in multi-core processor. '339 Patent (Ex. A), Abstract; 1:61-2:40. Specifically, the specification describes the use of "power management for a multi-core processor" including a "power profile associated with an individual processor core," which may include "one or more power-supply voltages of the core processor, clock rates of the core processor, clock multipliers of the core processor, power throttling of the core processor, and/or sleep state cycles of the core processor." '339 Patent (Ex. A) at 1:58-2:3.

30.    The '339 Patent also explains that prior art multi-core processors required that "[e]ach processor core in a conventional multi-core processor generally shares the same supply voltage and clock signal to simplify the interfaces between the processor cores." *Id.* at 1:7-14. The '339 Patent proposes that each processor core group has an independent power profile powered with a separate supply voltage and that each processor core group obtain a clock output signal from a phase locked loop (PLL) that receives a clock input signal from an "independent clock domain." *Id.* at 2:27-31, 4:1-17, Fig. 3.

31.    This approach is illustrated below in annotated Fig. 3 of the '339 Patent, which depicts three independent clock signals, "the clock signal 1, the clock signal 2, the clock signal 3" (annotated in green), providing independent inputs to "the respective phase lock loops (PLLs)" 1, 2, and 3. *Id.* at 4:1-17, Fig. 3.



**FIG. 3**

32. Consistent with Fig. 3, each asserted independent claim (Claims 1 and 21) of the '339 Patent recites "a first phase lock loop (PLL) having a first clock signal as input" and "a second PLL having a second clock signal as input" wherein "the first clock signal is independent from the second clock signal." *Id.* at Claims 1 and 21.

## VII. DISPUTED TERMS

### A. Term 1: "the first clock signal is independent from the second clock signal"

33. I understand that Qualcomm proposes that this term should be construed as having its plain and ordinary meaning, and Qualcomm explains that the plain and ordinary meaning "requires that the first and second clock signals depend from different reference oscillator clocks." In my opinion, Qualcomm's proposed construction aligns with how a POSITA would understand this term in the context of the claims, the specification, and the prosecution history.

34.     I understand that Redstone also proposes that the term "the first clock signal is independent from the second clock signal" in the asserted independent claims (Claims 1 and 21) should be construed as having its plain and ordinary meaning, but disputes that this plain meaning requires that the first and second clock signals are provided by or processed (i.e., divided or multiplied) from different reference oscillator clocks. Therefore, it appears that Redstone is interpreting the claim language as broad enough to encompass a first and second clock signal that are provided by or processed (i.e., divided or multiplied) from a single common reference oscillator clock.

### 1.     Prior art processors with a single clock source

35.     Computer processors require a clock timing reference to ensure synchronized operation and coordination among its multiple subsystems. These subsystems may include multiple processor cores, memory controllers, and input/output interfaces, all of which rely on the clock to operate in harmony. The clock provides a timing signal that dictates when each core performs computational tasks, accesses memory, or communicates with other components within the processor.

36.     The basic design principles for clocks used in processors, including their generation, distribution, and synchronization, were widely known at the time the '339 Patent was filed and documented in technical resources provided by semiconductor manufacturers. This included technical publications, such as application notes and white papers, that often served as references offering detailed insights into clock design methodologies, challenges, and practical implementation tips. For example, ON Semiconductor's application note AND8248/D provides in-depth discussions on the typical path from a reference oscillator clock source to a consumer of a clock signal. *Stys* (December, 2006) (Ex. B) at 1-4. In particular, the disclosure covers crystal

oscillators and PLLs, and their role in generating reliable and scalable clock signals for microcontrollers and processors. *Stys* (Ex. B) at 1-4.

37. As shown in annotated Fig. 2 below from *Stys*, the basic design begins with a reference oscillator clock source, typically a crystal oscillator (blue), which generates a stable and accurate reference clock signal (red). *Stys* (Ex. B) at 2, Fig. 2.



**Figure 2. Typical Crystal Oscillator Clock**

38. However, there are some limitations with this basic design. The reference clock signal of a standalone crystal oscillator is typically fixed and may not directly meet the wide range of frequency requirements for multi-core processors. This is where a crystal oscillator combined with a PLL provides additional flexibility, as the PLL enables frequency multiplication, division, or fine-tuning to achieve the desired clock frequencies. *Id.* at 1.

39. As shown in annotated Fig. 3 below from *Stys*, the basic PLL design generates precise system clock signals by leveraging an external crystal and a PLL circuit (red). *Id.* at 2-3, Fig. 3. The crystal oscillator (blue) provides the stable reference frequency, which the PLL (red) multiplies or divides to achieve the desired output frequencies. Key components of the PLL, including a gain amplifier, phase frequency detector (PFD), charge pump, low-pass filter (LPF), and voltage-controlled oscillator (VCO), work together in a feedback loop to align the output signal's phase and frequency with the crystal reference.



**Figure 3. Typical PLL Synthesizer Clock**

40.     In addition, *Stys* explains that the basic PLL design may include multiple PLLs, dividers, and multipliers, making PLLs versatile for distributing system clock signals. *Id.* at 2-3, Fig. 3. For instance, one divider/multiplier combination might produce a high-frequency clock for a processor core, while another generates a lower-frequency clock for another processor core. *Id.* In such a design, while the PLL can process (e.g., through multiplying/dividing) the reference clock signal to produce multiple different output clock signals, all resulting clock signals are still dependent on the same/single reference oscillator clock. Accordingly, a POSITA would understand that despite the PLL having multiple output clock signals, those output clock signals are not independent because the PLL design still relies on the same/single reference oscillator clock. In other words, when multiple clock signals originate from the same/single reference oscillator clock (as disclosed in the above references), then those clock signals share a dependency and are thus not independent.

41.     Additionally, patents directed to integrated circuits and computer processors frequently detailed known techniques for clock management, including the design and architectures for clock trees and strategies for optimizing power efficiency. For example, as with the ON Semiconductor's application note AND8248/D, the *Cesky* Patent, assigned to International

Business Machines Corporation, describes a typical prior art phase-locked loop design (shown in red box below) that relies on a single reference oscillator clock source (blue). *Cesky* (filed Feb. 27, 2007) (Ex. C), Fig. 1 (annotated). As shown, the basic phase-locked loop circuit receives a reference clock signal from reference oscillator 102, and includes a phase/frequency detector 104 that generates an error signal that enables adjustments to the VCO's output frequencies to lock in phase and frequency with the reference clock signal. *Id.* at 2:62-3:44. The phase/frequency detector is then coupled to a charge pump 106, a low-pass filter (LPF) 108, and a voltage-controlled oscillator 110. *Id.* at 2:62-3:44, Fig. 1 (annotated).



PRIOR ART

## FIG. 1

42.     The output clock signals are then distributed (e.g., through a "clock tree" distribution as shown above) within a processor to support various functional blocks (including processor cores) for each subsystem. *Id.* at 2:62-3:44, 4:45-47, Figs. 1, 3; *see also Stys* (Ex. B) at 2-4. *Cesky* is consistent with the teachings of ON Semiconductor's application note AND8248/D as well as other prior art references. For example, *Jacobowitz* is a prior art patent discussed during the prosecution of the '339 Patent, which discloses a multi-core processor having a single reference oscillator clock source (112 in Fig. 1) that provides a reference clock signal that is then distributed

to the cores. *Jacobowitz* (filed: Oct. 17, 2007) (Ex. D) at [0025], [0037], [0038], [0040], Figs. 1, 5, 6. Similarly, *Kim* is a prior art patent discussed during the prosecution of the '339 Patent, which discloses a multi-core processor having a single reference oscillator clock source (170 in Fig. 1 and 270 in Fig. 2) that provides a reference clock signal (172 in Fig. 1 and 272 in Fig. 2) that is then processed (i.e., divided or multiplied) to produce different output clock signals for the cores. *Kim* (filed Nov. 28, 2007) (Ex. E) at [0024]-[0025], Figs. 1-2. I discuss both *Jacobowitz* and *Kim* in the following section.

43.     Finally, the '339 Patent specification explains that "a conventional multi-core processor generally **shares the same supply voltage and clock signal** to simplify the interfaces between the processor cores." '339 Patent (Ex. A) at 1:7-14 (emphasis added). For these "same clock signal" processors, a POSITA would understand that the clock signals share a dependency from a single reference oscillator clock, as described above, and thus are not independent.

44.     A simple example serves to illustrate this point.  The below Demonstrative Figure A depicts an exemplary single reference oscillator design.  In Figure A, the single reference oscillator, $Osc_1$, generates a clock with frequency $f_1$.  The clock with frequency $f_1$ is split along two paths, with each path passing through a corresponding divider that serves to alter frequency $f_1$ in the manner depicted—either by dividing by 2 or by 4.  The resulting clock frequencies that are provided to Components 1 and 2 are of the frequences $f_1/2$ and $f_1/4$ respectively.  Because the clock frequencies $f_1/2$ and $f_1/4$ that are provided to Components 1 and 2 originate from and are mathematically  derived from clock frequency $f_1$ of the reference oscillator, clock frequencies $f_1/2$ and $f_1/4$ are not independent.  As a result, for example, when reference oscillator clock frequency $f_1$ increases or decreases, the frequencies of clock signals provided to Components 1 and 2—$f_1/2$

and $f_1/4$—also increase or decrease, as these clock signals are dependent upon the reference oscillator clock, $f_1$.



Figure A

45.      While the above depicts dividers with "input / 2" and "input / 4" for simplicity, the dependence between clock signals provided to Components 1 and 2 would remain even if the dividers were variable.  This is because regardless of the alterations made to the dividers, the output clock frequencies of such a system necessarily remain dependent upon reference oscillator $Osc_1$ and its clock frequency $f_1$.  For example, if $f_1$ were set to 0 Hz, the clock signals provided to Components 1 and 2 would also be 0 Hz regardless of how those signals are scaled using the depicted dividers, even if those dividers were to divide by a different number (e.g., by 3 or by 8), confirming a dependency.

46.      By contrast, Demonstrative Figure B below depicts two reference oscillators, $Osc_1$ that generates a clock with frequency $f_1$, and $Osc_2$ that generates a clock with frequency $f_2$.  Each clock signal is provided to a corresponding component, Components 1 and 2.  However, in contrast with Demonstrative Figure A, in Demonstrative Figure B the frequency output of each of reference oscillators $Osc_1$ and $Osc_2$ is connected with its own corresponding component. As a result, a change in the clock frequency of $Osc_1$ has no impact on the clock frequency provided to Component 2, and a change in the clock frequency of $Osc_2$ has no impact on the clock frequency provided to Component 1.  For this reason, Demonstrative Figure B presents independent clocks.

- 16 -



Figure B

> **2.** ***During prosecution, the applicant added the phrase "the first clock signal is independent from the second clock signal" to distinguish prior art disclosing multiple clock signals sharing a single reference oscillator clock***

47.     During prosecution, the examiner rejected the then-pending claims over multiple prior art references including *Jacobowitz* and *Kim*. *See* Ex. F at 4-9  (Office Action (Aug. 29, 2012)). In response, the applicant conducted an examiner interview and explained that *Jacobowitz* "disclosed using ***a single reference clock***," which was different than FIG. 3 of the '339 Patent where "clock signals 1 through 3 were ***different/independent clock signals*** input to the PLLs." *See* Ex. G at 2 (Examiner Interview (Nov. 27, 2012)) (emphasis added). "The examiner ***agreed*** that Jacobowitz discloses using ***a single reference clock***," but concluded that "the broadest reasonable interpretation of the recited claim language" in the then-pending claims did not exclude such an arrangement." *Id*. "Applicant's representative stated that he would discuss amends [sic] to the claims." *Id.*

48.     Two days later, the applicant filed a response amending the independent claims to add the phrase "the first clock signal is independent from the second clock signal" and pointed to that language to distinguish both *Jacobowitz* and *Kim*. *See* Ex. H at 3, 5-7 (Applicant's Resp. (Nov. 29, 2012)).

49.     The applicant explained that "Jacobowitz does not teach or suggest one or more elements of the amended independent claims 1 and 21… Jacobowitz does not teach or suggest at least the elements of…wherein the first supply voltage is independent from the second supply voltage, and the first clock signal is independent from the second clock signal." *Id.* at 9. In particular, the applicant asserted that "FIG. 6 and all other figures of Jacobowitz clearly show that the microprocessor chip (e.g., 600) receives a system reference oscillator clock frequency (VR) and distributes VR to local oscillators 108." *Id.* Based on Jacobowitz's disclosure of use of a ***single*** "reference oscillator clock frequency (VR)," the applicant asserted that "Jacobowitz fails to disclose or teach . . .  the first clock signal is ***independent*** from the second clock signal, as required in the amended independent claims 1 and 21." *Id.* at 9-10 (emphasis added); *see also id.* at 11 ("As discussed above, neither Jacobowitz nor Kim discloses having sets of processor cores configured to receive multiple and independent clock signals."). Consistent with this argument, a POSITA would understand the plain and ordinary meaning of "independent" as used the '339 Patent and that the added phrase to the amended claims excludes multiple clock signals (e.g., local oscillators 108) that originate from a single common reference oscillator clock (e.g., reference oscillator clock frequency (VR) originating from "reference oscillator 112").

50.     Fig. 1 and 6 from *Jacobowitz* are reproduced below. As shown in annotated Fig. 1 below, *Jacobowitz* discloses a single reference oscillator design that provides a reference clock signal ($V_R$) (red) from the master reference oscillator (112) (blue). This reference clock signal ($V_R$) is then distributed throughout various processor embodiments shown in Figs. 1-6. For example, as shown in annotated Fig. 6 below, the 2nd Level Distribution Function (502) distributes reference clock signal ($V_R$) throughout the processor to two different groups of cores (e.g., group 1 (orange) and group 2 (purple).



51. More specifically, as shown in *Jacobowitz* Fig. 6 above, the processor (600) receives the reference clock signal ($V_R$) from the master reference oscillator (112) and distributes $V_R$ to local oscillators 108 (green). *See Jacobowitz*, at ¶¶ [0037]-[0038]. Each local oscillator (108) then distributes clock signals to cores (102) (orange/purple) in respective groups of cores. Because the clock signals provided to the processor cores all originate from the same/single reference oscillator clock source (112), a POSITA would understand that the distributed clock signals are not "independent" as used in the '339 Patent. This understanding is consistent with the examiner's and applicant's discussion of "independent" clock signals.

52. With respect to the *Kim* reference, the applicant likewise explained that "Kim also fails to disclose or teach a first set of processor cores and second set of processor cores configured to dynamically receive a first output clock signal of a first PLL having a first clock signal as input and a second output clock signal of a second PLL having a second clock signal, respectively. In addition, ***the first clock signal is independent from the second clock signal***." *See* Ex. H at 10 (Applicant's Resp. (Nov. 29, 2012)) (emphasis added); *see also id.* at 11 ("As discussed above, neither Jacobowitz nor Kim discloses having sets of processor cores configured to receive multiple and independent clock signals."). "***Instead,*** Kim discloses the apparatus comprising a multi-core

processor (i.e., 100 in FIG. 1 or 200 in FIG. 2) having **a single clock source** (i.e., 170 in FIG. 1 or

270 in FIG. 2). The clock signal from this single clock source is then **processed (i.e., divided or**

**multiplied)** and provided to each of the cores. *See Kim* at ¶¶ [0024]-[0025] and FIGs 1 - 2." *Id.* at

10-11 (emphasis added). Consistent with this argument, a POSITA would understand the plain and

ordinary meaning of "independent" as used in the '339 Patent and that the phrase added to the

amended claims excludes multiple clock signals "processed (i.e., divided or multiplied)" from a

single clock source (e.g., clock source 170, which may be "a crystal oscillator").

53.     *Kim* Figures 1 and 2 illustrate two different embodiments and are reproduced

below. Each figure includes a single reference oscillator (blue) that provides an input clock signal

(red) to a phased locked loop (PLL) (160 or 260) (green). *See Kim* (Ex. E) at [0024]-[0025]

(explaining that clock source 170 or 270 (blue) may be "a crystal oscillator" that provides an "input

clock frequency" to a "main PLL 160/260" (green)).



54.     Kim further explains that the reference clock signal (provided by the single

reference oscillator clock source) may be further divided by a "main PLL 160 compris[ing]…one

or more frequency dividers (preferably, at least one divider for each core in the multi-core

processor)…such that, a respective reference input clock frequency (indicated by arrows 162, 164, 166 and 168) is provided to each of the cores in the multi-core processor." *Id.* at [0024]; *see also id.* at [0025] (stating that the main PLL "reference numeral 260, which is configured to receive an input clock frequency from a clock source 270, such as, a crystal oscillator (as shown in FIG. 1)…[and] comprises…one or more frequency dividers"). By dividing or multiplying the reference clock signal received by the main PLL (160/260), multiple, different clock signals may be provided to cores within the processor, where each of these clock signals share a common reference oscillator clock source. *See id.* at Fig. 2, [0025] (stating that each additional PLLs "receives an input clock frequency from the main PLL 260 (indicated by respective arrows 262, 264, 266 and 268), which provides a first multiple of the clock frequency provided by the clock source 270").

55.     That is, while *Kim*'s main PLL can divide/multiply the input reference clock signal to produce multiple different clock signals at various frequencies, all clock signals are still dependent on the same/single reference oscillator clock 170/270. Accordingly, a POSITA would understand that *Kim*'s different clock signals (e.g., 162, 164, 166, 168 / 262, 264, 266, 268) are not independent because each still relies on the same/single reference oscillator clock.

56.     In sum, the applicant repeatedly emphasized that regardless of how a reference clock signal reaches the cores (whether provided by or processed (i.e., divided or multiplied) as disclosed in *Jacobowitz* and *Kim*), the added "independent" clock limitation meant that the first clock signal and the second clock signal originated from *different reference oscillator clocks*. *See* Ex. H at 9-11 (Applicant's Resp. (Nov. 29, 2012)). As I explained above, these prosecution statements are consistent with how a POSITA would understand the plain and ordinary meaning of "independent" as used the '339 Patent and that phrase.

57.     Consistent with the applicant's discussion, the prior art, and the discussion above, it is my opinion that term "the first clock signal is independent from the second clock signal" should be construed as having its plain and ordinary meaning, where that meaning "requires that the first and second clock signals depend from different reference oscillator clocks."

**B.     Term 2: "located in a periphery of the multi-core processor"**

58.     I understand that Redstone proposes that the term "located in a periphery of the multi-core processor" should be construed as having its plain and ordinary meaning.

59.     I understand that Qualcomm contends this term is indefinite. In my opinion, a POSITA would not be able to determine with reasonable certainty the scope of the term "located in a periphery of the multi-core processor" within the context of the '339 Patent.

60.     The term "located in a periphery of the multi-core processor" appears in Claim 5 of the '339 Patent, which depends from Claim 1.

61.     For context, Claim 5 of the '339 Patent recites:

5. The multi-core processor of claim 1, wherein the first set of processor cores and the second set of processor cores are configured to receive one or more control signals from one or more control blocks **located in a periphery of the multi-core processor**.

62.     In my opinion, neither the claims, the specification, nor the prosecution history provide guidance sufficient to determine whether a location is "in the periphery of the multi-core processor." Further, as described below in greater detail, while a POSITA understands that there are processors with multiple cores, the POSITA would also recognize that the term "multi-core processor" might refer to multiple things. Thus, there is not a common understanding in the relevant field such that a POSITA could determine with reasonable certainty what constitutes the "periphery" of a "multi-core processor."



'339 Patent, Figure 1 (excerpt)

63.    Figure 1 of the '339 Patent is reproduced above. While the patent describes Figure 1 as depicting "an example configuration of a multi-core processor" (*Id.* at 1:26-27), a POSITA understands that the processor cores in a multi-core processor are contained with a die formed on a semiconductor substate, and that the die contains functional blocks in addition to processor cores, and is typically further packaged in plastic and electrical contacts added. Demonstrative Figure C below depicts this arrangement, with '339 Patent Figure 1's cores manufactured on a die which itself is encased in protective packaging.



Figure C

64.     As noted above, A POSITA understands there is no single understanding of "multi-core processor." In some instances, a POSITA might refer to the multiple individual processor cores (such as processor cores 152, 154, and 156 in Figure 1) as a multi-core processor. In other instances, a POSITA may consider the complete die, containing the processor cores and additional circuitry—for example, PLLs, power amplifiers, memory, and RF components—as a "multi-core processor." Still, a POSITA may also refer to the packaged die as a "multi-core processor." Demonstrative Figure D is an annotated version of Figure C with the border of each such interpretation of multi-core processor highlighted in a different color:



Figure D

65.     The red rectangle in Figure D denotes the boundary of just the processor cores of Figure 1; the blue rectangle denotes the boundary of the die; and the yellow rectangle denotes the boundary of the packaged die. A POSITA would not be reasonably certain, based on the claim language, which if any of the three depicted boundaries should be used to identify the periphery required in dependent Claim 5. For example, the POSITA would not know whether some or all of the components located outside the red boundary but within the blue boundary are within the "periphery." The POSITA would also be unsure whether the "periphery" might refer to everything

outside the red boundary but within the yellow boundary, or whether "periphery" might include, or be limited to, components outside the yellow boundary.

66.     Thus, it is my opinion that a POSITA cannot determine, with reasonable certainty in view of the claims, the meaning of the phrase "located in a periphery of the multi-core processor."

67.     The '339 Patent's specification does not resolve the ambiguity. As described in the patent, "FIG. 1 illustrates an example configuration of a multi-core processor 100…. The multi-core processor 100 may include multiple processor cores 102 arranged in rows and columns in a 2-dimensional array in an integrated circuit." '339 Patent (Ex. A), 2:4-9. "Each row of processors may also be referred to as a 'stripe.' For example, the multi-core processor 100 may be divided into stripes 112, 114, 116, and 118. Each stripe may be associated with an independent power profile." *Id.* at 2:24-27. A POSITA would understand that each stripe of Figure 1 is an example of the set of processor cores from independent Claims 1 and 21.

68.     The specification further describes control blocks located "at two different sides of the multi-core processor 100 as shown in FIG. 1," "at the same side of the multi-core processor 100," or "in a common area located near the center of the multi-core processor 100." *Id.* at 2:31-40. However, it is unclear whether or not any of these described locations are considered "in a periphery" of the claimed multi-core processor. This lack of clarity is further underscored by the labeling (in the upper left of the figure) of the *entirety* of Figure 1 as a multi-core processor. *Id.* at 2:4-5. This leaves it unclear whether "periphery of the multi-core processor" might be limited to regions *inside* the multi-core processor within some unspecified distance of the boundary of the multi-core processor, however that boundary might be defined, or whether "periphery of the multi-

core processor" also includes components outside the multi-core processor but within some unspecified distance of its boundary.

69. The description in the specification of the components depicted in Figure 1 as a "multi-core processor" (*id.*) does not resolve the ambiguity. Although the '339 Patent depicts multiple processor cores as physically arranged adjacent each other in rows and columns, neither of independent Claims 1 and 21 nor dependent Claim 5 require the first and second sets to be arranged in adjacent rows, columns, or a grid. A POSITA would understand that that the processor cores of a multi-core processor need not be located immediately adjacent to one another in the manner depicted in the patent's Figure 1. Rather, the first set of processor cores and the second set of processor cores of the claims could be spaced apart on the semiconductor die, as depicted in Demonstrative Figure E.



Figure E

70. Figure E modifies Figure 1 from the patent such that each of the stripes is spaced apart on the die, and the voltage and control blocks are omitted. If one views the collection of processor cores alone as the "multi-core processor" of the claims, with the stripes of Figure 1

arranged in the manner depicted in Figure E, a POSITA would not understand with reasonable certainty what constitutes the periphery of such a multi-core processor.

71.     Even under a view that the "multi-core processor" of the claims requires not just the multiple cores, but also an interface block, that does not resolve the ambiguities that prevent a POSITA from identifying with reasonable certainty the periphery of the multi-core processor.  For example, Demonstrative Figure F depicts a processor with multiple cores, an interface block, and connecting circuitry, with the subsets of processor cores 154 and 156 as the claimed first and second sets of processor cores; the depicted component placement would not be unusual due to the need to use some of the real estate on the chip for functionalities other than processor cores.



Figure F

72.     But, even with the added interface block and the circuitry connecting it to the two depicted sets of cores, a periphery cannot be ascertained with reasonable certainty.  For example, in Demonstrative Figure G, Figure F is annotated to depict three different potential "peripheries" in yellow, red, and blue, though there are clearly more possible "peripheries" that are not shown. The yellow "periphery" is a boundary immediately adjacent each of the sets of cores and the

interface block, is comprised of three different boundaries, and excludes the circuitry connecting the sets of cores to the interface block. The red "periphery" is a single boundary that is immediately adjacent each set of cores, the interface block, and the connecting circuitry. And the blue "periphery" loosely surrounds all the components and the portions of the die that lie between them. The specification provides no guidance to a POSITA which if any of these potential peripheries— or if a boundary not shown in the figure at all—is the periphery of Claim 5, much less whether a control block located at any of the green reference points A, B, or C is "in" said periphery. Indeed, the sole reference to "periphery" in the specification provides no more detail that what is already in the claim itself: "A power profile associated with an individual processor core may be controlled through signals that may be received from control blocks that are located in the periphery of the multi-core processor." '339 Patent (Ex. A) at 1:62-65.



Figure G

73.     Thus, it is my opinion that a POSITA cannot determine, with reasonable certainty in view of the claims and the specification, the scope of the phrase "located in a periphery of the multi-core processor."

**C. Term 3: "located in a common region that is substantially central to the first set of processor cores and the second set of processor cores"**

74. I understand that Redstone proposes that the term "located in a common region that is substantially central to the first set of processor cores and the second set of processor cores" should be construed as having its plain and ordinary meaning.

75. I understand that Qualcomm contends this term is indefinite within the context of the '339 Patent. In my opinion, a POSITA would not be able to determine with reasonable certainty the scope of the term "located in a common region that is substantially central to the first set of processor cores and the second set of processor cores" within the context of the '339 Patent.

76. The term "located in a common region that is substantially central to the first set of processor cores and the second set of processor cores" appears in Claim 14 of the '339 Patent, which depends from Claim 1.

77. For context, Claim 14 of the '339 Patent recites:

14. The multi-core processor of claim 1, wherein the first set of processor cores and the second set of processor cores are configured to receive one or more control signals from one or more control blocks **located in a common region that is substantially central to the first set of processor cores and the second set of processor cores**.

78. In my opinion, neither the claims, the specification, nor the prosecution history provide guidance on how to determine whether a region is "common" or whether a region is "substantially central" to the processor cores. Further, neither "located in a common region" nor "substantially central" have a common understanding in the relevant field such that a POSITA could determine with reasonably certainty what constitutes components "located in a common region" or whether such components are "substantially central" to the first and second sets of processor cores.

79.     In my opinion, the claim language provides no clarity as to what constitutes a common region. Claim 14 recites, in part, "the first set of processor cores and the second set of processor cores are configured to receive one or more control signals from one or more control blocks located in a common region." Thus, the claim requires that the "common region" is a "region" of processor cores that is "common" to both the first set of processor cores and the second set of processor cores and that further contains one more control blocks.

80.     But this still leaves significant ambiguity. Among other challenges, identifying a "common region" first requires identifying what the patentee means by "region"—a term that, as used herein, compounds rather than resolves ambiguity. The lack of clarity is further underscored by the language of Claim 8, which like Claim 14 depends directly (without any intervening dependent claims) from Claim 1. Claim 8 describes the processor cores as located in a "region." Specifically, Claim 8 states "the first set of processor cores are located in a first region of the multi-core processor, and the second set of processor cores are located in a second region of the multi-core processor."

81.     But, the disclosure of regions containing the first and second sets of processor cores in Claim 8 would not provide a POSITA with reasonable certainty regarding what delineates a region or what it means for such a "region" to be "common" between the first and second sets of processor cores. Absent further guidance, one interpretation of "common" in this context would be regions that overlap each other. But "overlapping" regions are explicitly claimed in Claim 9, which depends from Claim 8 and states, in part, "wherein the first region and the second region are overlapping regions." A POSITA would note that the patentee, by using "overlapping" in Claim 8 and "common" in Claim 14, distinguished between "overlap" and "common," though the nature of such a distinction is never made clear.

82.     In my opinion, the specification does not resolve the lack of clarity regarding "common region." The phrase "common region" is never used in the patent's specification. While the specification does use the phrase "common area," that use is within the context of control blocks being in the same area, as opposed to a region that is "common" to the first and second sets of processor cores, as the claim requires. Specifically, the specification states "[i]n yet some other implementations, the power control block 108 and the clock control block 110 may be arranged in a common area located near the center of the multi-core processor 100." *Id.* at 2:37-40. A POSITA would not understand the "common region" language of Claim 14 to refer to the "common area" of the specification because the cited portion of the specification refers to <u>two</u> control blocks—the power and clock control blocks—as being located in the same area. Such a scenario is not co-extensive with Claim 14, which requires that "<u>one</u> or more control blocks [be] located in a common region that is substantially central to" the first and second sets of processor cores. The patent thus leaves unclear how a region with only one control block could be deemed to have another control block in "common." As such, neither the specification nor the claims provides reasonable certainty as to the scope of a "common region."

83.     In my opinion, another source of ambiguity is the Claim 14 phrase "substantially central."

84.     Neither the claims nor the specification inform a POSITA as to the scope of the phrase "substantially central," nor what it means for a "common region" to be "substantially central" to the first and second sets of processor cores. Indeed, the phrase "substantially central" is never used in the specification.

85.     Claim 14 requires that the region containing "one or more control blocks" is substantially central to the multiple sets of processor cores. An example of control blocks is shown

in Demonstrative Figure H. In this image, the clock control block and the power control block are relatively equidistant from each of the sets of processor cores. Furthermore, the clock control block and the power control block are not immediately adjacent to any set of processor cores. Given this placement of processor cores, the POSITA would not know whether the clock control block and the power control block are "substantially central" (on the basis of being placed in the middle of the figure), or not "substantially central" (on the basis of the separation between the control blocks and processor cores to the first and second sets of processor cores).



Figure H

86.     As substantially central is a term of degree, a POSITA understands that establishing the claim scope requires identifying a position of the control blocks that either would, or would not, be deemed substantially central to the sets of processor cores. To illustrate, Figure H is simplified in Demonstrative Figure I to include only two stripes from Figure 1, *i.e.*, first and second sets of cores, consistent with the asserted claims.



Figure I

87.     The clock control block and the power control block in Figure I are located at the horizontal midpoint between the first and second sets of processor cores, but the control blocks lie in a different vertical position than the sets of processor cores. A POSITA would not understand (a) whether the control blocks in Figure I are substantially central to the sets of processor cores because they are at the horizontal midpoint between the sets of processor cores, or (b) whether the control blocks in Figure I are not substantially central because they are below and in a different vertical plane from the sets of processor cores.

88.     Thus, it is my opinion that a POSITA cannot determine, with reasonable certainty in view of the specification, the claims, and the prosecution history, the bounds of the term "located in a common region that is substantially central to the first set of processor cores and the second set of processor cores."

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed on the __4th__ day of __April__ 2025 in __Houston, TX_____.

By: _John Villasenor_____

Dr. John Villasenor

**APPENDIX 1**

# John D. Villasenor

## Education

| | |
|---|---|
| **1986 – 1989** | **Stanford University**<br>Ph.D. in Electrical Engineering |
| **1985 – 1986** | **Stanford University**<br>M.S. in Electrical Engineering |
| **1982 – 1985** | **University of Virginia**<br>B.S. in Electrical Engineering |

## Appointments

**Since 1992**    **University of California, Los Angeles**    **Los Angeles, CA**

*Current Position: Professor of Electrical Engineering, Law, Public Policy, and Management; Founder and Faculty Co-Director, Institute for Technology, Law, and Policy*

Focus on innovative communications, networking, security, artificial intelligence, signal and image processing, and computing technologies and their broader implications. Have taught classes in the UCLA schools of engineering, law, public affairs, and management. See http://johnvillasenor.com for more information, including publications.

**Since 2011**    **The Brookings Institution**    **Washington, DC**

*Nonresident Senior Fellow, Governance Studies Program*

Examining a broad range of issues at the intersection of technology, policy, and law, generally related to the topics listed above. See https://www.brookings.edu/experts/john-villasenor/.

**2014-2023**    **Stanford University**    **Stanford, CA**

*The Hoover Institution: National Fellow (2014-2016), Visiting Fellow (2016-2018), Senior Fellow (2018-2023).*

**1990 – 1992**    **Jet Propulsion Laboratory**    **Pasadena, CA**

Developed new techniques for imaging and mapping the earth from space.

## Other Professional Activities

- Member, Council on Foreign Relations
- Have provided congressional testimony approximately half a dozen times (before the Senate Judiciary Committee, House Judiciary Committee, the Senate Commerce Committee, and the House Energy and Commerce Committee). See http://johnvillasenor.com/publications/congressional-testimony/.
- Have contributed to international standards organizations and industry consortia for the development of new communications standards.
- Served as Vice Chair of the International Center for Missing and Exploited Children's Digital Economy Task Force. See https://tmsnrt.rs/4cKAdp6.

- Developed and implemented an online training program covering patents, copyright, trademarks, and trade secrets. The program was adopted and implemented by the University of California system.

## Patents

- Approximately 20 issued U.S. patents in areas including communications, information processing, and cybersecurity.

## Publications

- Approximately 200 academic publications in technology and law journals (see below; see also http://johnvillasenor.com). "H-index" of 53 (as of 2024). Articles and commentary also published in broader interest venues including the *Atlantic*, *Billboard*, the *Chronicle of Higher Education*, *Fast Company*, *Forbes*, the *Huffington Post*, the *Los Angeles Times*, the *New York Times*, *Scientific American*, *Slate*, and the *Washington Post*.

Note: In the list below, engineering papers are listed first, followed by law publications.

Technical Papers Published in Academic Journals; Book Chapters

1. Jason Jaskolka and John Villasenor, "An approach for identifying and analyzing implicit interactions in distributed systems," IEEE Transactions on Reliability, Vol. 66, No. 2, pp. 529-546, June 2017.

2. John Villasenor, "A probabilistic framework for modelling false Title IX 'convictions' under the preponderance of the evidence standard," Law, Probability and Risk, Vol.15, No. 5, pp. 223-237, December 2016.

3. Lok-Won Kim and John Villasenor, "Dynamic function verification for system-on-chip security against hardware-based attacks," IEEE Transactions on Reliability, Vol. 64, No. 4, pp. 1229-1242, November 2015.

4. Jerry Lien, Laura Hughes, Jorge Kina, and John Villasenor, "Mobile money solutions for a smartphone-dominated world," Journal of Payments Strategy & Systems, Vol. 9, No. 3, pp. 341-350, Fall, 2015. Available at SSRN: http://ssrn.com/abstract=2632372

5. Lok-Won Kim and John Villasenor, "Automated iterative pipelining for ASIC design," ACM Transactions on Design Automation of Electronic Systems, Vol. 20, No. 2, February 2015.

6. Lok-Won Kim and John Villasenor, "Dynamic function replacement for system-on-chip security in the presence of hardware-based attacks," IEEE Transactions on Reliability, Vol. 63, No. 2, pp. 661-675, June 2014.

7. Przemyslaw Pawelczak, Shaunak Joshi, Sateesh Addepalli, John Villasenor, Danijela Cabric, "Impact of the connection admission process on the direct retry load balancing algorithm in cellular networks," IEEE Transactions on Mobile Computing, Vol. 12, No. 9, pp. 1681-1696, September 2013.

8. Jianwen Chen, Jason Cong, Luminita A. Vese, John Villasenor, Ming Yan, and Yi Zou, "A hybrid architecture for compressive sensing 3D CT reconstruction," IEEE Journal on Emerging and Selected

Topics in Circuits and Systems, Special Issue: Circuits, Systems and Algorithms for Compressive Sensing, Vol. 2, No. 3, pp. 616-625, Oct. 2012.

9. Jianwen Chen, Jianhua Zheng, Feng Xu, and John Villasenor, "Adaptive frequency weighting for high-performance video coding," IEEE Transactions on Circuits and Systems for Video Technology, Vol. 22, No. 7, pp. 1027-1036, July 2012.

10. W. Hu, J. Wen, W. Wu, Y. Han, S. Yang, and J. Villasenor, "Highly scalable parallel arithmetic coding on muti-core processors using LDPC codes," IEEE Transactions on Communications, Vol. 60, No. 2, pp. 289-194, February 2012.

11. J. Chen, F. Xu, Y. He, J. Villasenor, Y. Han, Y. Xu, Y. Rong, C. Reader, and J. Wen, "Efficient video coding using legacy algorithmic approaches," IEEE Transactions on Multimedia, Vol. 14, No. 1, pp. 111-120, February, 2012.

12. D. Lee, L. Kim, and J. Villasenor, "Precision-aware, self-quantizing hardware architectures for the discrete wavelet transform," IEEE Transactions on Image Processing, Vol. 21, No. 2, pages 768-777, February 2012.

13. L.W. Kim and J.D. Villasenor, "A system-on-chip bus architecture for thwarting integrated circuit Trojan horses," IEEE Transactions on VLSI Systems, vol. 19, no. 10, pp. 1921-1926, October 2011.

14. Y. Han, J. Wen, D. Cabric and J. Villasenor, "Using a vector of observations to identify the number of frequency-hopping transmitters," IEEE Communications Letters, vol. 15, no. 3, pp. 299-301, March 2011.

15. D. Lee, H, Kim, M. Rahimi, D. Estrin, and J.D. Villasenor, "Energy-efficient image compression for resource-constrained platforms," IEEE Transactions on Image Processing, vol. 18. no. 9, pp. 2100-2113, September 2009.

16. D. Lee, R.C.C. Cheung, W. Luk, and J.D. Villasenor, "Hierarchical segmentation for hardware function evaluation," IEEE Transactions on VLSI Systems, vol. 17, No. 1, pp. 103-116, January 2009.

17. D. Lee and J.D. Villasenor, "Optimized custom precision function evaluation for embedded processors," IEEE Transactions on Computers, vol. 58, no. 1, pp. 46-59, January 2009.

18. H. Kim, M. Rahimi, D. Lee, D. Estrin, and J.D. Villasenor, "Energy-aware high resolution image acquisition via heterogeneous image sensors," IEEE Journal of Selected Topics in Signal Processing, vol. 2, no. 4, pp. 526-537, August 2008.

19. H. Kim, D. Lee, and J.D. Villasenor, "Design tradeoffs and hardware architecture for real-time iterative MIMO detection using sphere decoding and LDPC coding," IEEE Journal on Selected Areas in Communications, vol. 26, no. 6, pp. 1003-1014, August 2008.

20. D. Choi, K. Choi, and J.D. Villasenor, "New non-volatile memory structures for FPGA architectures," IEEE Transactions on VLSI Systems, vol. 16, no. 7, pp. 874-881, July 2008.

21. H. Kim and J.D. Villasenor, "Secure MIMO communications in a system with equal numbers of transmit and receive antennas," IEEE Communications Letters, vol. 12, no. 5, pp. 386-388, May 2008.

22. D. Lee, H. Kim, C. Jones, and J.D. Villasenor, "Pilotless frame synchronization for LDPC-coded transmission systems," IEEE Transactions on Signal Processing, vol. 56, No. 7, pp. 2865 - 2874, July 2008.

23. D. Lee, R.C.C. Cheung, J.D. Villasenor, and W. Luk, "Hardware implementation tradeoffs of polynomial approximations and interpolations," IEEE Transactions on Computers, vol. 57, no. 5, pp. 686-701, May 2008.

24. D.B. Thomas, W. Luk, P.H.W. Leong, and J.D. Villasenor, "Gaussian random number generators," ACM Computing Surveys, vol. 39, issue 4, article 11, October 2007.

25. D. Lee, H. Kim, C.R. Jones, and J.D. Villasenor, "Pilotless frame synchronization via LDPC code constraint feedback," IEEE Communications Letters, vol. 11, no. 8, pp. 683-685, August 2007.

26. R.C.C. Cheung, D. Lee, W. Luk, and J.D. Villasenor, "Hardware generation of arbitrary random number distributions from uniform distributions via the inversion method," IEEE Transactions on VLSI Systems, vol. 15, no. 8, pp. 952-962, August 2007.

27. H. Kim, J. Wen, and J.D. Villasenor, "Secure arithmetic coding," IEEE Transactions on Signal Processing, vol. 55, no. 5, pp. 2263 - 2272, May 2007.

28. D. Lee, R.C.C. Cheung, and J.D. Villasenor, "A flexible architecture for precise gamma correction," IEEE Transactions on VLSI Systems, vol. 15, no. 4, pp. 474-479, April 2007.

29. D. Lee and J.D. Villasenor, "A bit-width optimization methodology for polynomial-based function evaluation," IEEE Transactions on Computers, vol. 56, no. 4, pp. 567-571, April 2007.

30. C. Jones, T. Tian, J.D. Villasenor, and R. Wesel, "The universal operation of LDPC codes over scalar fading channels," IEEE Transactions on Communications, vol. 55, no. 1, pp.122-132, January 2007.

31. M.D. Smith and J. Villasenor, "JPEG-2000 rate control for digital cinema," SMPTE Motion Imaging Journal, vol. 115, no. 10, pp. 394-399, October 2006.

32. D. Lee, J.D. Villasenor, W. Luk and P.H.W. Leong, "A hardware Gaussian noise generator using the Box-Muller method and its error analysis," IEEE Transactions on Computers, vol. 55, no. 6, pp. 659-671, June 2006.

33. D. Lee, E.L. Valles, J.D. Villasenor and C.R. Jones, "Joint LDPC decoding and timing recovery using code constraint feedback," IEEE Communications Letters, vol. 10, no. 3, pp. 189-191, March 2006.

34. J. Wen, H. Kim and J.D. Villasenor, "Binary arithmetic coding with key-based interval splitting," IEEE Signal Processing Letters, vol. 13, No. 2, pp. 69-72, February 2006.

35. William J. Kaiser, Gregory J. Pottie, Mani Srivastava, Gaurav S. Sukhatme, John Villasenor, and Deborah Estrin, Networked infomechanical systems (NIMS) for ambient intelligence. Weber W, Rabaey JM, eds. Ambient Intelligence (Springer, Berlin), 83–113, 2005.

36. D. Lee, W. Luk, J.D. Villasenor, G. Zhang and P.H.W. Leong, "A hardware Gaussian noise generator using the Wallace method," IEEE Transactions on VLSI Systems, vol. 13, no. 8, pp. 911-920, August 2005.

37. P.H.W. Leong, G. Zhang, D. Lee, W. Luk and J.D. Villasenor, "A comment on the implementation of the ziggurat method," Journal of Statistical Software, vol. 12, no. 7, February 2005.

38. D. Lee, W. Luk, J.D. Villasenor and P.Y.K Cheung, "A Gaussian noise generator for hardware-based simulations," IEEE Transactions on Computers, vol. 53, no. 12, pp. 1523-1534, December 2004.

39. D. Lee, W. Luk, J.D. Villasenor and P.Y.K Cheung, "The effects of polynomial degrees on the hierarchical segmentation method," in New Algorithms, Architectures, and Applications for Reconfigurable Computing, Chapter 24, W. Rosenstiel and P. Lysaght (Eds.), Springer-Verlag, December 2004.

40. T. Tian, C. Jones, J.D. Villasenor, and R. Wesel, "Selective avoidance of cycles in irregular LDPC code construction," IEEE Transactions on Communications, vol. 52, no. 8, pp. 1242-1247, August 2004.

41. "Networked Infomechanical Systems (NIMS) for Ambient Intelligence", CENS Technical Report 31, December 2003 (PDF File). Ambient Intelligence, J. Rabaey et. Al., 2004

42. K. Lakovic, J. Villasenor, "An algorithm for construction of efficient fix-free codes," IEEE Communication Letters, vol. 7, no. 8, pp. 391-393, August 2003.

43. J. Garcia-Frias, J.D. Villasenor, "Combined turbo detection and decoding for unknown ISI channels", IEEE Transactions on Communications, vol. 51, no. 1, pp. 79-85, January 2003.

44. K. Lakovic, J. Villasenor, "On the design of error-correcting reversible variable length codes," IEEE Communication Letters, vol. 6, no. 8, pp. 337-339, August 2002.

45. Jiangtao Wen and J.D. Villasenor, "Soft-input soft-output decoding of variable length codes," IEEE Transactions on Communications, vol. 50, No. 5, pp. 689-692, May 2002.

46. J. Garcia-Frias and J.D. Villasenor, "Turbo decoding of Gilbert-Elliot channels," IEEE Transactions on Communications, vol. 50, no.3, pp. 357-363, March 2002.

47. J. Garcia-Frias and J.D. Villasenor, "Joint turbo decoding and estimation of hidden Markov sources," IEEE Journal on Selected Areas in Communications, vol. 19, no. 9, pp. 1671-1679, September 2001.

48. S. Saha, M. Jamtgaard and J.D. Villasenor, "Bringing the wireless internet to mobile devices," Computer, vol. 34, no.6, pp.54-58, June 2001.

49. D. Lau, A. Schneider, M.D. Ercegovac and J.D. Villasenor "An FPGA-based library for on-line signal processing," Journal of VLSI Signal Processing Systems for Signal, Image, and Video Technology, vol. 28, no. 1-2, pp. 129-143, May-June 2000.

50. J. Wen, M.Luttrell and J.D Villasenor, "Trellis-based R-D optimal quantization in H.263+," IEEE Transactions on Image Processing, vol. 9, no. 8, pp. 1431-1434, Aug. 2000.

51. J.Y. Liao and J.D. Villasenor, "Adaptive intra block update for robust transmission of H.263," IEEE Transactions on Circuits and Systems for Video Technology, vol. 10, no. 1, pp. 30-35, February 2000.

52. J.D. Villasenor, Y.Q. Zhang, and J. Wen, "Robust video coding algorithms and systems," Proceedings of the IEEE, vol. 87, no. 10, pp. 1724-1733, October 1999.

53. J. Wen and J.D. Villasenor, "Structured prefix codes for quantized low-shape-parameters generalized Gaussian sources," IEEE Transactions on Information Theory, vol. 45, no. 4, pp. 1307-1314, May 1999.

54. J. Garcia-Frias and J.D. Villasenor, "Turbo decoders for Markov channels," IEEE Communications Letters, vol. 2, no. 9, pp. 257-259, September 1998.

55. John Villasenor and Brad Hutchings, "The flexibility of configurable computing," IEEE Signal Processing Magazine, vol. 15, no. 5, pp. 67-84, September 1998.

56. Kang-Ngee Chia, Hea Joung Kim, Shane Lansing, William Mangione-Smith, and John Villasenor, "High-performance automatic target recognition through data-specific VLSI," IEEE Transactions on Very Large Scale Integration Systems, vol. 6, no. 3, pp. 364-371, September 1998.

57. Niko Faerber, Bernd Girod, and John Villasenor, "Extensions of ITU-T Recommendation H.324 for error-resilient video transmission," IEEE Communications Magazine, vol. 36, pp. 120-128, June 1998.

58. B. Belzer and J.D. Villasenor, "Symmetric trellis coded vector quantization," IEEE Transactions on Communications, vol. 45, no. 11, pp. 1354-1357, November 1997.

59. A. Watson, G. Yang, J. Solomon, and J.D. Villasenor, "Visibility of wavelet quantization noise," IEEE Transactions on Image Processing, vol. 6, no.8, pp 1164-1175, August 1997.

60. J. Garcia-Frias and J.D. Villasenor, "Combining hidden Markov source models and parallel concatenated codes," IEEE Communications Letters, vol. 1, no. 4, pp. 111-113, July 1997.

61. A. Lientz and J.D. Villasenor, "Very low variable rate convolutional codes for unequal error protection in DS-CDMA systems," IEEE Transactions on Communications, vol. 45, no. 7, pp. 753-755, July 1997.

62. John Villasenor and William H. Mangione-Smith, "Configurable computing," Scientific American, pp. 66-71, June 1997. (Strictly speaking, this publication is not in a traditional academic journal. However, I am including it here because it is technical in nature and has been very widely cited in the academic literature.)

63. F. Chen, Z. Gao, and J.D. Villasenor, "Lattice Vector quantization of Generalized gaussian sources," IEEE Transactions on Information Theory, vol. 43, pp. 92-103, January 1997.

64. M.J. Tsai, J.D. Villasenor, and F. Chen, "Stack-run image coding," IEEE Transactions on Circuits and Systems for Video Technology, vol. 6, pp. 519-521, October 1996.

65. A. Alwan, R. Bagrodia, N. Bamos, M. Gerla, L. Kleinrock, J. Short, J.D Villasenor, "Adaptive mobile multimedia networks," IEEE Personal Communications, vol. 3, no. 2, pp. 34-51, April 1996.

66. J.D. Villasenor, C. Jones, and B. Schoner, "Video communications using rapidly reconfigurable hardware," IEEE Transactions on Circuits and Systems for Video Technology, vol. 5, pp. 565-567, December 1995.

67. Z. Gao, F. Chen, B. Belzer, and J.D. Villasenor, "A comparison of the Z, E8, and Leech lattices for quantization of low-shape-parameter generalized Gaussian sources," IEEE Signal Processing Letters, vol. 2, pp. 197-199, October 1995.

68. J.D. Villasenor, B. Belzer, J. Liao, "Wavelet filter evaluation for image compression," IEEE Transactions on Image Processing, vol. 4, no. 8, pp. 1053-1060, August 1995.

69. J.D. Villasenor, Tomographic image compression using multidimensional transforms," The Journal of Information Processing and Management, vol. 30, no. 8 pp. 817-824, November 1994.

70. J.D. Villasenor, "Optical Hartley transforms," Proceedings of the IEEE, vol. 82, no. 3, pp. 391-399, March 1994.

71. A. Freeman, J.D. Villasenor, J.D. Klein, P. Hoogeboom, and J. Groot, "On the use of multi-frequency and polarimetric radar backscatter features for classification of agricultural crops," International Journal of Remote Sensing, vol. 15, no. 9, pp. 1799-1812, 1994.

72. J.D. Villasenor, "Alternatives to the Discrete Cosine Transform for irreversible tomographic image compression," IEEE Transactions on Medical Imaging, vol. 12, no. 4, pp. 803-812, December 1993.

73. H.A. Zebker and J.D. Villasenor, "Decorrelation in interferometric radar echoes," IEEE Transactions on Geoscience and Remote Sensing, vol. 30, no. 5, pp. 950-959, September 1992.

74. John Villasenor and Alain Vincent, "An algorithm for space recognition and time tracking of vorticity tubes in turbulence," CVGIP: Image Understanding, vol. 55, No. 1, pp. 27-25, January 1992.

75. John Villasenor and Oscar Buneman, "Rigorous charge conservation for local electromagnetic field solvers," Computer Physics Communications, vol. 69, no. 2, pp. 306-316, March 1992.

76. S.C. Pei, S.B Jaw, J.D. Villasenor, and R.N. Bracewell, "Comment on 'Vector Hartley transform'," Electronics Letters, vol. 26, no. 2, pp. 94-95, January 1990.

77. R.N. Bracewell and J.D. Villasenor, "Fraunhofer diffraction by a spiral slit," Journal of the Optical Society of America, vol. 7, no. 1, pp. 21-25, 1990.

78. J.D. Villasenor and R.N. Bracewell, "Lensless microwave imaging using the Hartley transform," Nature, vol. 335, pp. 617-619, October 1988.

79. John Villasenor, "Two-dimensional optical Hartley transforms in the presence of errors," Applied Optics, vol. 28, no. 13, pp. 2671-2676, 1989.

80. J.D. Villasenor and R.N. Bracewell, "Vector Hartley transform," Electronics Letters, vol. 25, no. 17, pp. 1110-1111, August 1989.

81. John Villasenor and R.N. Bracewell, "Optical phase obtained by analogue Hartley transformation," Nature, vol. 330, pp. 735-737, December 1987.

82. R.N. Bracewell, O. Buneman, H. Hao, and J.D Villasenor, "Fast two-dimensional Hartley transform," Proceedings of the IEEE, vol. 74, no. 9, pp. 1282-1283, September 1986.

Technical Conference Papers

83. Pratyush Garg, John Villasenor & Virginia Foggo, "Fairness Metrics: A Comparative Analysis," Proceedings of the IEEE International Conference on Big Data, December 2020.

84. Jason Jaskolka and John Villasenor, "Identifying Implicit Component Interactions in Distributed Cyber-Physical Systems," Proceedings of HICSS-50 (Hawaii International Conference on System Sciences), Honolulu, HI, Jan. 2017.

85. Jianwen Chen, Feng Xu, John Villasenor, Tao Fan, Haiwu Zhao, Guozhong Wang, "An adaptive covariance-based edge diffusion image enlargement method," Proceedings of the Visual Communications and Image Processing (VCIP) 2012, San Diego, CA, Nov. 2012.

86. J. Villasenor, Y. Han, D. Wen, E. Gonzalez, and J. Chen, "The information rate of modern speech and its implications for language evolution," Proceedings of the Ninth Evolution of Language Conference (Evolang), Kyoto, Japan, pp. 376-383, March 2012.

87. P. Monajemi, R. Sahasrabudhe, and J. Villasenor, "Scheduling in heterogeneous cellular networks with mobility," 2012 Information Theory and Applications Workshop, San Diego, February 2012.

88. M. Yan, J. Chen, L. A. Vese, J. Villasenor, A. Bui and J. Cong, "EM+TV based reconstruction for cone-beam CT with reduced radiation," Proceedings of the 7th International Symposium on Visual Computing (ISVC), Part I, LNCS 6938, pp. 1-10, Las Vegas, Nevada, Sept. 2011.

89. Jianwen Chen, Ming Yan, Luminita Vese, John Villasenor, Alex Bui, and Jason Cong, "EM-TV for reconstruction of cone-beam CT with curved Detectors using GPU," Proceedings of the Fully Three-Dimensional Image Reconstruction in Radiology and Nuclear Medicine Conference, pp. 363-366, July, 2011.

90. Xinyu Zhang, Zhuoyuan Chen, Jiangtao Wen, Jianwei Ma, Yuxing Han and John Villasenor, "A compressive sensing reconstruction algorithm for trinary and binary sparse signals using pre-mapping," Proceedings of the 2011 IEEE Data Compression Conference (DCC), March, 2011.

91. Xinyu Zhang, Jiangtao Wen, Yuxing Han and John Villasenor, "An improved compressive sensing reconstruction algorithm using linear/non-linear mapping," Proceedings of the Information Theory and Application Workshop (ITA), San Diego, February, 2011.

92. Esteban Valles, Richard Wesel, John Villasenor, Christopher Jones, and Marvin Simon, "Pilotless carrier phase-synchronization via LDPC code feedback," Proceedings of Milcom 2010, October 2010.

93. Shaunak Joshi, Przemyslaw Pawelczak, Sateesh Addepalli, John Villasenor, and Danijela Cabric, "Connection Admission Versus Load Balancing," Proceedings of IEEE Globecom 2010, Miami, December 2010.

94. Y. K. Jang and J. Villasenor, "SINR improvement through reconfigurable antenna adaptation to handheld device orientation," Proceedings of the IEEE AP-S International Symposium, Toronto, Canada, July 2010.

95. Yuxing Han, Jiangtao Wen, Danijela Cabric, Sateesh Addepalli, John Villasenor, "A probabilistic approach to identifying the number of transmitters in the presence of mis-detection," Proceedings of the 2010 IEEE Int. Conference on Communications (ICC), Cape Town, South Africa, June 2010.

96. Jiangtao Wen, Zhuoyuan Chen, Yuxing Han, John Villasenor, and Shiqiang Yang, "Reconstruction of sparse binary signals using compressive sensing," Proceedings of the 2010 IEEE Data Compression Conference, March, 2010.

97. Zhuoyuan Chen, Jiangtao Wen, Yuxing Han, John Villasenor, and Shiqiang Yang, "Image compression using the DCT and noiselets: a new algorithm and its rate distortion performance," Proceedings of the 2010 IEEE Data Compression Conference, March, 2010.

98. Zhuoyuan Chen, Jiangtao Wen, Yuxing Han, John Villasenor, Shiqiang Yang, "A compressive sensing image compression algorithm using quantized DCT and noiselet information," Proceedings of IEEE ICASSP 2010, Dallas, March 2010.

99. Yuxing Han, Shaunak Joshi, Lillian Dai, Danijela Cabric, Sateesh Addepalli, Jiangtao Wen and John Villasenor, "A Probabilistic Approach to Identifying the Number of Frequency Hoppers for Spectrum Sensing," Proceedings of Globecom 2009, Dec. 2009.

100. Shaunak Joshi, Ray C.C. Cheung, Pooya Monajemi, and John Villasenor, "Traffic-based study of femtocell access policy impacts on HSPA service quality," Proceedings of Globecom 2009, Dec. 2009.

101. Lok-Won Kim, John D. Villasenor and Cetin K. Koc, "A Trojan-resistant system-on-chip bus architecture," Proceedings of IEEE Military Communication (MILCOM) 2009, Boston, Oct. 2009.

102. Alican Gok, Shaunak Joshi, John Villasenor and Danijela Cabric, "Estimating the Number of Bluetooth Transmitters Using Spectral Sensing With Time and Frequency Offset Measurements," Proceedings of IEEE Military Communication (MILCOM) 2009, Boston, Oct. 2009.

103. Ray C.C. Cheung, C.K. Koc, and John Villasenor, "An efficient hardware architecture for spectral hash algorithm," Proceedings of the IEEE International Conference on Application-specific Systems, Architectures and Processors (ASAP), Boston, July 7 -9, 2009.

104. K. Soroushian, S. Priyadarshi, and J. Villasenor, "H.264 parameter optimizations for internet based distribution of high quality video," Proceedings of the SMPTE 2008 Annual Technical Converence, October 2008.

105. S. Priyadarshi, K. Soroushian and J. Villasenor, "Rich metadata description for interactivity and dynamic user-generated information," Proceedings of the SMPTE 2008 Annual Technical Converence, October 2008.

106. D. Choi, P. Monajemi, S. Kang, and J. Villasenor, "Dealing with loud neighbors: the benefits and tradeoffs of adaptive femtocell access," Proceeedings of Globecom 2008, December 2008.

107. Yuxing Han, Jiangtao Wen and John D. Villasenor, "Entropy coding using equiprobable partitioning," Proceedings of the Forty-Sixth Annual Allerton Conference on Communication, Control, and Computing, September 2008.

108. M.D. Smith and J.D. Villasenor, "Bitrate Reduction Techniques for Stereoscopic Digital Cinema Distribution," SPIE Electronic Imaging Conference 2008: Visual Communications and Image Processing (VCIP), vol. 6822, pp. 1-9, San Jose, CA, January 2008.

109.    D. Lee, H. Kim, S. Tu, M. Rahimi, D. Estrin, and J.D. Villasenor, "Energy-optimized image communication on resource-constrained sensor platforms," Proceedings of the IEEE/ACM International Conference on Information Processing in Sensor Networks: Special Track on Sensor Platforms, Tools and Design Methods (SPOTS), pp. 126-225, Cambridge, MA, Apr 2007.

110.    M.D. Smith and J. Villasenor, "Constant Quality JPEG2000 Rate Control for Digital Cinema," Proceedings of the Visual Communication and Image Processing Conference, VCIP 2007, San Jose, CA, Jan 2007.

111.    D. Lee, R.C.C. Cheung, J.D. Villasenor and W. Luk, "Inversion-based hardware Gaussian random number generator: a case study of function evaluation via hierarchical segmentation," Proceedings of the IEEE International Conference on Field-Programmable Technology (FPT), pp. 33-40, Bangkok, Thailand, Dec 2006.

112.    R. Osborne and J. Villasenor, "Video traffic modeling for resource-constrained clients," Proceedings of Globecom 2006, Nov 2006.E. Valles, C. Jones, J. Villasenor, and R. Wesel, "Carrier and timing synchronization of BPSK via LDPC code feedback," Proceedings of the 40th Annual Asilomar Conference on Signals, Systems, and Computers, pp. 2177-2181, Pacific Grove, CA, Nov 2006.

113.    Marvin Simon, Esteban Valles, Christopher Jones, Richard Wesel and John Villasenor, "Information-reduced carrier synchronization of BPSK and QPSK using soft decision feedback," Proceedings of the 44th Annual Allerton Conference on Communications, Control and Computing, September 2006.

114.    D. Choi, E.P. Kwon, H. Lee, J. Chang, K. Choi, and J. Villasenor, "Single-chip integration of SRAM and non-volatile memory using bit-line sharing," Proceedings of the European Solid State Circuits Conference (ESSCIRC) 2006, pp. 295-298, Sept 2006.

115.    K. Lakovic, T. Tian, and J. Villasenor, "Iterative Decoder design for joint source-Channel LDPC coding," Proceedings of IEEE EUROCON 2005, pp. 486-489, Nov. 2005.

116.    E. Valles, A.I. Vila Casado, M. Blaum, J. Villasenor, and R.D. Wesel, "Hamming codes are rate-efficient array codes," Proceedings of the Globecom 2005, vol. 3, pp. 1320-1324, December 2005.

117.    J. Wen, H. Kim and J.D. Villasenor, "Secure arithmetic coding using interval splitting," Proceedings of the 39th Annual Asilomar Conference on Signals, Systems, and Computers, pp. 1218-1221, Pacific Grove, CA, October 2005.

118.    G. Zhang, P.H.W. Leong, D. Lee, J.D. Villasenor, R.C.C. Cheung, and W. Luk, "Ziggurat-based hardware Gaussian random number generator," Proceedings of the IEEE International Conference on Field Programmable Logic and its Applications (FPL), Tampere, Finland, September 2005.

119.    M. Smith, J. Villasenor, "Intra-frame JPEG-2000 vs. inter-frame compression comparison: The benefits and trade-offs for very high quality, high resolution sequences," Proceedings of the SMPTE Technical Conference and Exhibition, pp. 1-9, Pasadena, CA., October 2004.

120.    T. Tian, C. Jones, and J. Villasenor, "Rate-compatible low-density parity-check codes," Proceedings of the International Symposium on Information Theory, Chicago, IL, July 2004.

121.    D. Lee, W. Luk, C. Wang, C. Jones, M. Smith and J.D. Villasenor, "A flexible hardware encoder for low-density parity-check codes," Proceedings of the IEEE Symposium on Field-Programmable Custom Computing Machines, pp. 101-111, Napa, CA, April 2004.

122.    D. Lee, W. Luk, J.D. Villasenor and P.Y.K Cheung, "Hierarchical segmentation schemes for function evaluation," Proceedings of the IEEE International Conference on Field-Programmable Technology, pp. 92-99, Tokyo, Japan, December 2003.

123.    C. Jones, A. Matache, T. Tian, J. Villasenor, and R. Wesel, "The Universality of LDPC Codes on wireless channels," Proceedings of the 2003 IEEE Military Communications Conference, vol. 1, pp. 440-445, October 2003.

124.    C. Jones, E. Valles, M. Smith, J. Villasenor, "Approximate-MIN constraint node updating for LDPC code decoding," Proceedings of the IEEE Military Communications Conference, vol. 1 pp. 157-162, October 2003.

125.    D. Lee, W. Luk, J.D. Villasenor and P.Y.K Cheung, "Non uniform segmentation for hardware function evaluation," Proceedings of theInternational Conference on Field Programmable Logic and Applications, Lisbon, Portugal, pp. 796-807, September 2003.

126.    D. Lee, W. Luk, J.D. Villasenor and P.Y.K Cheung, "A hardware Gaussian noise generator for channel code evaluation," Proceedings of IEEE Symposium on Field-Programmable Custom Computing Machines, pp. 69-78, Napa, CA, April 2003.

127.    T. Tian, C. Jones, John Villasenor, and Rick Wesel, "Construction of irregular LDPC codes with low error floors," Proceedings of the IEEE International Conference on Communications, May 2003.

128.    K. Lakovic K. and J. Villasenor, "Design considerations for efficient reversible variable length codes," Proceedings of the Thirty-Sixth Asilomar Conference on Signals, Systems and Computers, pp. 262-266, Monterey, CA, November 2002.

129.    C.Jones, T.Tian, Adina Matache, R.Wesel, and J.Villasenor, "Robustness of LDPC Codes in periodic fading channels," Proceedings of IEEE Globecom, Taipei, Taiwan, November 2002.

130.    K. Lakovic and J. Villasenor, "On reversible variable length codes with turbo codes, and iterative source-channel decoding," Proceedings of the IEEE International Symposium on Information Theory, July 2002.

131.    K. Lakovic and J. Villasenor, "Combining Variable Length Codes and Turbo Codes," Proceedings of the IEEE VTS 55th Vehicular Technology Conference, Birmingham, Alabama, May 2002.

132.    Adam H.  Li, Jay Fahlen, Tao Tian, Luciano Bononi, So-Young Kim, Jeong-Hoon Park, and John Villasenor, "Generic uneven level protection algorithm for multimedia data transmission over packet-switched networks," Proceedings of the IEEE International Conference on Computer Communications and Networks Proceedings, pp. 340-346, October 2001.

133.    Ksenija Lakovic and John Villasenor, "Parallel concatenated codes for iterative source-channel decoding," Proceedings of the 39th Annual Allerton Conference on Communications, Control and Computing, October 2001.

134.    T. Tian, A.H. Li, J.Wen and J.Villasenor, "priority dropping in network transmission of scalable video," Proceedings of the 7th IEEE International Conference on Image Processing, vol.3, pp. 400-403, Vancouver, BC, Canada, September 2000.

135.    M. Luttrell, J.Wen and J. Villasenor, "Trellis-based R-D optimal quantization in H.263+," Proceedings of the 7th IEEE International Conference on Image Processing, vol.3, pp.852-854, , Vancouver, BC, Canada, September 2000.

136.    Ksenija Lakovic, Christopher Jones, and John Villasenor, "Investigating Quasi Error Free (QEF) operation with turbo codes," Proceedings of the 2nd International Symposium on Turbo Codes and Related Topics, Brest, France, September 2000.

137.    J. Garcia-Frias and J.D. Villasenor, "Low complexity turbo decoding for binary hidden Markov channels," Proceedings of the 2000 IEEE 51st Vehicular Technology Conference, pp. 840-843, Tokyo, Japan, May 2000.

138.    Adam H. Li, Surin Kittitornkun, Yu-Hen Hu, Dong-Seek Park, and John Villasenor, "Data partitioning and reversible variable length codes for robust video communications," IEEE Data Compression Conference Proceedings, pp.460-469, March 2000.

139.    Ksenija Lakovic, John Villasenor, Rick Wesel, "Robust joint Huffman and convolutional decoding," Proceedings of the IEEE VTS 50th Vehicular Technology Conference, pp. 2551-2555, Amsterdam, The Netherlands, September 1999.

140.    M. Luttrell, J. Villasenor, J.H. Park, and D.S. Park, "A data partitioning based video coding algorithm for error prone channels," Proceedings of the International Packet Video Workshop 1999.

141.    J. Garcia-Frias and J. Villasenor, "Combined blind equalization and turbo decoding," Proceedings of the 1999 International Communications Conference, Vancouver, Canada, June 1999.

142.    J. Garcia-Frias and J. Villasenor, "Blind turbo decoding and equalization," Proceedings of the 1999 Vehicular Technology Conference, Houston, Texas, May 1999.

143.    Jiangtao Wen and John Villasenor, "Utilizing soft information in decoding of variable length codes," Proceedings of the IEEE Data Compression Conference, pp. 131-139, March 1999.

144.    J. Garcia-Frias and J. Villasenor, "Exploiting binary Markov channels with unknown parameters in turbo coding," Proceedings of the 1998 IEEE Global Telecommunications Conference, pp. 3244-3249, Sydney, Australia, November 1998.

145.    P. Meshkat and J. Villasenor, "New schedules for information processing in turbo decoding algorithms," Proceedings of the 1998 IEEE International Symposium on Information Theory, p. 118, Cambridge, Massachusettes August 1998.

146.    P. Meshkat and J. Villasenor, "Generalized versions turbo decoding in the framework of bayesian networks and pearl's belief propagation algorithm," Proceedings of the IEEE 1998 International Conference on Communications, pp. 121-125, Atlanta, Georgia, June 1998.

147.    J. Garcia-Frias and J. Villasenor, "Turbo codes for binary markov channels," Proceedings of the IEEE 1998 International Conference on Communications, pp. 110-115, Atlanta, Georgia, June 1998.

148.    J. Garcia-Frias and J. Villasenor, "Turbo decoding of hidden markov sources with unknown parameters," Proceedings of the 1998 IEEE Data Compression Conference, pp. 159-168, Snowbird, Utah, March 1998.

149.    Jiangtao Wen and John Villasenor, "Reversible variable length codes for efficient and robust image and video coding," Proceedings of the IEEE 1998 Data Compression Conference, pp. 471-480, Snowbird, Utah, March 1998.

150.    J. Garcia-Frias and J. Villasenor, "Markov structures in turbo becoding," Proceedings of the 1998 Information Theory Workshop, pp. 54-55, San Diego, California, February 1998.

151.    J. Wen and J. Villasenor, "A class of reversible variable length codes for robust image and video coding," Proceedings of the IEEE International Conference on Image Processing, vol. 2, pp. 65-68, Santa Barbara, CA, October 1997.

152.    J. Garcia-Frias, D. Benyamin, and J. Villasenor, "Rate-distortion optimal parameter choice in a wavelet image communications system," Proceedings of the IEEE International Conference on Image Processing, vol. 2, pp. 25-28, Santa Barbara, CA, October 1997.

153.    J. Garcia-Frias and J. Villasenor, "Joint source channel decoding of turbo codes," Proceedings of the 1997 International Symposium on Turbo Codes, pp. 259-262, Brest, France, September 1997.

154.    J. Garcia-Frias and J. Villasenor, "An analytical treatment of channel-induced distortion in run length coded subbands," Proceedings of the IEEE 1997 Data Compression Conference, pp. 52-61, Snowbird, Utah, March 1997.

155.    A.B. Watson, G.Y. Yang, J.A. Soloman, J. Villasenor, "Visual thresholds for wavelet quantization error," Proceedings of the SPIE - The International Society for Optical Engineering, vol. 2657, pp. 382-392, 1996.

156.    J. Wen, P. Meshkat, and J. Villasenor, "Structured trees for lossless coding of quantized wavelet coefficients," Proceedings of the 30th Asilomar Conference on Signals, Systems, & Computers, vol. 2, pp 931-937, Pacific Grove, CA, November 1996.

157.    M.J. Tsai, J. Villasenor, and F. Chen, "Stack-run coding for low bit rate image communication," Proceedings of the 1996 IEEE International Conference on Image Processing, vol. 1, pp. 681-684, Lausanne, Switzerland, September 1996.

158.    F. Chen, J. Villasenor and D.S. Park, "A low-complexity rate-distortion model for motion estimation in H.263," Proceedings of the 1996 IEEE International Conference on Image Processing, vol. 2, pp. 517-520, Lausanne, Switzerland, September 1996.

159.    J.Y. Liao and J. Villasenor, "Adaptive Intra update for video coding under noisy channels," Proceedings of the 1996 International Conference of Image Processing, vol. 3, pp. 763-766, Lausanne, Switzerland, September 1996.

160.    J. Villasenor, B. Schoner, K.N. Chia, and C. Zapata, H.J. Kim, C. Jones, S. Lansing, and B. Mangione-Smith, "Configurable computing solutions for automatic target recognition," Proceedings of the IEEE Symposium of FPGAs for Custom Computing Machines, pp. 70-79, Napa, CA, April 1996.

161.    J. Villasenor, R.A. Ergas, and P.L. Donoho, "Seismic data compression using high-dimensional wavelet transforms," Proceedings of the IEEE 1996 Data Compression Conference, pp. 396-405, Snowbird, Utah, April 1996.

162.    B. Belzer and J. Villasenor, "Symmetric trellis coded vector quantization," Proceedings of the IEEE 1996 Data Compression Conference, pp. 13-22, Snowbird, Utah, April 1996.

163.    J. Villasenor, "Image compression for defense applications--perspectives and directions," Proceedings of the 1995 IEEE Military Communications Conference, Los Angeles, California, November 1995.

164.    P.L. Donoho, R.A. Ergas, and J. Villasenor, "High performance seismic trace compression," Proceedings of the 65th Society of Exploration Geophysicists Conference, pp. 160-163, Houston, Texas, October 1995.

165.    Benjamin Belzer, J. Villasenor, and Bernd Girod, "Joint source channel coding of images with trellis coded quantization and convolutional codes," Proceedings of the 1995 IEEE International Conference on Image Processing, vol. 2, pp. 85-88, Oct. 1995.

166.    F. Chen, Z. Gao, and J. Villasenor, "A lattice vector quantizer for generalized Gaussian sources," Proceedings of the IEEE Conference on Image Processing, pp. 105-108, Oct. 23-26, 1995.

167.    M.J. Tsai, J.D. Villasenor, A. Chatziioannou, and M. Dahlbom, "Positron emission tomograph compression by using wavelet transforms," Proceedings of the IEEE 1995 Nuclear Science Symposium and Medical Imaging Conference, Medical Imaging, Paper No. 7M10, , San Francisco, CA, October 1995.

168.    R. Jain, J. Short, S. Nazareth, L. Kleinrock, and J. Villasenor, "PC-notebook-based mobile networking: algorithms, architectures, and implementation," Proceedings of the IEEE 1995 International Communications Conference, Seattle, Washington, June 1995.

169.    B. Schoner, C. Jones and J. Villasenor, "Issues in wireless video coding using run-time-reconfigurable FPGAs," Proceedings of the IEEE Symposium on FPGAs for Custom Computing Machines, pp. 85-89, Napa, California, April 1995.

170.    J. Villasenor, R. Jain, B. Belzer, W. Boring, and C. Jones, "Wireless video coding system demonstration," Proceedings of the IEEE 1995 Data Compression Conference, pp. 448, Snowbird, Utah, March 1995.

171.    Z. Gao, F. Chen, B. Belzer, and J. Villasenor, "A Comparison of the Z, E8, and Leech Lattices for image subband quantization," Proceedings of the 1995 IEEE Data Compression Conference, pp. 312-321, Snowbird, Utah, March 1995.

172.    B. Schoner, J. Villasenor, S. Molloy, and R. Jain, "Techniques for FPGA Implementation of video compression," Proceedings of the ACM/SIGBA International Symposium on Field-Programmable Gate Arrays, 1995.

173.    H. Chou, F. Chen, D. Valentino, L. Huang, and J. Villasenor, "Large scale implementation of optimal image compression algorithms," Proceedings of the SPIE Medical Imaging, Image Display Conference, SPIE Proceedings vol. 2431, San Diego, California ,February 1995.

174.    B. Belzer, J. Liao, and J. Villasenor, "Adaptive video coding for mobile wireless networks," Proceedings of IEEE International Conference on Image Processing, pp. 972-976, Austin, Texas, 1994.

175.    M.J. Tsai, J. Villasenor, and B.K.T. Ho, "Coronary angiogram video compression," Proceedings of the IEEE 1994 Nuclear Science Symposium and Medical Imaging Conference, Medical Imaging, paper No. 8M65, Norfolk, Virginia, November 1994.

176.    J. Villasenor, B. Belzer, and J. Liao, "Filter evaluation and selection in wavelet image compression," 1994 IEEE Proceedings of the Data Compression Conference, pp. 351-360, Snowbird, Utah, March 1994.

177.    M.J. Tsai, B.K.T. Ho, and J. Villasenor, "Motion estimation and wavelet transform in angiogram video coding," Proceedings of the 1993 IEEE Conference Record Nuclear Science Symposium and Medical Imaging Conference, vol. 2, pp.1121-1125, November 1993.

178.    J. Villasenor, "Full-Frame Compression of Tomographic Images using Discrete Fourier Transform," Proceedings of the IEEE 1993 Data Compression Conference, pp. 195-203, Snowbird, Utah, April 1993.

179.    H. Zebker and J. Villasenor, "Temporal decorrelation in repeat pass-radar interferometry," Proceedings of the 12th Annual International Geoscience and Remote Sensing Symposium, Houston, TX; pp. 941-943, May 1992.

180.    H. Zebker, J. Villasenor, and S. Madsen, "Topographic mapping from ERS-1 and SEASAT radar interferometry," IGARSS '92; Proceedings of the 12th Annual International Geoscience and Remote Sensing Symposium, Houston, pp. 387-388, May 1992.

181.    J. Villasenor and H. Zebker, "Studies of temporal change using radar interferometry," Proceedings of Synthetic Aperture Radar, Los Angeles, CA; pp. 187-198. May 1992.

<u>Law Review and Other Academic Legal Publications</u>

182.    John Villasenor, "Ten Thousand AI Systems Typing on Keyboards: Generative AI in Patent Applications and Preemptive Prior Art," 26 *Vanderbilt Journal of Entertainment and Technology Law*, Vol. 26, p. 375, 2024.

183.    John Villasenor, "Artificial Intelligence, Trade Secrets, and the Challenge of Transparency," 25 *North Carolina Journal of Law and Technology*, Vol. 25, p. 495, 2024.

184.    John Villasenor, "Generative Artificial Intelligence and the Practice of Law: Impact, Opportunities, and Risks," 25 *Minnesota Journal of Law, Science, and Technology*, Vol. 25, p. 25, 2024.

185.    John Villasenor, "Reconceptualizing Conception: Making Room for Artificial Intelligence Inventions," *Santa Clara High Technology Law Journal*, Vol. 39, p. 197, February 2023.

186.    John Villasenor, "The First Amendment and Online Access to Information About Abortion: The Constitutional and Technological Problems with Censorship," *Northwestern Journal of Technology and Intellectual Property*, Vol. 20, p. 87, November 2022.

15

187.    Leeza Arbatman and John Villasenor, "Anonymous Expression and 'Unmasking' in Civil and Criminal Proceedings," *Minnesota Journal of Law, Science, and Technology*, Vol. 33, p. 77, January 2022.

188.    Virginia Foggo and John Villasenor, "Algorithms, Housing Discrimination, and the New Disparate Impact Rule," *Columbia Science and Technology Law Review*. Vol. 22, p. 1, January 2021.

189.    Virginia Foggo, John Villasenor and Pratyush Garg, "Algorithms and Fairness," *Ohio State Technology Law Journal*, Vol. 17, p. 123, December 2020.

190.    John Villasenor and Virginia Foggo, "Artificial Intelligence, Due Process, and Criminal Sentencing," *Michigan State Law Review*, vol. 2020, p. 295, summer 2020.

191.    John Villasenor, "Views Among College Students Regarding Freedom of Expression: An Analysis in Light of Key Supreme Court Decisions," *University of Pennsylvania Journal of Constitutional Law Online*, Vol. 20, January 2018.

192.    John Villasenor, "A probabilistic framework for modelling false Title IX 'convictions' under the preponderance of the evidence standard," *Law, Probability and Risk*, vol. 15, pp. 223-237, December 2016.

193.    John Villasenor, "Technology and the Role of Intent in Constitutionally Protected Expression," *Harvard Journal of Law and Public Policy*, Vol. 39, No. 3, Spring 2016.

194.    John Villasenor, "Corporate Cybersecurity Realism: Managing Trade Secrets in a World Where Breaches Occur," *American Intellectual Property Law Association Quarterly Journal*, Volume 43, Numbers 2/3, pages 329-357, Spring/Summer 2015. Available through SSRN at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2488756.

195.    John Villasenor, "Rethinking a Digital First Sale Doctrine in a Post-*Kirtsaeng* World: The Case for Caution" *Competition Policy International Antitrust Chronicle*, Vol. 2, May 2013.

196.    John Villasenor, "Observations from Above: Unmanned Aircraft Systems and Privacy," *Harvard Journal of Law and Public Policy*, Vol. 36, No. 2, Spring, 2013.

197.    Vivek Mohan and John Villasenor, "Decrypting the Fifth Amendment: The Limits of Self-Incrimination in the Digital Era" *University of Pennsylvania Journal of Constitutional Law Heightened Scrutiny*, vol. 15, October 2012.

<u>Book</u>

Ilana Redstone and John Villasenor, "Unassailable Ideas: How Unwritten Rules and Social Media Shape Discourse in American Higher Education," Oxford University Press, 2020.

# John Villasenor Previous Testimony
April 2025

To the best of my current recollection, the federal district court, ITC, and PTAB matters in which I have testified in trial or deposition within the last four years[1] are listed below. The party on behalf of which I was retained is shown in bold text.

*In the Matter of Certain Movable Barrier Operator Systems and Components Thereof,* ITC Investigation No. 337-TA-1209.I represented respondent **Chamberlain Group, Inc**. Complainant was Overhead Door Corporation and GMI Holdings Inc.

NexStep, Inc. v. **Comcast Cable Communications, LLC**, Case No. 19-1031, D. Del.

**Qualcomm Inc.** v. Monterey Research, LLC, IPR2020-01493

Future Link Systems LLC v. **Qualcomm Inc.**, Case No. 6:21-cv-00265-ADA, W.D. Tex.

Intertrust Technologies Corp. v. **Cinemark Holdings, Inc.**, **AMC Entertainment Holdings, Inc.**, and **Regal Entertainment Group**, Case Nos. 2:19-cv-00266-JRG, 2:19-cv-00265-JRG, 2:19-cv-00267-JRG, E.D. Tex.

**Chamberlain Group, Inc.** v. Overhead Door Corporation and GMI Holdings Inc., Case No. 2:21-cv-00084-JRG, E.D. Tex.

Solas OLED Ltd. v. **Samsung**, Case No. 2:21-cv-00105-JRG, E.D. Tex.

SAIC v. United States, **Microsoft**, and **L3**, Case No. 17-cv-00825, Court of Federal Claims

Abbott Diabetes Care Inc. v. **Dexcom, Inc**., Case No. C.A. No. 21-cv-00977 (KAJ), D. Del.

GoTV Streaming, LLC v. **Netflix, Inc**., Case No. 2:22-CV-07556-RGK-SHK, C.D. Cal

*In the Matter of Certain Integrated Circuits, Mobile Devices Containing the Same, and Components Thereof,* ITC Investigation No. 337-TA-1335 in the United States International Trade Commission. I represented respondent **Qualcomm**. Complainant was Daedalus Prime LLC.

Centripetal Netw., LLC v. **Palo Alto Netw., Inc.**, Case No. 2:21-Cv-00137-EWH, E.D. VA

Polaris PowerLED Tech., LLC v. **Samsung Elec. Am., Inc**., Case No. 2:22-cv-00469-JRG, E.D. Tex.
*In The Matter of Certain Cameras, Camera Systems, and Accessories Used Therewith*, ITC Investigation No. 337-TA-1400 in the United States International Trade Commission. I represent complainant **GoPro**. Respondent is Arashi Vision (U.S.) LLC (D/B/A Insta360).

---

[1] For some of the matters listed here, the time since I last provided testimony may be greater than four years.

# EXHIBIT  A

US008549339B2

US 8,549,339 B2

## (12) United States Patent
Wolfe et al.

(10) Patent No.: **US 8,549,339 B2**
(45) Date of Patent: **Oct. 1, 2013**

(54) **PROCESSOR CORE COMMUNICATION IN MULTI-CORE PROCESSOR**

(75) Inventors: **Andrew Wolfe**, Los Gatos, CA (US);
**Marc Elliot Levitt**, San Jose, CA (US)

(73) Assignee: **Empire Technology Development LLC**,
Wilmington, DE (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 524 days.

(21) Appl. No.: **12/713,220**

(22) Filed: **Feb. 26, 2010**

(65) **Prior Publication Data**

US 2011/0213991 A1    Sep. 1, 2011

(51) Int. Cl.
*G06F 1/08* (2006.01)
*G06F 1/32* (2006.01)

(52) U.S. Cl.
USPC ............................ **713/322**; 713/320; 713/501

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,711,447 B1 | 3/2004 | Saeed | |
| 7,219,245 B1 | 5/2007 | Raghuvanshi | |
| 7,248,838 B2* | 7/2007 | Goodnow et al. | .............. 455/70 |
| 7,263,457 B2 | 8/2007 | White et al. | |
| 7,735,037 B2 | 6/2010 | Tell | |
| 7,853,808 B2 | 12/2010 | Kim et al. | |
| 8,225,315 B1* | 7/2012 | Cheng et al. | ...................... 718/1 |
| 2009/0106576 A1* | 4/2009 | Jacobowitz et al. | ....... 713/501 |
| 2009/0138737 A1* | 5/2009 | Kim et al. | ...................... 713/322 |
| 2010/0162018 A1* | 6/2010 | Subramanian et al. | ....... 713/322 |
| 2010/0188115 A1* | 7/2010 | von Kaenel | ...................... 326/16 |

OTHER PUBLICATIONS

Notification of Transmittal of the International Search Report and the Written Opinion of the International Searching Authority, May 17, 2011.

Joonho Kong et al "Low-Cost Application-Aware DVFS for Multi-Core Architecture", Third 2008 International Conference on Convergence and Hybrid Information Technology, IEEE Computer Society, 2008, pp. 106-111.

Reinaldo Bergamaschi et al., "Exploring Power Management in Multi-Core Systems", IEEE, 2008, pp. 708-713 (Downloaded on Jul. 13, 2009 from IEEE Xplore).

Wayne H. Cheng et al "Dynamic Voltage and Frequency Scaling Circuits with Two Supply Voltages", IEEE, 2008, pp. 1236-1239 (Downloaded on Jul. 14, 2009 from IEEE Xplore).

Wonyoung Kim et al "System Level Analysis of Fast, Per-Core DVFS using On-Chip Switching Regulators", High Performance Computer Architecture, IEEE 14th International Symposium, Feb. 16-20, 2008, pp. 123-134.

Howlett-Packard Corporation et al., "Advanced Configuration and Power Interface Specification", Oct. 10, 2006, pp. 1-631 (represented by 4 different files), Revision 3.0b.

Micah Schmidt, "Nehalem: Xeon Gets Core i7 Upgrade", 2CPU.com, Mar 29, 2009 <http://www.2cpu.com/review.php?id=117>.

"Third-Generation AMD Opteron Processor Key Architectural Features", Waybackmachine, Oct. 20, 2007 <http://www.amd.com/us-en/Processors/ProductInformation/0,,30_118_8796_15224,00.html>.

* cited by examiner

*Primary Examiner* — Dennis M Butler

(74) *Attorney, Agent, or Firm* — Ren-Sheng International

(57) **ABSTRACT**

Embodiments of the disclosure generally set forth techniques for handling communication between processor cores. Some example multi-core processors include a first set of processor cores in a first region of the multi-core processor configured to dynamically receive a first supply voltage and a first clock signal, a second set of processor cores in a second region of the multi-core processor configured to dynamically receive a second supply voltage and a second clock signal, and an interface block coupled to the first set of processor cores and the second set of processor cores, wherein the interface block is configured to facilitate communications between the first set of processor cores and the second set of processor cores.

**23 Claims, 5 Drawing Sheets**



<u>100</u>



**FIG. 1**



**FIG. 2**



**FIG. 3**

400



402 — Receive Clock Frequency Change Request

404 — Idle Communication between Stripes

406 — Examine PLL Blocks of Requesting Stripe and Adjacent Stripes

YES

408 — Does Each of PLL Blocks Acquire a Lock?

NO

YES

410 — Determine Whether to Resume Communication between Stripes

**FIG. 4**

500 A computer program product

502 at least one of

one or more instructions for receiving a request of changing the clock frequency;

one or more instructions for issuing a command to idle communication with the first region;

one or more instructions for examining whether a first phase lock loop operation associated with the first region has acquired a first lock signal in response to the request; and/or

one or more instructions for examining whether a second phase lock loop operation associated with a second region of processor cores in the multi-core processor has acquired a second lock signal in response to the request, wherein the second region is adjacent to the first region

504 a signal bearing medium

506 a communication medium

508 a computer readable medium

510 a recordable medium

**FIG. 5**

1

# PROCESSOR CORE COMMUNICATION IN MULTI-CORE PROCESSOR

## BACKGROUND OF THE DISCLOSURE

A multi-core processor includes two or more independent processor cores arranged in an array. Each processor core in a conventional multi-core processor generally shares the same supply voltage and clock signal to simplify the interfaces between the processor cores. For power consumption management, dynamic supply voltage and clock speed control may be utilized, so that a multi-core processor may operate at high power and high clock frequency when needed and at low power when the computing requirements are reduced.

## BRIEF DESCRIPTION OF THE DRAWINGS

The foregoing and other features of the present disclosure will become more fully apparent from the following description and appended claims, taken in conjunction with the accompanying drawings. These drawings depict only several embodiments in accordance with the disclosure and are, therefore, not to be considered limiting of its scope. The disclosure will be described with additional specificity and detail through use of the accompanying drawings.

FIG. **1** illustrates an example configuration of a multi-core processor;

FIG. **2** is a block diagram illustrating an example set of processor cores with example interface blocks having level shifters;

FIG. **3** is another block diagram illustrating an example set of processor cores with example interface blocks having synchronizers;

FIG. **4** is a flow chart illustrating an example transition processing routine for managing a clock frequency change; and

FIG. **5** is a block diagram illustrating an example computer program product for handling processor core communication in a multi-core processor; all arranged in accordance with at least some embodiments of the present disclosure.

## DETAILED DESCRIPTION

In the following detailed description, reference is made to the accompanying drawings, which form a part hereof. In the drawings, similar symbols typically identify similar components, unless context dictates otherwise. The illustrative embodiments described in the detailed description, drawings, and claims are not meant to be limiting. Other embodiments may be utilized, and other changes may be made, without departing from the spirit or scope of the subject matter presented here. It will be readily understood that the aspects of the present disclosure, as generally described herein, and illustrated in the Figures, can be arranged, substituted, combined, and designed in a wide variety of different configurations, all of which are explicitly contemplated and make part of this disclosure.

This disclosure is drawn, inter alia, to devices, methods, systems, and computer programs related to power management for a multi-core processor.

A multi-core processor may include multiple processor cores arranged in an array. A power profile associated with an individual processor core may be controlled through signals that may be received from control blocks that are located in the periphery of the multi-core processor. The power profile may include, without limitation, one or more power-supply voltages of the core processor, clock rates of the core proces-

sor, clock multipliers of the core processor, power throttling of the core processor, and/or sleep state cycles of the core processor.

FIG. **1** illustrates an example configuration of a multi-core processor **100** that is arranged in accordance with at least some embodiments of the present disclosure. The multi-core processor **100** may include multiple processor cores **102** arranged in rows and columns in a 2-dimensional array in an integrated circuit. A processor core may be coupled with adjacent processor cores through an interface circuit **120**. In some implementations, the processor cores **102** may be horizontally coupled to one another, vertically coupled to one another, and/or diagonally coupled to one another by the interface circuit **120**. In some example implementations, the processor core **102** located on one edge of the multi-core processor **100** may also be coupled to the processor core **102** on the opposite edge with a wrap-around connection **122**, which may be employed to ensure a continuous connection among the processor cores in the same row and/or column.

The multi-core processor **100** may be further divided into regions. In some implementations, the regions of multi-core processor **100** may correspond to rows of the two-dimensional array, and the regions may or may not be overlapping. Each row of processors may also be referred to as a "stripe." For example, the multi-core processor **100** may be divided into stripes **112**, **114**, **116**, and **118**. Each stripe may be associated with an independent power profile. For example, the stripe **112** may be powered by a supply voltage received from a power control block **108** and/or may be associated with an independent clock domain defined by a clock signal received from a clock control block **110**. In some implementations, the power control block **108** and the clock control block **110** may be arranged at two different sides of the multi-core processor **100** as shown in FIG. **1**. In some other implementations, the power control block **108** and the clock control block **110** may be arranged at the same side of the multi-core processor **100**. In yet some other implementations, the power control block **108** and the clock control block **110** may be arranged in a common area located near the center of the multi-core processor **100**.

The power profile associated with a stripe may be determined based on the computational requirements of the tasks assigned to the processor cores in the stripe. In some implementations, sensors placed at the input of each processor core may be configured to measure the supply voltage and the local temperature for the processor core. The measured supply voltage and local temperature may be maintained in the power control block **108**. One or more performance counters associated with each processor core may also provide feedback to the power control block **108**. Based on the measured operational information (e.g., supply voltage and local temperature) and the performance data, the power control block **108** may then be configured to select a supply voltage for each strip. For example, the tasks with the highest computational requirements may be scheduled into the topmost stripe, such as the stripe **112**. The stripe **112** may be configured to operate at a high supply voltage. The tasks with lesser computational requirements may be scheduled into the stripe **114** and so forth. The stripes **114**, **116**, and **118** thus may be configured to operate lower supply voltages.

In some implementations, supply voltages to the stripes may be selected such that the selected supply voltages for adjacent stripes may differ by a limited amount. This limited amount may be based on a relationship between the output voltage level associated with one stripe and the input voltage level associated with an adjacent stripe. For example, suppose the stripe with the higher supply voltage (e.g., the stripe **112**)

US 8,549,339 B2

3

may be associated with an output voltage level (e.g., $V_o$). $V_o$ needs to fall reliably within an acceptable input voltage level range (e.g., $V_{i+}$ to $V_{i-}$) for an adjacent stripe (e.g., the stripe 114). In other words, the power control block 108 may be configured to set supply voltages to the stripe 112 and the stripe 114, so that the aforementioned relationship between $V_o$ and range $V_{i+}$ to $V_{i-}$ may be maintained.

To maintain the limited differential relationship discussed above, adjusting the supply voltage to one stripe may involve adjusting the supply voltages to the other stripes. To illustrate, suppose the power control block 108 may adjust the supply voltage to the stripe 112. To maintain the limited differential relationship, the power control block 108 may adjust the supply voltages to the stripes 118, 116, and 114 before adjusting the supply voltage to the stripe 112.

Although dynamically adjusting the power profile for a stripe in response to changes in computational requirements may reduce power consumption for a multi-core processor, such adjustments may take some period of time to stabilize. To further illustrate the interfaces that facilitate communication between two processor cores in the multi-core processor 100, a subset 150 of processor cores 152, 154, and 156 of FIG. 1 may be selected. The processor core 152 belongs to the stripe 112; the processor core 154 belongs to the stripe 114; and the processor core 156 belongs to the stripe 116.

FIG. 2 is a block diagram illustrating an example subset 150 of processor cores with example interface blocks having level shifters, arranged in accordance with at least some embodiments of the present disclosure. The processor core 152 may be powered by a supply voltage 1 and coupled to an interface block 200 having a level shifter 202; the processor core 154 may be powered by a supply voltage 2 and coupled to the same interface block 200; and the processor core 156 may be powered by a supply voltage 3 and coupled to an interface block 204 having a level shifter 206. In some implementations, the inputs of the level shifter 202 may be the supply voltage 1 and the supply voltage 2, and the inputs of the level shifter 206 may be the supply voltage 2 and the supply voltage 3. The supply voltage 1, the supply voltage 2, and the supply voltage 3 may come from a power control block, such as the power control block 108 of FIG. 1.

When the processor core 152 of the stripe 112 sends a signal to the processor core 154 of the stripe 114, in some implementations, the output voltage of the level shifter 202 may be tied to the supply voltage 2, and the input voltage of the level shifter 202 may be tied to the supply voltage 1. The level shifters are arranged to translate the signal levels such that each of the processor cores operates correctly (e.g., the processor cores properly interpret the voltages as valid logic levels even though processor cores are powered by different supply voltages). Here, the level shifter 202 may be adapted to translate first logic levels associated with the stripe 112 to second logic levels associated with the stripe 114, and the level shifter 202 may be referenced to the supply voltage 2. On the other hand, when the processor core 154 of the stripe 114 sends a signal to the processor core 152 of the stripe 112, the output voltage of the level shifter 202 may be tied to the supply voltage 1, and the input voltage of the level shifter 202 may be tied to the supply voltage 2. In other words, the level shifter 202 may be adapted to translate second logic levels associated with the stripe 114 to first logic levels associated with stripe 112, and the level shifter 202 may be referenced to the supply voltage 1. The relationships among the supply voltage 1, supply voltage 2, and the level shifter 202 described above similarly apply to the relationships among the supply voltage 2, supply voltage 3, and the level shifter 206.

4

FIG. 3 is another block diagram illustrating an example subset 150 of processor cores with example interface blocks having synchronizers, arranged in accordance with at least some embodiments of the present disclosure. The processor core 152 may be driven by a clock signal 1 and coupled to an interface block 300 having a synchronizer 302; the processor core 154 may be driven by a clock signal 2 and coupled to the same interface block 300; and the processor core 156 may be driven by a clock signal 3 and coupled to an interface block 304 having a synchronizer 306. In some implementations, the clock signal 1, the clock signal 2, the clock signal 3, and the respective phase lock loops (PLLs) may be a part of a clock control block, such as the clock control block 110. The processing results of the PLL blocks may be fed back to a transition processing routine 308. Commands generated by the transition processing routine 308 may also be sent to the synchronizer 302 and/or the synchronizer 306.

As discussed above, when the power profile for a stripe changes, such as a change in clock frequency, the clock signal for the stripe may become unstable. To handle such a situation, FIG. 4 is a flow chart illustrating an example transition processing routine 400 for managing a clock frequency change, arranged in accordance with at least some embodiments of the present disclosure. For ease of description, the transition processing routine 400 is described in terms of a set of processor cores and interface blocks substantially similar to those described previously with respect to FIG. 3. The transition processing routine 400 may include one or more functions, operations, or actions as depicted by operations 402, 404, 406, 408, and/or 410. In some implementations, the various features of the illustrated operations for the transition processing routine 400 may be combined into fewer operations, divided into additional operations, or eliminated based on the desired result.

Processing for the transition processing routine 400 may begin at operation 402, "receive clock frequency change request." Operation 402 may be followed by operation 404, "idle communication between stripes." Operation 404 may be followed by operation 406, "examine PLL blocks of requesting stripe and adjacent stripe(s)." Operation 406 may be followed by operation 408, "does each of PLL blocks acquire a lock?" Operation 408 may be followed by either operation 406 when the decision logic tested at block 408 fails to be satisfied (NO), or operation 410, "determine whether to resume communication between stripes", when the decision logic tested at block 408 is satisfied (YES). Processing for the routine may terminate after block 410.

For illustration, suppose the processor core 154 of the stripe 114 in FIG. 3 is asked to change its clock frequency based on the tasks that are being assigned to the stripe 114 for processing. After having received the request in operation 402, the transition processing routine 400 may issue commands to the synchronizer 302 and the synchronizer 306 in operation 404 to idle the communications between the processor core 154 and the processor core 152 and between the processor core 154 and the processor core 156. Following operation 404, the outputs of the PLL blocks for the stripes that are adjacent to the stripe 114 may be examined in operation 406. Depending on whether the PLL blocks have acquired locks as determined in operation 408, the transition processing routine 400 may decide in operation 410 whether the transition sequence has occurred properly and the communication between the stripes may resume.

In some implementations, after each of the PLL block 1, PLL block 2, and PLL block 3 is determined to have acquired a lock of its respective clock signal in operation 408, a stable clock signal may be sent to the processor core 154 and also the

US 8,549,339 B2

5

6

synchronizer **302** and the synchronizer **306**. Then, the synchronizer **302** may be configured to synchronize the clock signal **1** and the clock signal **2** for the communication between the processor core **152** and the processor core **154**. Similarly, the synchronizer **306** may be configured to synchronize the clock signal **2** and the clock signal **3** for the communication between the processor core **154** and the processor core **156**.

FIG. **5** is a block diagram illustrating a computer program product **500** for handling processor core communication in a multi-core processor in accordance with at least some embodiments of the present disclosure. Computer program product **500** may include one or more sets of executable instructions **502** for executing the transition processing routine described above and illustrated in FIG. **4**. Computer program product **500** may be transmitted in a signal bearing medium **504** or another similar communication medium **506**. Computer program product **500** may also be recorded in a computer readable medium **508** or another similar recordable medium **510**.

There is little distinction left between hardware and software implementations of aspects of systems; the use of hardware or software is generally (but not always, in that in certain contexts the choice between hardware and software can become significant) a design choice representing cost vs. efficiency tradeoffs. There are various vehicles by which processes and/or systems and/or other technologies described herein can be effected (e.g., hardware, software, and/or firmware), and that the preferred vehicle will vary with the context in which the processes and/or systems and/or other technologies are deployed. For example, if an implementer determines that speed and accuracy are paramount, the implementer may opt for a mainly hardware and/or firmware vehicle; if flexibility is paramount, the implementer may opt for a mainly software implementation; or, yet again alternatively, the implementer may opt for some combination of hardware, software, and/or firmware.

The foregoing detailed description has set forth various embodiments of the devices and/or processes via the use of block diagrams, flowcharts, and/or examples. Insofar as such block diagrams, flowcharts, and/or examples contain one or more functions and/or operations, it will be understood by those within the art that each function and/or operation within such block diagrams, flowcharts, or examples can be implemented, individually and/or collectively, by a wide range of hardware, software, firmware, or virtually any combination thereof. In one embodiment, several portions of the subject matter described herein may be implemented via Application Specific Integrated Circuits (ASICs), Field Programmable Gate Arrays (FPGAs), digital signal processors (DSPs), or other integrated formats. However, those skilled in the art will recognize that some aspects of the embodiments disclosed herein, in whole or in part, can be equivalently implemented in integrated circuits, as one or more computer programs running on one or more computers (e.g., as one or more programs running on one or more computer systems), as one or more programs running on one or more processors (e.g., as one or more programs running on one or more microprocessors), as firmware, or as virtually any combination thereof, and that designing the circuitry and/or writing the code for the software and/or firmware would be well within the skill of one of skill in the art in light of this disclosure. In addition, those skilled in the art will appreciate that the mechanisms of the subject matter described herein are capable of being distributed as a program product in a variety of forms, and that an illustrative embodiment of the subject matter described herein applies regardless of the particular type of signal bearing medium used to actually carry out the distribution. Examples of a signal bearing medium include, but are not limited to, the following: a recordable type medium such as a floppy disk, a hard disk drive, a Compact Disc (CD), a Digital Video Disk (DVD), a digital tape, a computer memory, etc.; and a transmission type medium such as a digital and/or an analog communication medium (e.g., a fiber optic cable, a waveguide, a wired communications link and/or channel, a wireless communication link and/or channel, etc.).

Those skilled in the art will recognize that it is common within the art to describe devices and/or processes in the fashion set forth herein, and thereafter use engineering practices to integrate such described devices and/or processes into data processing systems. That is, at least a portion of the devices and/or processes described herein can be integrated into a data processing system via a reasonable amount of experimentation. Those having skill in the art will recognize that a typical data processing system generally includes one or more of a system unit housing, a video display device, a memory such as volatile and non-volatile memory, processors such as microprocessors and digital signal processors, computational entities such as operating systems, drivers, graphical user interfaces, and applications programs, one or more interaction devices, such as a touch pad or screen, and/or control systems including feedback loops and control motors (e.g., feedback for sensing position and/or velocity; control motors for moving and/or adjusting components and/or quantities). A typical data processing system may be implemented utilizing any suitable commercially available components, such as those typically found in data computing/communication and/or network computing/communication systems.

The herein described subject matter sometimes illustrates different components contained within, or connected with, different other components. It is to be understood that such depicted architectures are merely exemplary, and that in fact many other architectures can be implemented which achieve the same functionality. In a conceptual sense, any arrangement of components to achieve the same functionality is effectively "associated" such that the desired functionality is achieved. Hence, any two components herein combined to achieve a particular functionality can be seen as "associated with" each other such that the desired functionality is achieved, irrespective of architectures or intermedial components. Likewise, any two components so associated can also be viewed as being "operably connected", or "operably coupled", to each other to achieve the desired functionality, and any two components capable of being so associated can also be viewed as being "operably couplable", to each other to achieve the desired functionality. Specific examples of operably couplable include but are not limited to physically mateable and/or physically interacting components and/or wirelessly interactable and/or wirelessly interacting components and/or logically interacting and/or logically interactable components.

With respect to the use of substantially any plural and/or singular terms herein, those having skill in the art can translate from the plural to the singular and/or from the singular to the plural as is appropriate to the context and/or application. The various singular/plural permutations may be expressly set forth herein for sake of clarity.

It will be understood by those within the art that, in general, terms used herein, and especially in the appended claims (e.g., bodies of the appended claims) are generally intended as "open" terms (e.g., the term "including" should be interpreted as "including but not limited to," the term "having" should be interpreted as "having at least," the term "includes"

7

8

should be interpreted as "includes but is not limited to," etc.). It will be further understood by those within the art that if a specific number of an introduced claim recitation is intended, such an intent will be explicitly recited in the claim, and in the absence of such recitation no such intent is present. For example, as an aid to understanding, the following appended claims may contain usage of the introductory phrases "at least one" and "one or more" to introduce claim recitations. However, the use of such phrases should not be construed to imply that the introduction of a claim recitation by the indefinite articles "a" or "an" limits any particular claim containing such introduced claim recitation to inventions containing only one such recitation, even when the same claim includes the introductory phrases "one or more" or "at least one" and indefinite articles such as "a" or "an" (e.g., "a" and/or "an" should typically be interpreted to mean "at least one" or "one or more"); the same holds true for the use of definite articles used to introduce claim recitations. In addition, even if a specific number of an introduced claim recitation is explicitly recited, those skilled in the art will recognize that such recitation should typically be interpreted to mean at least the recited number (e.g., the bare recitation of "two recitations," without other modifiers, typically means at least two recitations, or two or more recitations). Furthermore, in those instances where a convention analogous to "at least one of A, B, and C, etc." is used, in general such a construction is intended in the sense one having skill in the art would understand the convention (e.g., "a system having at least one of A, B, and C" would include but not be limited to systems that have A alone, B alone, C alone, A and B together, A and C together, B and C together, and/or A, B, and C together, etc.). In those instances where a convention analogous to "at least one of A, B, or C, etc." is used, in general such a construction is intended in the sense one having skill in the art would understand the convention (e.g., "a system having at least one of A, B, or C" would include but not be limited to systems that have A alone, B alone, C alone, A and B together, A and C together, B and C together, and/or A, B, and C together, etc.). It will be further understood by those within the art that virtually any disjunctive word and/or phrase presenting two or more alternative terms, whether in the description, claims, or drawings, should be understood to contemplate the possibilities of including one of the terms, either of the terms, or both terms. For example, the phrase "A or B" will be understood to include the possibilities of "A" or "B" or "A and B."

While various aspects and embodiments have been disclosed herein, other aspects and embodiments will be apparent to those skilled in the art. The various aspects and embodiments disclosed herein are for purposes of illustration and are not intended to be limiting, with the true scope and spirit being indicated by the following claims.

We claim:

1. A multi-core processor, comprising:

a first set of processor cores of the multi-core processor, wherein each processor core from the first set of processor cores is configured to dynamically receive a first supply voltage and a first output clock signal of a first phase lock loop (PLL) having a first clock signal as input;

a second set of processor cores of the multi-core processor, wherein each processor core from the second set of processor cores is configured to dynamically receive a second supply voltage and a second output clock signal of a second PLL having a second clock signal as input, wherein the first supply voltage is independent from the second supply voltage, and the first clock signal is independent from the second clock signal; and

an interface block coupled to the first set of processor cores and also coupled to the second set of processor cores, wherein the interface block is configured to facilitate communication between the first set of processor cores and the second set of processor cores.

2. The multi-core processor of claim 1, wherein the interface block further comprises a first level shifter that is referenced to the second supply voltage and adapted to translate first logic levels associated with the first set of processor cores to second logic levels associated with the second set of processor cores for a first signal traveling from the first set of processor cores to the second set of processor cores.

3. The multi-core processor of claim 1, wherein the interface block further comprises a second level shifter that is referenced to the first supply voltage and adapted to translate second logic levels associated with the second set of processor cores to first logic levels associated with the first set of processor cores for a second signal traveling from the second set of processor cores to the first set of processor cores.

4. The multi-core processor of claim 1, wherein the interface block further comprises a synchronizer configured to synchronize the first clock signal and the second clock signal for communication between one or more processor cores of the first set of processor cores and one or more processor cores of the second set of processor cores.

5. The multi-core processor of claim 1, wherein the first set of processor cores and the second set of processor cores are configured to receive one or more control signals from one or more control blocks located in a periphery of the multi-core processor.

6. The multi-core processor of claim 5, wherein the first set of processor cores is adjacent to the second set of processor cores, and the one or more control blocks are configured to select the first supply voltage and the second supply voltage to maintain a differential relationship between the first supply voltage and the second supply voltage.

7. The multi-core processor of claim 6, wherein the differential relationship is based on having an output voltage level associated with the first set of processor cores to be within an acceptable input voltage level associated with the second set of processor cores.

8. The multi-core processor of claim 1, wherein the first set of processor cores are located in a first region of the multi-core processor, and the second set of processor cores are located in a second region of the multi-core processor.

9. The multi-core processor of claim 8, wherein the first region and the second region are overlapping regions of the multi-core processor.

10. The multi-core processor of claim 8, wherein the first region and the second region are non-overlapping regions of the multi-core processor.

11. The multi-core processor of claim 8, wherein the first region corresponds to a first row of the multi-core processor, and wherein the second region corresponds to a second row of the multi-core processor.

12. The multi-core processor of claim 1, wherein the interface block is configured to idle communications between the first set of processor cores and the second set of processor cores when one or more of the first output clock signal and/or the second output clock signal is determined to have changed.

13. The multi-core processor of claim 12, wherein the interface block is configured to resume communication between the first set of processor cores and the second set of processor cores after one or more of the first output clock signal and/or the second output clock signal is determined to have stabilized.

US 8,549,339 B2

9

**14**. The multi-core processor of claim **1**, wherein the first set of processor cores and the second set of processor cores are configured to receive one or more control signals from one or more control blocks located in a common region that is substantially central to the first set of processor cores and the second set of processor cores.

**15**. A method for managing communications in a multi-core processor that includes a plurality of processor cores having a first set of processor cores and a second set of processor cores, the method comprising:

idling communications between the first set of processor cores and the second set of processor cores in response to a clock frequency change request for the first set of processor cores; and

resuming communications between the first set of processor cores and the second set of processor cores after having determined that a first phase lock loop operation associated with a first clock signal for the first set of processor cores has acquired a first lock signal and a second phase lock loop operation associated with a second clock signal for the second set of processor cores has also acquired a second lock signal, wherein the first clock signal is independent from the second clock signal.

**16**. The method of claim **15**, wherein resuming communications further comprises having determined that a third phase lock loop operation associated with a third set of processor cores in the multi-core processor has acquired a third lock signal, wherein the third set of processor cores is adjacent to the first set of processor cores.

**17**. The method of claim **16**, wherein the second set of processor cores is adjacent to the first set of processor cores.

**18**. A non-transitory computer-readable medium containing a sequence of instructions to manage communications in a multi-core processor that includes a plurality of processor cores having a first set of processor cores and a second set of processor cores, which when executed by a computing device, causes the computing device to:

issue a first command to idle communications between the first set of processor cores and the second set of processor cores in response to a clock frequency change request for the first set of processor cores;

issue a second command to resume communications between the first set of processor cores and the second set of processor cores after having determined that a first phase lock loop operation associated with a first clock signal for the first set of processor cores has acquired a first lock signal and a second phase lock loop operation associated with a second clock signal for the second set

10

of processor cores has also acquired a second lock signal, wherein the first clock signal is independent from the second clock signal.

**19**. The non-transitory computer-readable medium of claim **18**, further including a sequence of instructions, which when executed by the computing device, causes the computing device to determine whether a third phase lock loop operation associated with a third set of processor cores in the multi-core processor has acquired a third lock signal before issuing the second command, wherein the third set of processor cores is adjacent to the first set of processor cores.

**20**. The non-transitory computer-readable medium of claim **19**, wherein the second set of processor cores is adjacent to the first set of processor cores.

**21**. A multi-core processor, comprising:

a first set of processor cores of the multi-core processor, wherein each processor core from the first set of processor cores is configured to dynamically receive a first supply voltage from a power control block and a first output clock signal from a first phase lock loop (PLL) having a first clock signal as input in a clock control block;

a second set of processor cores of the multi-core processor, wherein each processor core from the second set of processor cores is configured to dynamically receive a second supply voltage from the power control block and a second output clock signal from a second PLL having a second clock signal as input in the clock control block, wherein the first supply voltage is independent from the second supply voltage, and the first clock signal is independent from the second clock signal; and

an interface block coupled to the first set of processor cores and also coupled to the second set of processor cores, wherein the interface block is configured to facilitate communication between the first set of processor cores and the second set of processor cores.

**22**. The multi-core processor of claim **21**, wherein the interface block is configured to idle communications between the first set of processor cores and the second set of processor cores when one or more of the first output clock signal and/or the second output clock signal is determined to have changed.

**23**. The multi-core processor of claim **22**, wherein the interface block is configured to resume communication between the first set of processor cores and the second set of processor cores after one or more of the first output clock signal and/or the second output clock signal is determined to have stabilized.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.          : 8,549,339 B2                          Page 1 of 1
APPLICATION NO.     : 12/713220
DATED               : October 1, 2013
INVENTOR(S)         : Wolfe et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

On the Title Page

In Item (56), under "OTHER PUBLICATIONS", in Column 2, Line 1, delete "al" and insert -- al., --, therefor.

In Item (56), under "OTHER PUBLICATIONS", in Column 2, Line 8, delete "al" and insert -- al., --, therefor.

In Item (56), under "OTHER PUBLICATIONS", in Column 2, Line 11, delete "al" and insert -- al., --, therefor.

In Item (56), under "OTHER PUBLICATIONS", in Column 2, Line 15, delete "Howlett-Packard" and insert -- Hewlett-Packard --, therefor.

In the Specifications

In Column 5, Line 61, delete "and or" and insert -- and/or --, therefor.

In the Claims

In Column 9, Line 7, in Claim 15, delete "for managing" and insert -- to manage --, therefor.

Signed and Sealed this
Sixth Day of May, 2014

*Michelle K. Lee*

Michelle K. Lee
*Deputy Director of the United States Patent and Trademark Office*

# EXHIBIT  B

# AND8248/D

# System Clock Generators: A Comparison of a PLL Synthesizer vs. a Crystal Oscillator Clock

**Prepared by: Casey Stys and Paul Shockman**
ON Semiconductor
Application Engineers



**ON Semiconductor®**

http://onsemi.com

### APPLICATION NOTE

### Abstract

*An electronic system requires a reliable, precision timing reference: the system clock. We examine and compare two forms of system clocks, the Crystal Oscillator and the Phase Locked Loop Synthesizer.*

### The System Clock

Generation and distribution of the system master clock will require at minimum an oscillator source driving a gain amplifier, translation to standard logic levels, and a clock distribution network. Two of the most common oscillator sources are the Crystal Oscillator Clock Module and the Phase Locked Loop (PLL) Synthesizer Clock. A complex system clock may include: a mux function between oscillator sources, additional translation to other logic family levels, fanout buffering, zero delay buffering, skew tuning, higher multiple frequency generation, and frequency division in diverse topologies. See Figure 1: Generic System Clock Tree Design illustrating various possible topologies and applications of On Semiconductor devices in a system clock tree.



**Figure 1. Generic System Clock Tree Design**

© Semiconductor Components Industries, LLC, 2006
December, 2006 – Rev. 1

Publication Order Number:
AND8248/D

**AND8248/D**

Today's very complex system designs may need to distribute numerous clock copy signals at several logic standards and at several frequencies. Some boards may also demand tight skew and synchronization characteristics between several devices requiring zero delay buffers and skew tuning buffers. Multiple copies of a clock may require a fanout buffer for distribution. Frequency multiples of a clock may require a PLL synthesizer. All these requirements may be combined in challenging clock tree designs.

**Crystal Oscillator Clock (XO)**

The traditional System Clock Tree oscillator source in general use is a quartz crystal. For oscillator operation, the quartz crystal must also be in a loop with a gain amplifier to compensate for crystal losses and to match impedances. This gain amplifier must also be level translated to standard logic levels for use by the system clock distribution network. For a generalized schematic of the Crystal Oscillator Clock, see Figure 2: Typical Crystal Oscillator Clock.



**Figure 2. Typical Crystal Oscillator Clock**

A Crystal Oscillator Clock (or XO) is usually found as a single supply hermetically sealed, or "canned", module with an internal crystal and integrated circuitry, although a discrete hybrid remains an alternative design. These canned oscillators are complex to manufacture and may be relatively expensive with long lead times and unique custom customer requirements often driving cost higher. The Crystal Oscillator Clock is generally limited to a single frequency and only one logic output, or a single differential pair. Operation may be in a fundamental or overtone mode.

Key characteristic features of the Crystal Oscillator Clock may include:

      Frequency Accuracy
      Frequency Precision
      Stability across temperature and voltage
      Oscillation startup time
      Aging
      Jitter (Phase Noise, Cycle−to−Cycle, Period)
      Output load capability
      Duty Cycle
      Rise and fall times
      Power Dissipation or current demand
Some advantages may include:
      Crystal ease of use
      Frequency Accuracy and Precision
      Family logic level compatible output
Some disadvantageous limitations may include:
      Crystal fixed operating frequency
      Single Output
      Custom order application specific frequencies
      Large physical size
      Long delivery lead time

**PLL−Synthesizers**

A more advanced System Clock Tree oscillator source is a Phase Locked Look Synthesizer clock generator offering greater design flexibility and potential cost reduction. By utilizing fully integrated Phase Locked Loop (PLL) circuitry, higher functions become available such as multiples of the crystal frequency, and output phase alignment. A single Synthesizer clock device could offer substantial cost reduction over a design with multiple crystals of different frequencies. ON Semiconductor PLL−synthesizer clock generators offer comparable or better parametric performance, greater design flexibility, a lower overall cost potential, and reduced lead times compared to the most widely used crystal oscillators. For a generalized schematic of a simple PLL Synthesizer Clock Generator, see Figure 3: Typical PLL Synthesizer Clock.



**Figure 3. Typical PLL Synthesizer Clock**

A generic PLL Synthesizer Clock device requires an external crystal and contains an integrated phase−lock−loop (PLL) circuit capable of multiplying up or dividing down the crystal's unique frequency. An external crystal permits the added flexibility of fine−tuning or pulling frequency, but requires additional external stabilizing capacitors, one on each side of the crystal.

For operation, the quartz crystal must also be in a loop with a gain amplifier to compensate for crystal losses and to match impedances. This gain amplifier output becomes a Reference signal to the Phase Frequency Detector (PFD) which drives a charge pump and a Low Pass Filter (LPF). The LPF output approaches a DC level which drives the Voltage Controlled Oscillator (VCO) at frequency. Output from the VCO may be ported out of the device, but will also be sent through a Divide counter (÷N) and back to the PFD as a Feedback signal. As a loop dynamic, the PFD compares the Feedback signal to the Reference and outputs a pulse width modulated signal to pump the VCO frequency/phase either up or down, accordingly to the crystal Reference. The Charge Pump assures the pulse width modulated signal will not vary in the HIGH and LOW levels. The "÷N" counter will multiply up the VCO output frequency. For "Phase Lock Loop General Operations", see AND8040.

Common to all PLL outputs, the VCO output phase approaches zero with respect to the input Reference signal (zero delay buffering). When the PLL feedback loop "÷N" is externally accessibly, controlled delay may be added. More complex PLL Synthesizer devices may incorporate multiple PLLs, additional input or output dividers, logic family translators, or banks of fanout. The VCO output must also be level translated to standard logic levels for use by the system clock distribution network.

Key characteristic features of a generic PLL Synthesizer Clock include all those of the Crystal Oscillator Clock:

      Frequency Accuracy
      Frequency Precision
      Stability across temperature and voltage
      Oscillation startup time
      Aging
      Jitter (Phase Noise, Cycle−to−Cycle, Period)
      Output load capability
      Duty Cycle
      Rise and fall times
      Power Dissipation or current demand
And additionally,
      Multiple Outputs
      Aligned Outputs
      Multiple Selectable Frequencies
      Pullable Frequency
      Jitter Rejection

Some advantages of the PLL Synthesizer Clock include all those found in the Crystal Oscillator Clock:
      Ease of use
      Frequency accuracy and precision

      Family logic level compatible output
And potential benefits:
      Lower frequency (less costly) crystal
      Multiple logic family outputs
      Differential outputs
      Multiple selectable frequencies
      Spread spectrum option
      Layout board area optimization (reduced overall footprint)
      Pullable Frequency
      Jitter Rejection
      Shorter delivery lead time
      Simplifies customer BOM
Some challenges may include:
      Crystal capacitor considerations

## Frequency Accuracy and Stability

Frequency is exactly defined as the number of oscillations per second, but is often approximated as instantaneous frequency (reciprocal of the wavelength period) measurement with significant error. Frequency precision refers to the number of significant digits in a frequency measurement.

Output Frequency (Fout) accuracy is a marginal error (deviation boundary) from a nominal or mean spec value (Fin) and usually expressed in Parts Per Million (PPM). Crystal operation accuracy is typically measured at 25°C, where effects due to changes in operating temperature, input voltage, aging shock and vibration are most stable.

Frequency stability is typically expressed in Parts Per Million (PPM). It is as spec deviation boundary from a reference frequency over such parameters such as temperature, voltage, and time (drift and aging). Common crystal spec stability values overvoltage and temperature are 25, 50 and 100 PPM.

A crystal driven PLL frequency synthesizer would be phase and frequency locked on the crystal signal, thus retaining the crystal spec stability and accuracy in PPM. In a PLL the mean output frequency, fout, is a multiplier factor, N, of the input reference mean frequency:

$$Fout = (N)(Fin) \qquad (eq.\ 1)$$

Where:
    Fout is the mean output frequency (in MHz)
    N is the multiplier factor
    Fin is the input reference mean frequency (in MHz)

A PLL output signal frequency accuracy, Fouta, expressed as ± PPM (parts per million) deviation relative to the output target mean frequency is equal to the input accuracy expressed as ± PPM deviation relative to the input target reference mean frequency. This due to the PLL locking both phase and frequency to the input signal.

$$\begin{aligned} Fouta\ (output\ frequency\ \pm\ PPM) \\ = Fina\ (input\ frequency\ \pm\ PPM) \end{aligned} \qquad (eq.\ 2)$$

Where:

Fouta is the output deviation ($\pm$ PPM relative to the output target mean frequency)

Fina is the input deviation ($\pm$ PPM relative to the input target reference mean frequency)

If the input signal deviates $\pm 20$ PPM from the input mean frequency, the output reference will deviate $\pm 20$ PPM from the output mean frequency, regardless of the PLL's N loop multiplier factor. When frequency accuracy boundaries are expressed in Hertz (or MHz), they get multiplied by N, the PLL loop multiplier factor.

For example:

An NB4N507 PLL with a multiplier factor of 8 has an input reference crystal frequency of 16 MHz with $\pm 20$ PPM accuracy. What is the output accuracy and frequency?

The output mean frequency, Fout, will be Fin times 8, the multiplier factor according to Equation 1.

$$Fout = (N)(Fin)$$
$$= 8 \, (16 \times 10^\wedge 6)$$
$$= 128 \text{ MHz}$$

Since the mean input frequency (Fin) of 16 MHz signal has the accuracy, Fa, of $\pm 20$ PPM, the input signal deviation Fina is $\pm 320$ Hertz:

$$Fina = (Fin)(Fa) \qquad\qquad (eq. 3)$$
$$= (16 \times 10^\wedge 6)(\pm 20 \times 10^\wedge -6)$$
$$= \pm 320 \text{ Hertz}$$

The crystal frequency will range from 16.00032 MHz (or 16,000,320 Hz) to 15.99968 MHz (or 15,999,680 Hz).

Output frequency signal (Fout) of 128 MHz also has accuracy, Fa, of $\pm 20$ PPM, and will deviate $\pm 2560$ Hertz:

$$Fouta = (Fout)(Fa) \qquad\qquad (eq. 4)$$
$$= (128 \times 10^\wedge 6)(\pm 20 \times 10^\wedge -6)$$
$$= \pm 2560 \text{ Hertz}$$

The output frequency will range from 128.00256 MHz (or 128,002,560 Hz) to 127.99744 MHz (or 127,997,440 Hz). Precision was not considered in this example.

## Jitter

A stable PLL–based frequency synthesizer will display output frequency stability primarily determined by the crystal specifications, while presenting a characteristic additive Rj (random jitter) magnitude greater than the crystal spec. Output Jitter magnitude may be specified as Rj(RMS), Cycle–to–Cycle (RMS), Period (RMS), or total jitter (Peak–to–Peak) is measured time units, typically as ps.

Random Jitter (Rj) is a stochastic deviation in the edge placement from an ideal reference. This measurement is often made in the time domain on an accumulation of instantaneous waveforms (typ. 10,000). When measuring frequency, true Gaussian Rj (random jitter) is always present and must always sum to zero, whereas the magnitude measurement of Rj (random jitter) is an independent parameter to frequency. Period jitter is an accumulation (typ. 10,000) of instantaneous deviations in the waveform period from ideal reference locations

Alternatively, the jitter measurement may be derived from frequency domain Phase Noise summation, usually across a specified offset measurement frequency band from the ideal reference, or carrier. Sampling time close to the carrier becomes impractically long, limiting the measurement band lower cutoff. The upper measurement band cutoff becomes limited by approaching the residual noise floor.

Any crystal shock or vibration can produce large phase deviations. Supply noise, crosstalk, and EMI can affect jitter.

## Summary

A System Clock Tree may consist of one or several Crystal Oscillator Clocks (XOs) which may be replaced by a PLL Synthesizer Clock and divider. Each PLL Synthesizer Clock output frequency may be further divided down to provide a replacement for two or more different Crystal Oscillator Clocks (XOs).

EXAMPLE 1)

DESIGN A has four separate Crystal Oscillator Clocks (XOs) and four Xtals:

    (2)  16 MHz XO

    (1)  32 MHz XO

    (1)  128 MHz XO

Compared to DESIGN B with one Crystal Oscillator Clock (XOs) and one Xtal:

    (1)  16 MHz Xtal on NB4N507 PLL with X8 selected for 128 MHz

    (1)  NB6L230 $\div 4$ (32 MHz) and $\div 8$ (16 MHz)

    (1)  MC100EP11 (1:2 Fanout of 16 MHz)

EXAMPLE 2)

DESIGN C has three separate Crystal Oscillator Clocks (XOs) and three Xtals:

    (1)  200 MHz XO

    (1)  100 MHz XO

    (1)  50 MHz XO

Compared to DESIGN D with one Crystal Oscillator Clock (XOs) and one Xtal:

    (1)  25 MHz Xtal on NB4N507 PLL with X8 selected for 200 MHz

    (1)  Use the 200 MHz into a MC100LVEP34 with $\div 2$ (100 MHz) and $\div 4$ (50 MHz)

**ON Semiconductor** and Ⓜ are registered trademarks of Semiconductor Components Industries, LLC (SCILLC). SCILLC reserves the right to make changes without further notice to any products herein. SCILLC makes no warranty, representation or guarantee regarding the suitability of its products for any particular purpose, nor does SCILLC assume any liability arising out of the application or use of any product or circuit, and specifically disclaims any and all liability, including without limitation special, consequential or incidental damages. "Typical" parameters which may be provided in SCILLC data sheets and/or specifications can and do vary in different applications and actual performance may vary over time. All operating parameters, including "Typicals" must be validated for each customer application by customer's technical experts. SCILLC does not convey any license under its patent rights nor the rights of others. SCILLC products are not designed, intended, or authorized for use as components in systems intended for surgical implant into the body, or other applications intended to support or sustain life, or for any other application in which the failure of the SCILLC product could create a situation where personal injury or death may occur. Should Buyer purchase or use SCILLC products for any such unintended or unauthorized application, Buyer shall indemnify and hold SCILLC and its officers, employees, subsidiaries, affiliates, and distributors harmless against all claims, costs, damages, and expenses, and reasonable attorney fees arising out of, directly or indirectly, any claim of personal injury or death associated with such unintended or unauthorized use, even if such claim alleges that SCILLC was negligent regarding the design or manufacture of the part. SCILLC is an Equal Opportunity/Affirmative Action Employer. This literature is subject to all applicable copyright laws and is not for resale in any manner.

## PUBLICATION ORDERING INFORMATION

**LITERATURE FULFILLMENT**:
  Literature Distribution Center for ON Semiconductor
  P.O. Box 5163, Denver, Colorado 80217 USA
  **Phone**: 303−675−2175 or 800−344−3860 Toll Free USA/Canada
  **Fax**: 303−675−2176 or 800−344−3867 Toll Free USA/Canada
  **Email**: orderlit@onsemi.com

**N. American Technical Support**: 800−282−9855 Toll Free
  USA/Canada
**Europe, Middle East and Africa Technical Support**:
  Phone: 421 33 790 2910
**Japan Customer Focus Center**
  Phone: 81−3−5773−3850

**ON Semiconductor Website: www.onsemi.com**

**Order Literature**: http://www.onsemi.com/orderlit

For additional information, please contact your local
Sales Representative

# EXHIBIT  C

US007538625B2

(12) **United States Patent**
     Cesky et al.

(10) **Patent No.:     US 7,538,625 B2**
(45) **Date of Patent:        May 26, 2009**

(54) **METHOD AND ENHANCED PHASE LOCKED LOOP CIRCUITS FOR IMPLEMENTING EFFECTIVE TESTING**

(75) Inventors: **Michael David Cesky**, Rochester, MN (US); **James David Strom**, Rochester, MN (US)

(73) Assignee: **International Business Machines Corporation**, Armonk, NY (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 135 days.

(21) Appl. No.: **11/679,323**

(22) Filed: **Feb. 27, 2007**

(65) **Prior Publication Data**

US 2008/0204154 A1      Aug. 28, 2008

(51) **Int. Cl.**
     *H03L 7/00*        (2006.01)
     *H03L 7/06*        (2006.01)
(52) **U.S. Cl.** ............................. **331/51**; 331/18; 331/25; 331/16; 327/156; 327/157
(58) **Field of Classification Search** .................. 331/18, 331/25, 16, 34, 51, 10
     See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,757,240 A * 5/1998 Boerstler et al. .............. 331/34
2008/0007348 A1  1/2008 Huang et al.

* cited by examiner

*Primary Examiner*—Rexford Barnie
*Assistant Examiner*—Thienvu V Tran
(74) *Attorney, Agent, or Firm*—Joan Pennington

(57)        **ABSTRACT**

A method and enhanced phase-locked loop (PLL) circuit enable effective testing of the PLL. A phase frequency detector generates a differential signal, receiving a reference signal and a feedback signal of an output signal of the PLL circuit. A charge pump is coupled to the phase frequency detector receiving the differential signal. The charge pump applies either negative or positive charge pulses to a low-pass filter, which generates a tuning voltage input applied to a voltage controlled oscillator. A first divider is coupled to the voltage controlled oscillator receives and divides down the VCO output signal, providing the output signal of the PLL circuit. A second divider receives the output signal of the PLL circuit and provides the feedback signal to the phase frequency detector. The output signal of PLL circuit is applied to a clock distribution.

12 Claims, 4 Drawing Sheets

300



PRIOR ART



## FIG. 1

PRIOR ART



FIG. 2



FIG. 3

| FOUT (MHZ) | FRACTIONAL-N DIVIDER (F=1...5, K=1, N=10) | FVCO(MHZ) |
|------------|-------------------------------------------|-----------|
| 750        | (10+1/1)                                  | 7575      |
| 750        | (10+1/2)                                  | 7875      |
| 750        | (10+1/3)                                  | 7750      |
| 750        | (10+1/4)                                  | 7687.5    |
| 750        | (10+1/5)                                  | 7650      |

# FIG. 4

US 7,538,625 B2

1

**METHOD AND ENHANCED PHASE LOCKED LOOP CIRCUITS FOR IMPLEMENTING EFFECTIVE TESTING**

FIELD OF THE INVENTION

The present invention relates generally to the data processing field, and more particularly, relates to a method and apparatus for implementing enhanced phase-locked loop (PLL) circuits enabling effective testing.

DESCRIPTION OF THE RELATED ART

Phase-Locked Loop circuits are used in frequency synthesizers to provide an output signal that has a selectable, precise, and stable frequency with low frequency spurs and good phase noise. The phase-locked loop output signal may connect to the clock distribution of a games or server processor chip or provide the clock for a high speed IO interface and many other applications.

When a PLL is locked, a simple phase-frequency detector can send out a small glitching pulse every reference clock cycle. The charge pump reacts to this glitch the same way it reacts to any other input, it changes the control voltage and current, which causes a glitch in the control voltage and charge pump current. This causes the VCO frequency to change.

Phase-Locked Loops are designed, optimized, and characterized within the scope and specifications of the chips they are integrated in; the robustness of the design is rarely tested. During a time when chip designs are being used in many applications, only slightly altered, knowing the full strength and capabilities of components within the chip, especially phase-locked loops, becomes more beneficial to circuit designers. A need exists to characterize the robustness of phase-locked loops and to create a design that enables effective phase-locked loop characterization.

During phase-locked loop characterization, it is essential to run exercisers on the rest of the chip while taking characterization measurements for the phase-locked loop circuit. Exercisers including various host programs and interactive utilities are used in a comprehensive test strategy and system verification testing for hardware (HW), software and firmware (FW) elements in integrated circuit chips and systems. Existing exercisers such as Trash, IDE, TNK, HTX or AVP can be used for chip testing during phase-locked loop characterization.

Exercisers run commands simultaneously and continuously on chips creating noise, the created noise generates jitter within phase-locked loops. For example, the noise from running a microprocessor with the exercisers or during functional operation is difficult to recreate in a test site or pad cage environment.

Exercisers will stop running or crash when one tries to input a frequency greater than the chip can handle; this is a dilemma in fully testing the robustness of phase-locked loops because traditionally, phase-locked loops are capable of running significantly faster than the rest of the chip. For single-use chips, the phase-locked loop would not be fully tested outside the chips frequency range.

However, with today's multiple applications for chips, to identify the limitations and capabilities of phase-locked loop designs would be very beneficial. Therefore, a design that provides the ability to test the phase-locked loops at frequencies above the chips frequency range while still running exercisers is necessary.

2

SUMMARY OF THE INVENTION

A principal aspect of the present invention is to provide a method and enhanced phase-locked loop (PLL) circuit for implementing effective testing. Other important aspects of the present invention are to provide such method and enhanced phase-locked loop (PLL) circuit substantially without negative effect and that overcome many of the disadvantages of prior art arrangements.

In brief, a method and enhanced phase-locked loop (PLL) circuit are provided for implementing effective testing. A phase frequency detector generates a differential signal, receiving a reference signal and a feedback signal of an output signal of the PLL circuit. A charge pump is coupled to the phase frequency detector receiving the differential signal. The charge pump applies either negative or positive charge pulses to a low-pass filter depending on whether the reference signal phase leads or lags the phase of the output feedback signal and generates a tuning voltage input applied to a voltage controlled oscillator. A first divider is coupled to the voltage controlled oscillator receives and divides down the VCO output signal, providing the output signal of the PLL circuit. A second divider receives the output signal of the PLL circuit and provides the feedback signal to the phase frequency detector. The output signal of PLL circuit is applied to a clock distribution.

In accordance with features of the invention, the first divider is a fractional-N divider. The first divider allows the phase-locked loop VCO output signal to vary in a frequency range much greater than a maximum frequency at the clock tree. The output signal of the PLL circuit is N-divided and compared to the reference signal at the phase frequency detector.

In accordance with features of the invention, the phase-locked loop is enabled to vary in frequency range significantly higher than the frequency capabilities of the clock tree, while maintaining the use of exercises and the generation of real noise during testing the phase-locked loop. The robustness of the phase-locked loop circuit can be tested and its usefulness in multiple applications can be identified.

BRIEF DESCRIPTION OF THE DRAWINGS

The present invention together with the above and other objects and advantages may best be understood from the following detailed description of the preferred embodiments of the invention illustrated in the drawings, wherein:

FIG. 1 is a prior art phase-locked loop circuit including a feedback N divider;

FIG. 2 is a prior art phase-locked loop circuit including a feedback fractional-N divider;

FIG. 3 illustrates an exemplary phase-locked loop circuit including a first and second divider in accordance with the preferred embodiment; and

FIG. 4 illustrates exemplary operation of the first divider of the phase-locked loop circuit of FIG. 3 in accordance with the preferred embodiment.

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

FIG. 1 illustrates a basic phase-locked loop circuit. The basic phase-locked loop circuit receives a reference signal from a reference oscillator 102, and includes a phase/frequency detector 104 coupled to a charge pump 106, a low-pass filter (LPF) 108, a voltage-controlled oscillator 110, and a feedback divider or N divider 112. The phase/frequency

**3**

detector **104** takes a reference signal and generates an output voltage that is proportional to the phase difference between the input reference signal and the output signal fed back from the VCO **110**. The charge pump **106** then delivers either positive or negative charge pulses to the low-pass filter **108** depending on whether the reference signal phase leads or lags the phase of the feedback of the VCO output signal. These charge pulses are integrated by the low-pass filter **108** to generate a tuning voltage input into the VCO **110**. The output frequency of the VCO **110** moves up or down based upon the tuning voltage in order to synchronize with the reference signal. Typically, the tuning voltage from the loop filter **108** moves higher or more positive to advance the VCO output phase and make its frequency higher and vice versa for the down voltages. The VCO output signal, FOUT, is related to the reference signal, FREF by the relationship FOUT=N*FREF, where N represents the feedback divider **112**. Table 1 shows frequencies attainable with integer-N dividers.

TABLE 1

| FREF (MHz) | Integer-N (N = 2 . . . 6) | FOUT (MHz) |
|---|---|---|
| 10 | 2 | 20 |
| 10 | 3 | 30 |
| 10 | 4 | 40 |
| 10 | 5 | 50 |
| 10 | 6 | 60 |

In a basic design, the phase-locked loop varies in frequency, the clock distribution of a game or server processor chip, high speed IO interface, or other application is fixed in frequency, and the feedback divider to the phase-locked loop is a fixed integer, N, value. This setup does not allow the phase-locked loop to run at frequencies greater than the clock tree paths can handle. With the N divider, N is an integer and therefore, the smallest increment in the VCO output frequency value is equal to the magnitude of the reference frequency. In order to have small step sizes between adjacent output frequencies, a very low reference frequency would be required. This, however, would introduce a limited frequency range and a long settling time for the phase-locked loop. A low reference frequency does not allow characterizing the inter-chip interfaces at high frequencies.

FIG. **2** illustrates a conventional fractional-N divider that is needed to provide a rational multiple of the reference signal frequency and allow for smaller step sizes. The basic fractional-N divider phase-locked loop circuit receives a reference signal from a reference oscillator **202**, and includes a phase/frequency detector **204** coupled to a charge pump **206**, a low-pass filter (LPF) **208**, a voltage-controlled oscillator **210**, and a feedback divider or fractional-N divider **212**. In a basic fractional-N phased-lock loop, the VCO output signal, FOUT is related to the reference signal, FREF, by the relationship FOUT=FREF*(N+K/F), where N is the integer divider, F is the fractional modulus of the circuit, such as an 8 would indicate a $\frac{1}{8}^{th}$ fractional resolution, and K is the fractional channel of operation. Table 2 shows frequencies attainable with fractional-N dividers.

TABLE 2

| $F_{REF}$ (MHz) | Fractional-N (F = 1 . . . 5, K = 1, N = 10) | $F_{VCO}$ (MHz) |
|---|---|---|
| 10 | $(10 + \frac{1}{1})$ | 110 |
| 10 | $(10 + \frac{1}{2})$ | 105 |

**4**

TABLE 2-continued

| $F_{REF}$ (MHz) | Fractional-N (F = 1 . . . 5, K = 1, N = 10) | $F_{VCO}$ (MHz) |
|---|---|---|
| 10 | $(10 + \frac{1}{3})$ | 103.33 |
| 10 | $(10 + \frac{1}{4})$ | 102.5 |
| 10 | $(10 + \frac{1}{5})$ | 102 |

In accordance with features of the invention, a method and phase-locked loop (PLL) circuit are provided for testing the robustness of the PLL design. The phase-locked loop (PLL) circuit of the invention enables the complete and effective characterization of components within the chip, specifically including the phase-locked loop. This invention allows the robustness of the phase-locked loop to be fully tested. By altering the loop in the phase-locked loop to include a fractional-N divider prior to the clock distribution tree and an integer-N divider prior to the phase/frequency detector, it is possible with the phase-locked loop (PLL) circuit of the invention to fully characterize the phase-locked loop while still running exercisers.

Having reference now to the drawings, in FIG. **3**, there is shown an exemplary phase-locked loop (PLL) circuit generally designated by the reference character **300** in accordance with the preferred embodiment. The phase-locked loop (PLL) circuit **300** is arranged for implementing enabling effective testing in accordance with the preferred embodiment. The PLL circuit **300** includes a reference oscillator **302** coupled to a phase frequency detector The phase frequency detector **304** generates a differential signal, receiving a reference signal and a feedback signal of an output signal of the PLL circuit **300**. A charge pump **306** is coupled to the phase frequency detector **304** receiving the differential signal. The charge pump **306** applies either negative or positive charge pulses to a low-pass filter **308** depending on whether the reference signal phase leads or lags the phase of the output feedback signal and generates a tuning voltage input applied to a voltage controlled oscillator (VCO) **310**.

A first divider **312** coupled to the voltage controlled oscillator (VCO) **310**, receives and divides down the VCO output signal, providing the output signal FOUT of the PLL circuit **300**. The PLL circuit **300** includes a second divider **314** receives the output signal of the PLL circuit and provides the feedback signal to the phase frequency detector **304**. The output signal FOUT of the PLL circuit **300** is applied to a clock distribution or clock tree **316**.

In accordance with features of the invention, the phase-locked loop (PLL) circuit **300** includes the reference signal entering the phase-locked loop as normal, and exiting to a fractional-N divider. This added fractional-N divider **312** allows the operation frequency of the phase-locked loop to vary significantly while still maintaining a fixed frequency FOUT at the clock tree **316**. The location of FOUT that the clock tree normally sees is now after the fractional-N divider **312**. The FOUT signal is also N-divided and compared to the reference signal at the phase frequency detector **304** like a typical phase-locked loop. The new loop configuration of the phase-locked loop (PLL) circuit **300** allows the phase-locked loop to vary in frequency range well outside the capabilities of the clock tree **316**, thus, including the use of exercises and the generation of real noise to the phase-locked loop. The robustness of the phase-locked loop circuit **300** can now be tested and its usefulness in multiple applications can be realized. Also, the need for separate hardware to characterize the phase-locked loop circuit **300** and understand its usefulness is not as urgent and necessary. This new design makes transi-

| 5 | 6 |

tions to a new application and reuse of the current design for separate chips easier for phase-locked loop designers.

In the PLL circuit **300**, the first divider **312** of the preferred embodiment is a fractional-N divider. The second divider **314** is an integer-N divider and is the feedback divider of the PLL circuit **300**.

The VCO output signal, FVCO, is related to the output signal, FOUT, by the relationship FVCO=FOUT*(N+K/F), where N is an integer, F is the fractional modulus of the fractional-N divider **312**, and K/F represents fractional resolution such as with, K of 1 and F equal to 8 indicates a $\frac{1}{8}^{th}$ fractional resolution.

FIG. **4** shows exemplary frequencies attainable with fractional-N divider As can be appreciated from FIG. **4**, the VCO output signal, FVCO, is divided down by the fractional-N divider **312** to provide the output signal, FOUT that is applied to the clock tree **316**.

The new loop configuration of PLL circuit **300** allows the phase-locked loop VCO output signal to vary in frequency range much greater than the capabilities of the clock tree **316**, thus, maintaining the use of exercises and the generation of real noise to the phase-locked loop being tested and fully characterized. The previous PLL designs, such as shown in FIGS. **1** and **2**, would cause exercisers to crash and halt the generation of real noise from the rest of the chip.

While the present invention has been described with reference to the details of the embodiments of the invention shown in the drawing, these details are not intended to limit the scope of the invention as claimed in the appended claims.

What is claimed is:

**1**. A phase-locked loop (PLL) circuit comprising:
a phase frequency detector receiving a reference signal and a feedback signal of an output signal of the PLL circuit, said phase frequency detector generating a differential signal,
a charge pump coupled to said phase frequency detector receiving said differential signal, said charge pump generating either negative or positive charge pulses responsive to said reference signal and said output feedback signal,
a low-pass filter coupled to said charge pump, said low-pass filter generating a tuning voltage,
a voltage controlled oscillator coupled to said low-pass filter receiving said tuning voltage, said voltage controlled oscillator generating a VCO output signal,
a first divider coupled to the voltage controlled oscillator receiving and dividing down said VCO output signal, said first divider providing the output signal of the PLL circuit;
a second divider receiving the output signal of the PLL circuit and providing said feedback signal to said phase frequency detector; and the output signal of the PLL circuit being applied to a clock tree, and
wherein said first divider is configured to allow the phase-locked loop VCO output signal to vary in a frequency range much greater than a maximum frequency at the clock tree.

**2**. The phase-locked loop (PLL) circuit as recited in claim **1** wherein said first divider is a fractional-N divider.

**3**. The phase-locked loop (PLL) circuit as recited in claim **1** wherein said output signal of PLL circuit is N-divided by said second divider and compared to the reference signal by said phase frequency detector.

**4**. The phase-locked loop (PLL) circuit as recited in claim **1** wherein said second divider is an integer-N divider.

**5**. A phase-locked loop (PLL) circuit comprising:
a phase frequency detector receiving a reference signal and a feedback signal of an output signal of the PLL circuit, said phase frequency detector generating a differential signal,
a charge pump coupled to said phase frequency detector receiving said differential signal, said charge pump generating either negative or positive charge pulses responsive to said reference signal and said output feedback signal,
a low-pass filter coupled to said charge pump, said low-pass filter generating a tuning voltage,
a voltage controlled oscillator coupled to said low-pass filter receiving said tuning voltage, said voltage controlled oscillator generating a VCO output signal,
a first divider coupled to the voltage controlled oscillator receiving and dividing down said VCO output signal, said first divider providing the output signal of the PLL circuit;
a second divider receiving the output signal of the PLL circuit and providing said feedback signal to said phase frequency detector; and the output signal of the PLL circuit being applied to a clock tree, and
said phase-locked loop VCO output signal having an operating frequency range greater than a maximum frequency at the clock tree, enabling the use of exercisers and noise generation during phase-locked loop testing within said operating frequency range.

**6**. The phase-locked loop (PLL) circuit as recited in claim **5** wherein said first divider is a fractional-N divider, said fractional-N divider represented by (N+K/F), where N represents an integer, F represents a fractional modulus, and K/F represents a fractional resolution of said first divider.

**7**. A method for implementing testing of a phase- locked loop (PLL) circuit including a phase frequency detector receiving a reference signal and a feedback signal of an output sinal of the PLL circuit, said phase frequency detector generating a differential signal, a charge pump coupled to said phase frequency detector receiving said differential signal, said charge pump generating either negative or positive charge pulses responsive to said reference signal and said output feedback signal, a low-pass filter coupled to said charge pump, said low-pass filter generating a tuning voltage, a voltage controlled oscillator coupled to said low-pass filter receiving said tuning voltage, said voltage controlled oscillator generating a VCO output signal, said method comprising the steps of:
providing a first divider coupled to the voltage controlled oscillator receiving and dividing down said VCO output signal, said first divider providing the output signal of the PLL circuit, and
providing a second divider coupled to said first divider receiving the output signal of the PLL circuit and providing the feedback signal to said frequency detector;
applying the first divider output signal of PLL circuit to a clock tree; and said phase-locked loop VCO output signal having an operating frequency range greater than a maximum frequency at the clock tree, further enabling the use of exercisers and noise generation during phase-locked loop testing within said operating frequency range.

**8**. The method for testing a phase-locked loop (PLL) circuit as recited in claim **7** wherein providing said first divider includes providing a fractional-N divider.

US 7,538,625 B2

7

**9**. The method for testing a phase-locked loop (PLL) circuit as recited in claim **8** wherein said fractional-N divider represented by (N+K/F), where N represents an integer, F represents a fractional modulus, and K/F represents a fractional resolution of said first divider.

**10**. The method for testing a phase-locked loop (PLL) circuit as recited in claim **7** wherein providing said second divider includes providing an integer-N divider.

**11**. The method for testing a phase-locked loop (PLL) circuit as recited in claim **10** wherein said output signal of

8

PLL circuit is N-divided by said second divider and the N-divided output signal is compared to the reference signal by the phase frequency detector.

**12**. The method for testing a phase-locked loop (PLL) circuit as recited in claim **7** wherein said first divider allows the phase-locked loop VCO output signal to vary in a frequency range much greater than a maximum frequency at the clock tree.

\* \* \* \* \*

# EXHIBIT D


US 20090106576A1

(19) **United States**

(12) **Patent Application Publication**  (10) Pub. No.: **US 2009/0106576 A1**

Jacobowitz et al.  (43) **Pub. Date:   Apr. 23, 2009**

(54) **METHODS AND SYSTEMS FOR DIGITALLY CONTROLLED MULTI-FREQUENCY CLOCKING OF MULTI-CORE PROCESSORS**

(75) Inventors:  **Lawrence Jacobowitz**, Wappingers Falls, NY (US); **Daniel J. Stigliani, JR.**, Hopewell Junction, NY (US)

Correspondence Address:
**CANTOR    COLBURN    LLP-IBM    POUGH-KEEPSIE**
**20 Church Street, 22nd Floor**
**Hartford, CT 06103 (US)**

(73) Assignee:  **INTERNATIONAL BUSINESS MACHINES CORPORATION**, Armonk, NY (US)

(21) Appl. No.:  **11/873,458**

(22) Filed:  **Oct. 17, 2007**

**Publication Classification**

(51) **Int. Cl.**
        ***G06F 1/08***        (2006.01)

(52) **U.S. Cl.** ...................................................... **713/501**

(57)            **ABSTRACT**

A method and system for digitally controlled multi-frequency clocking are provided. The method includes receiving a system reference oscillator clock frequency at a microprocessor including multiple cores. The system reference oscillator clock frequency provides a reference frequency to a local oscillator. The local oscillator supplies a core clock frequency to at least one of the cores. The method further includes adjusting the local oscillator to output the core clock frequency at a frequency greater than the system reference oscillator clock frequency as a function of digital frequency characteristic data associated with the core or cores. The method supports extendibility to larger systems and may support enhanced power management through frequency adjustments at the core level.





FIG. 1



FIG. 2



FIG. 3



FIG. 4



FIG. 5



FIG. 6



RECEIVE A SYSTEM REFERENCE OSCILLATOR CLOCK FREQUENCY AT A MICROPROCESSOR INCLUDING MULTIPLE CORES, WHERE THE SYSTEM REFERENCE OSCILLATOR CLOCK FREQUENCY PROVIDES A REFERENCE FREQUENCY TO A LOCAL OSCILLATOR, THE LOCAL OSCILLATOR SUPPLYING A CLOCK FREQUENCY TO AT LEAST ONE OF THE CORES 702

ADJUST THE LOCAL OSCILLATOR TO OUTPUT A FREQUENCY GREATER THAN THE SYSTEM REFERENCE OSCILLATOR CLOCK FREQUENCY AS A FUNCTION OF DIGITAL FREQUENCY CHARACTERISTIC DATA ASSOCIATED WITH THE AT LEAST ONE OF THE CORES 704

700

FIG. 7

US 2009/0106576 A1

1

## METHODS AND SYSTEMS FOR DIGITALLY CONTROLLED MULTI-FREQUENCY CLOCKING OF MULTI-CORE PROCESSORS

### CROSS-REFERENCE TO RELATED APPLICATIONS

[0001] This application contains subject matter related to the subject matter of the following co-pending application, which is hereby incorporated herein by reference in its entirety: U.S. patent application Attorney Docket No. POU920070208US1, entitled METHODS AND SYSTEMS FOR A DIGITAL FREQUENCY LOCKED LOOP FOR MULTI-FREQUENCY CLOCKING OF A MULTI-CORE PROCESSOR, filed on Oct. 17, 2007.

### BACKGROUND OF THE INVENTION

[0002] The present disclosure relates generally to computer system clocking, and, in particular, to digitally controlled multi-frequency clocking of multi-core processors.

[0003] Computer systems, such as servers, have encountered technology limitations associated with scaling performance by continuing to increase processor clock frequency. An approach being exploited in the industry to alleviate this bottleneck is the use of multiple processors working in synchronism to achieve higher performance. It has been shown that the scaling of these configurations for commercial use is approximately linear (sub-linear) with the number of processors but continues to scale with large numbers of processors. To date, the technique has been demonstrated for small numbers of processors (e.g., less than 100) at modest frequencies (e.g., less than 5 GHz). This approach usually contains multiple processor chips which are interconnected together with a clocking and data fabric to insure a quasi-synchronous structure. Silicon technology density improvements from generation to generation have enabled the placement of multiple processor cores on a processor chip to further the scaling of this paradigm.

[0004] This new paradigm, however, requires the distribution of a common clock to all the processor chips and cores. The increasing difficulty and hardware cost, as well as signal integrity concerns, associated with the transmission of high frequency clocking throughout a multi-chip and multi-core processor computer system make this an untenable long-term strategy for future systems. The state of the art for clock distribution is based on analog signals using transmission lines. This technique is limited in scalability due to skin effect, media and connector loss, crosstalk, termination mismatches, and the like. Today's large servers contain, for example, greater than 10 processor chips typically containing two cores. It is expected that demand for both the number of processor chips and cores per chip will increase in the future. Transmission of high frequency clocks (>5-10 GHz) for multiple chips, with multiple cores, in server systems is not feasible with known board technology and connectors. Operating this configuration in a tightly coupled mode, as a symmetric multi-processor (SMP), will require a new clocking paradigm.

[0005] Additionally, as chips become larger with more cores, regional process and parameter variability across a chip due to fabrication may result in each core having an optimal power/performance metric at a different clock voltage and clock frequency setting. As the chips get larger, the variability between the cores will increase. Obtaining optimum performance for each core within a multi-core system is not feasible today. Separate core fixed voltage domains are known, but they can only serve to optimize the power at the chip level and not obtain optimum chip performance.

[0006] Therefore, it would be beneficial to develop an approach to provide general processor clocking for multiple multi-core processor chip computer systems. Such an approach would enable a multiple processor computer system, e.g., a server, to maintain clock signal integrity and optimal frequency performance of each core independently, as well as higher total performance at a given power level. Conversely, power optimization on a processor core basis would also be advantageous. Further extendibility, as more cores per chip and larger chips exacerbate high frequency clock tree structures and optimization problems, would provide additional benefits. Accordingly, there is a need in the art for digitally controlled multi-frequency clocking in multi-core processor systems.

### BRIEF SUMMARY OF THE INVENTION

[0007] Embodiments of the invention include a method for digitally controlled multi-frequency clocking. The method includes receiving a system reference oscillator clock frequency at a microprocessor including multiple cores. The system reference oscillator clock frequency provides a reference frequency to a local oscillator. The local oscillator supplies a core clock frequency to at least one of the cores. The method further includes adjusting the local oscillator to output the core clock frequency at a frequency greater than the system reference oscillator clock frequency as a function of digital frequency characteristic data associated with the core or cores. The method supports extendibility to larger systems and may support enhanced power management through frequency adjustments at the core level.

[0008] Additional embodiments include a system for digitally controlled multi-frequency clocking. The system includes a microprocessor including multiple cores and a local oscillator supplying a core clock frequency to at least one of the cores in response to a reference frequency received from a system reference oscillator clock frequency. The local oscillator is adjusted to output the core clock frequency at a frequency greater than the system reference oscillator clock frequency as a function of digital frequency characteristic data associated with the core or cores. The system supports extendibility to larger systems and may support enhanced power management through frequency adjustments at the core level.

[0009] Other systems and/or methods according to embodiments will be or become apparent to one with skill in the art upon review of the following drawings and detailed description. It is intended that all such additional systems and/or methods be included within this description, be within the scope of the present invention, and be protected by the accompanying claims.

### BRIEF DESCRIPTION OF THE DRAWINGS

[0010] The subject matter which is regarded as the invention is particularly pointed out and distinctly claimed in the claims at the conclusion of the specification. The foregoing and other objects, features, and advantages of the invention are apparent from the following detailed description taken in conjunction with the accompanying drawings in which:

[0011]   FIG. 1 depicts multi-frequency clocking of a multi-core processor chip in accordance with exemplary embodiments;

[0012]   FIG. 2 depicts multi-frequency clocking of a processor multi-chip module in accordance with exemplary embodiments;

[0013]   FIG. 3 depicts multi-frequency clocking of a master processor node in accordance with exemplary embodiments;

[0014]   FIG. 4 depicts multi-frequency clocking of a non-master processor node in accordance with exemplary embodiments;

[0015]   FIG. 5 depicts multi-frequency clocking of an alternate configuration of a multi-core processor chip in accordance with exemplary embodiments;

[0016]   FIG. 6 depicts multi-frequency clocking of a multi-core processor chip sharing a local oscillator for multiple cores in accordance with exemplary embodiments; and

[0017]   FIG. 7 depicts an exemplary process for multi-frequency clocking.

[0018]   The detailed description explains the preferred embodiments of the invention, together with advantages and features, by way of example with reference to the drawings.

DETAILED DESCRIPTION OF THE INVENTION

[0019]   Exemplary embodiments provide methods and systems for digital multi-frequency clocking in multi-chip and/or multi-core processor systems. In exemplary embodiments, a computer system (e.g., a server) clocking subsystem with a single system reference oscillator provides both a reference clock for the computer system and a reference for individual processor cores but is not used directly to generate the individual core clocks. The system reference oscillator is used to provide a level of synchronization for the individual core clocks, which may be tightly synchronized or loosely synchronized based on the platform architecture. Exemplary embodiments allow for both tightly or loosely synchronized processors (e.g., based on local oscillator design) simultaneously within the same platform or a combination thereof, including degrees of asynchronous optimization.

[0020]   Clock distribution to each processor chip and core may be achieved with a digital data signal via a distribution network and a digitally controlled high-speed local oscillator as part of the core. The local core oscillator frequency may be determined by digital control data that can be used to set the core frequency of operation using digital signal processing or other digital means. The process of establishing, maintaining, and adjusting the high-speed local core oscillator frequency may be performed according to the disclosure of U.S. patent application Attorney Docket No. POU920070208US1.

[0021]   In exemplary embodiments, the digital control data resides in system serial electrically erasable programmable read-only memory (SEEPROM) and is part of vital chip data for each chip. Each core may have a specified data field associated with it that contains unique data for the core (e.g., power consumption as a function of core operating frequency). The frequency can be established based upon a policy set by the computer system manufacturer or customer. For example, the frequency can be set to the maximum capability of each core based upon a particular voltage setting at a given temperature.

[0022]   In exemplary embodiments, core clock frequency control information is sent to each core as a moderate speed (e.g., 10-100 Mb/s) digital control data signal, thereby avoiding problems associated with high-speed analog signal trans-mission. As digital data, the core clock frequency control information has high noise immunity and low signal distortion. The core clock frequency control information, also referred to as "vData" herein, may be sent as individual control data fields to each core. The vData may be latched into digitally controlled oscillator functions of the cores from system chip data held in the system SEEPROM of a master server or processing node. No further data transmission is required until the core clock frequency needs to be adjusted for conditions such as an environmental or policy change.

[0023]   In exemplary embodiments, the single master reference oscillator is set at a moderate frequency (e.g., 10-100 MHz) which is also distributed to each core via analog transmission line techniques and re-drive circuits. This clock can be used to latch the data into registers within the core oscillator function, rather than to set the frequency directly. A change in the fundamental core operating frequency may not be required, such that a low speed reference is sufficient to provide a clock for digital signal processing functions associated with the digitally controlled oscillator.

[0024]   Each core can run asynchronous or quasi-synchronously to each other and with respect to local cache. Once the different cores of a chip are asynchronous, some handshaking/buffering may be performed to transfer data between caches. Further details are provided herein.

[0025]   Turning now to the drawings, it will be seen that in FIG. 1 there is a block diagram of a microprocessor (μP) chip 100 upon which digitally controlled multi-frequency clocking is implemented in exemplary embodiments. The μP chip 100 of FIG. 1 includes four cores 102. The cores 102 provide independent processing engines, enabling parallel processing within the μP chip 100. Each core 102 can access a local cache 104, paired with the core 102, and a common cache 106 (e.g., a level-2 cache) shared between the cores 102. Independent digitally controlled clock generators, i.e., local oscillators 108, are used to clock each core 102 and local cache 104 pair synchronously, such that each core 102 can operate asynchronously to other cores 102 in the μP chip 100. In exemplary embodiments, the local oscillators 108 are digitally controlled with a frequency as determined by core clock frequency data stored in a local store vData and distribution function (LS&D) 110 in the μP chip 100. Each core 102 may have different core clock frequency settings, which can be optimized to reduce power consumption and heat dissipation at each core 102. The core clock frequency settings may be organized as one or more tables, enabling selection of higher frequencies for increased performance as a function of power dissipation, and vice versa. Power dissipation may be determined as a function of voltage at given temperatures. A master reference oscillator 112 provides a system reference oscillator clock frequency ($v_R$) that is used to gate digital vData into the LS&D 110 and also into the individual local oscillators 108. The local oscillator 108 output frequency can be adjusted to operate at an optimum point for each core 102 (e.g., maximum performance, lowest power), which may be above or below the mean operating frequency of total processor machine population for a larger system in which the μP chip 100 is incorporated.

[0026]   In exemplary embodiments, the reference oscillator clock frequency ($v_R$) is a relatively low frequency such that it can be easily routed throughout a multi-chip module (MCM) or a printed circuit (PC) board without significant signal degradation, yet fast enough for clock synchronization updates sufficient to insure that the local oscillators 108 are

stable and remain within the a deviation range of approximately 10-100 ppm (parts per million) across the computer system. For example, the reference oscillator clock frequency ($v_R$) may be approximately 10-100 MHz to control the local oscillators 108 running at frequencies ranging from approximately 5 to 10 GHz. The distribution of clock signals can be point-to-point for improved reference clock integrity but may be multi-drop for lower performance and lower cost configurations. Using a slower frequency clock to digitally command a local higher frequency clock may reduce issues associated with routing high frequency analog signals over long distances, such as skin effect, media and connector loss, crosstalk, termination mismatches, and the like.

[0027]    While only four cores 102 are depicted within the µP chip 100, it will be understood that any number of cores 102 can be included within the scope of the invention. Since all of the cores 102 may be running asynchronously to the common cache 106, as well as other memory, a level of buffering can be provided between the cores 102 and the common cache 106 to accommodate the asynchronous nature of the interface. The µP chip 100 need not include separate caches 104 for each core 102 or the common cache 106 as depicted in FIG. 1. Each local oscillator 108 may also include a bypass mode to allow the master reference oscillator 112 or another core's local oscillator 108 to be used in the event that a given local oscillator 108 circuit fails, thereby providing a backup clock. The µP chip 100 may additionally include support interfaces for integrating the µP chip 100 into a larger computer system, such as an I/O and memory interface 114, a fabric interface 116, and a core/chip vData interface 118. The fabric interface 116 can be used to interconnect multiple µP chips 100 together to construct a larger multi-processor system, forming one or more MCMs, and supporting a symmetric multiprocessing (SMP) configuration. In an SMP configuration, memory is coherent to the µP chips 100 within the SMP.

[0028]    FIG. 2 illustrates an exemplary MCM 200 that contains four µP chips 100. Distribution of vData and the reference oscillator clock frequency ($v_R$) to the individual µP chips 100 is performed via a first-level distribution application specific integrated circuit (ASIC) 202 mounted on the MCM 200. The distribution ASIC 202 may parse or otherwise route any MCM-level vData to specific µP chips 100 for storage and configuration in the respective LS&Ds 110. The distribution ASIC 202 may represent any type of integrated circuit, a programmable logic device (PLD), or a combination of discrete components. In exemplary embodiments, clock wiring 204 between the distribution ASIC 202 and the µP chips 100 on the MCM 200 is point-to-point, with all of the µP chips 100 synchronized to the master reference oscillator 112 located on a master processor node 300 (e.g., a main server PC board), as illustrated in FIG. 3, used to synchronize multiple MCMs 200. Returning now to FIG. 2, the µP chips 100 of the MCM 200 are interconnected via an internal cluster fabric 206 to insure that SMP properties can be maintained. In exemplary embodiments, the µP chips 100 are also connected to a MCM fabric controller 208 via MCM fabric 210. The MCM fabric controller 208 may be used to interconnect several MCMs 200 together into a larger SMP node configuration. Additionally, each µP chip 100 may connect to I/O and memory subsystems 212, e.g., main system memory, which can be external to the MCM 200.

[0029]    In alternate exemplary embodiments, the µP chips 100 are interconnected on multiple single chip modules (SCMs) mounted on a common glass epoxy PC board. This

alternate packaging configuration may be used for smaller systems. The distribution ASIC 202 can be mounted on an SCM on a system board, and interconnection to each µP chip 100 can be made via system PC board wiring.

[0030]    Turning now to FIG. 3, a master processor node 300 is depicted including a system level assembly 302 with several MCMs 200 interconnected using multi-frequency clocking of each MCM 200. The master processor node 300 contains the master reference oscillator 112 for the entire computer system as well as a master SEEPROM 304, which contains all the vData for each processor core within the computer system. The master processor node 300 is referred to as such since it includes both the master reference oscillator 112 and the master SEEPROM 304 that can be distributed to other nodes in a multi-node system. It is also the first node that is configured in a multi-node system, such as a server. The master processor node 300 may additionally include node main memory 306 to support functioning as a single board computer (e.g., a blade form-factor) without I/O. A node fabric controller 308 can be used to form a communication fabric between the MCMs 200 and additional nodes (not depicted). In exemplary embodiments, node fabric connections 310 connect the MCM fabric controller 208 of each MCM 200 to the node fabric controller 308. Intra-MCM communication may be performed via communication links 312, enabling exchanges of data between the MCMs 200 on the system level assembly 302 without passing the data to other nodes. The node fabric controller 308 may interface to other nodes via a fabric interface 314.

[0031]    In exemplary embodiments, the master reference oscillator 112 is a high precision, crystal controlled, temperature and voltage compensated oscillator that provides a very accurate (less than 10 ppm) system clock.

[0032]    The vData in the master SEEPROM 304 is a digital representation of optimum processor (core) frequencies along with identification (Id) of the appropriate chips and cores, such as the µP chips 100 and cores 102 of FIGS. 1 and 2. The Id information can be used to insure that the correct data is transmitted and stored in the LS&D 110 on each µP chip 100 for the cores 102. The vData may be derived from frequency characterization data, voltage characterization data, power characterization, and the like gathered by a service element (SE) 316. For example, optimum core operation frequencies may be determined by varying the local core clock frequency and power supply voltage (Vdd) to derive one or more curves for microprocessor component families. The SE 316 analyzes and reformats data into vData and loads the vData into the master SEEPROM 304 via a digital interface 318 (e.g. an inter-integrated circuit (I2C) bus). The SE 316 may be embodied as any form of computer device capable of writing to the master SEEPROM 304, such as a personal computer, workstation, or hand-held device. In alternate exemplary embodiments, the SE 316 is a subsystem within the same computer system as the master processor node 300 (e.g., a server subsystem). The totality of data gathered and analyzed by the SE 316 may be used to set the optimum frequency, voltage, and the like, for each core 102 to achieve the highest performance possible or other policy established by a customer. For example, "green" policies may be implemented to minimize aggregate power dissipation in the computer system, lowering operating cost as well as environmental impact through conserving power. Each node within the computer system, such as the master processor node 300, may perform workload monitoring at the system

level, node level, MCM level, chip level, and/or core level. Event monitoring may be performed using closed loop autonomic servocontrol and/or additional sensor nets can be used to turn down the clock frequency and/or the power-grid point at the various levels. For example, power dissipation may be reduced by lowering local oscillator frequencies or power supply voltage (Vdd) to an idle or zero value, while targeting various levels of the system (e.g., node, MCM, HLP chip, and/or core). The SE 316 may also enable in-field calibration of optimal operating conditions, such as degradation with time or environmental conditions.

[0033] The vData for each core/chip can be obtained during the chip test/verification stage in the manufacturing process or as part of a training program during initial power-on of the computer system. The latter approach may be part of the initialization and set-up process of the computer system. The SE 316 may implement the data collection process for each μP chip 100 and/or core 102, and subsequently load the vData into the master SEEPROM 304.

[0034] Using Id information in the vData, the master SEEPROM 304 can distribute and route the vData to corresponding μP chips 100 and cores 102 of FIGS. 1 and 2. The vData may be stored in the digitally controlled local oscillator 108 of each core 102 and then used to generate a core processor clock frequency until it is updated via a change to the master SEEPROM 304. In exemplary embodiments, the vData is not sent continuously from the master SEEPROM 304, but only upon an update. Thus, the core processor clock frequency of each core 102 can be updated upon an event driven basis to establish and maintain local high-speed digital clocking rather than requiring continuous high-speed analog clocking from the master reference oscillator 112.

[0035] Although the master reference oscillator 112 and the master SEEPROM 304 are shown as part of the master processor node 300, they may reside elsewhere within the computer system. In such a configuration, all nodes may be the same, with no node designated as the master processor node. Interconnections between various nodes within the computer system can be made via cables, including wire and/or optical connections.

[0036] FIG. 4 illustrates clocking of a non-master processor node 400. Similar to the master processor node 300 of FIG. 3, the non-master processor node 400 includes a system level assembly 402 that further includes a node fabric controller 308 in communication with MCMs 200 and fabric interface 314 as described in reference to FIG. 3. Instead of a master reference oscillator 112 or master SEEPROM 304 as depicted on the master processor node 300, the non-master processor node 400 includes a reference oscillator distributor 404 and a vData distributor 406. If the master reference oscillator 112 or master SEEPROM 304 are located external to a node (such as with the non-master processor node 400), then all nodes can be the same, and the master processor node 300 is not required. In exemplary embodiments, all nodes contain a node fabric controller 308 to allow the attachment of multiple nodes, thereby building a very large clustered computer system. The non-master processor node 400 may also include node main memory 408 to support processing functions of the μP chips 100 and cores 102 of FIGS. 1 and 2 on the MCMs 200. It will be understood that additional elements known in the art to support a computer system are included (but not depicted) within the scope of exemplary embodiments, e.g., a user interface, power supply, I/O, and additional interfaces.

[0037] FIGS. 5 and 6 depict further possible configurations for clock and data distribution to multiple cores within microprocessor chips 500 and 600. The exemplary μP chip 500 includes a second level distribution function 502 to distribute the system reference oscillator clock frequency ($v_R$) received from the first level distribution ASIC 202 to the local oscillators 108. The μP chip 500 includes multiple L2 (common) caches 106 shared between multiple cores 102, as well as local caches 104 and local oscillators 108 paired with each core 102. The μP chip 500 also includes a larger LS&D 504 to distribute vData to the eight local oscillators 108 as compared to LS&D 110 of FIG. 1. It will be understood that the exemplary μP chip 500 represents merely one example of scaling possibilities within a given microprocessor employing the inventive principles disclosed herein.

[0038] Similarly, the μP chip 600 represents an additional possible exemplary configuration that connects a local oscillator 108 to multiple cores 102. In this example, each core 102 has a corresponding local cache 104 and access to an L2 (common) cache 106. The second level distribution function 502 may be utilized to distribute the system reference oscillator clock frequency ($v_R$) to each local oscillator 108. The one-to-many local oscillator 108 to cores 102 configuration of FIG. 6 may be employed in designs where multiple cores 102 are grouped in different regions of the μP chip 600, e.g., north and south areas of the chip, with regional differences significant enough to justify separate local oscillators 108 for each region but not different enough at each core 102 to justify a local oscillator 108 for each core 102. The configuration depicted in FIG. 6 may be advantageous to lower cost and complexity over the configuration of FIG. 5, while reducing flexibility at the core level. LS&D 602 may also be reduced in size and complexity as compared to the LS&D 504 of FIG. 5 and the LS&D 110 of FIG. 1, since fewer local oscillators 108 are adjusted.

[0039] Turning now to FIG. 7, a process 700 for digitally controlled multi-frequency clocking will now be described in accordance with exemplary embodiments, and in reference to the FIGS. 1-6. At block 702, the μP chip 100 of FIG. 1 receives system reference oscillator clock frequency ($v_R$). The system reference oscillator clock frequency ($v_R$) provides a reference frequency to the local oscillators 108, which in turn supply a core clock frequency to the cores 102. The relationship of local oscillators 108 to cores 102 can be one-to-one (as depicted in FIGS. 1 and 5) or one-to-many (as depicted in FIG. 6). For example, a single local oscillator 108 can supply a core clock frequency to one core 102 or multiple cores 102 within the μP chip 100.

[0040] At block 704, the local oscillators 108 are adjusted to output frequencies that are greater than the system reference oscillator clock frequency ($v_R$) as a function of digital frequency characteristic data (vData) associated with the cores 102 which are connected to each local oscillator 108. For example, $v_R$ may be a relatively low frequency, such as 50 MHz, generated by the master reference oscillator 112. For a given operating scenario, one core 102 may have an optimum operating frequency of 5.0 GHz, while a second core 102 has an optimum operating frequency of 5.1 GHz, and yet a third core 102 can have an optimum operating frequency of 4.9 GHz, all in the same μP chip 100. Using the vData associated with each core 102 in the LS&D 110, each corresponding local oscillator 108 can be adjusted to the specific optimum operating frequency based upon the specific core 102 or cores 102 to which it is connected.

5

[0041] As previously described, the vData received at the LS&D 110 may be gated in using the system reference oscillator clock frequency ($v_R$). In exemplary embodiments, the vData is received at the LS&D 110 from a nonvolatile memory device, such as the master SEEPROM 304, which is external to the µP chip 100. The vData may include includes frequency settings to optimize core clock frequency as a function of the core clock frequency versus voltage at a given temperature or range of temperatures.

[0042] To form larger processing systems such as MCM 200 of FIG. 2, multiple µP chips 100 may be interconnected via a communication fabric, with $v_R$ and vData distributed to the multiple µP chips 100. Further scaling can be achieved through interconnecting multiple MCMs 200 into one or more nodes, such as master processor node 300 of FIG. 3 or non-master processor node 400 of FIG. 4. As system scaling increases, the advantages of digitally controlled multi-frequency clocking may become more apparent as a larger number of cores 102 are included into a single system with long signal paths.

[0043] Technical effects of exemplary embodiments include use of individual core clocks for workload management and to save power during server idle times by dynamically changing core clock frequency. Lowering the core clock frequency dynamically may reduce power consumption and heat dissipation. Further power management can be realized by controlling the power supply voltage (Vdd) to each core and/or chip. Thus, power management may be controlled through a combination of local core clock control and/or power grid control of the power supply voltage (Vdd) to reduce power consumption. The use of event frequency monitors to measure processing workloads in real-time enables workload management at the system level, servocontrolling power consumption to idle and/or turn off cores that are inactive. Additional technical effects include using a system reference oscillator clock frequency ($v_R$) to clock data in and out, such as clock information in a digital format, rather than generating local processor core clock frequencies as an analog multiple of $v_R$, enabling the use of a lower frequency system-wide clock and higher frequency local digitally controlled clocks. Further technical effects include programmable high-speed local digitally controlled clocks at the core level, with programmability at the system level for multiple cores in multiple microprocessor chips.

[0044] Advantages include a net performance gain of operating each core at its maximum frequency of approximately 10-20% potential improvement as compared to limiting a common core frequency to match the slowest core in a multi-core system. Employing a local store and distribution function for vData for individual chips versus on an MCM may simplify localized clock frequency control and scalability. Further advantages may include supporting extendibility to a cluster fabric between server frames when the nodes are in separate server frames. The inventive techniques disclosed herein can be applied to any processing platform that uses multi-core microprocessor chips, for example, servers, client microprocessor platforms, storage controllers, data communication switches, wireless communications devices, high-definition television equipment, and the like, which employ advanced solid-state clocking devices.

[0045] While the invention has been described with reference to exemplary embodiments, it will be understood by those skilled in the art that various changes may be made and equivalents may be substituted for elements thereof without departing from the scope of the invention. In addition, many modifications may be made to adapt a particular situation or material to the teachings of the invention without departing from the essential scope thereof. Therefore, it is intended that the invention not be limited to the particular embodiment disclosed as the best mode contemplated for carrying out this invention, but that the invention will include all embodiments falling within the scope of the appended claims. Moreover, the use of the terms first, second, etc. do not denote any order or importance, but rather the terms first, second, etc. are used to distinguish one element from another. Furthermore, the use of the terms a, an, etc. do not denote a limitation of quantity, but rather denote the presence of at least one of the referenced item.

What is claimed is:

1. A method for digitally controlled multi-frequency clocking, comprising:

receiving a system reference oscillator clock frequency at a microprocessor including multiple cores, wherein the system reference oscillator clock frequency provides a reference frequency to a local oscillator, the local oscillator supplying a core clock frequency to at least one of the cores; and

adjusting the local oscillator to output the core clock frequency at a frequency greater than the system reference oscillator clock frequency as a function of digital frequency characteristic data associated with the at least one of the cores.

2. The method of claim 1 further comprising:

receiving the digital frequency characteristic data at a local data store and distribution function in the microprocessor, wherein the local data store and distribution function gates in the digital frequency characteristic data using the system reference oscillator clock frequency.

3. The method of claim 2 wherein the digital frequency characteristic data is received at the local data store and distribution function from a nonvolatile memory device external to the microprocessor.

4. The method of claim 1 wherein the microprocessor further comprises dedicated independently digitally controlled local oscillators for each core, and the digital frequency characteristic data is provided on a per core basis via a local data store and distribution function.

5. The method of claim 1 wherein the digital frequency characteristic data includes frequency settings to optimize core frequency as a function of the core clock frequency versus voltage at a given temperature.

6. The method of claim 1 further comprising:

interconnecting multiple microprocessors via a communication fabric; and

distributing the system reference oscillator clock frequency and the digital frequency characteristic data to the microprocessors.

7. The method of claim 6 wherein the communication fabric is controlled by a fabric controller and the distributing of the system reference oscillator clock frequency and the digital frequency characteristic data is performed via a distribution application specific integrated circuit (ASIC).

8. The method of claim 6 wherein the multiple microprocessors are grouped to form a multi-chip module (MCM).

9. The method of claim 8 wherein multiple MCMs are interconnected in a node supporting intra-MCM communication.

**10**. The method of claim **9** wherein the node is one of a master processor node and a non-master processor node, the master processor node including:

a master reference oscillator to generate the system reference oscillator clock frequency; and

a master nonvolatile memory device to hold the digital frequency characteristic data for the MCMs; and

the non-master processor node including:

a reference oscillator distributor to distribute the system reference oscillator clock frequency; and

a data distributor to distribute the digital frequency characteristic data to the MCMs.

**11**. The method of claim **1** further comprising:

performing power management control via adjusting the local oscillator to output the core clock frequency as a function of processing workload.

**12**. A system for digitally controlled multi-frequency clocking, comprising:

a microprocessor including multiple cores; and

a local oscillator supplying a core clock frequency to at least one of the cores in response to a reference frequency received from a system reference oscillator clock frequency, wherein the local oscillator is adjusted to output the core clock frequency at a frequency greater than the system reference oscillator clock frequency as a function of digital frequency characteristic data associated with the at least one of the cores.

**13**. The system of claim **12** further comprising:

a local data store and distribution function in the microprocessor, wherein the local data store and distribution function gates in the digital frequency characteristic data using the system reference oscillator clock frequency.

**14**. The system of claim **13** wherein the digital frequency characteristic data is received at the local data store and distribution function from a nonvolatile memory device external to the microprocessor.

**15**. The system of claim **12** wherein the microprocessor further comprises dedicated independently digitally controlled local oscillators for each core, and the digital frequency characteristic data is provided on a per core basis via a local data store and distribution function.

**16**. The system of claim **12** wherein the digital frequency characteristic data includes frequency settings to optimize core frequency as a function of the core clock frequency versus voltage at a given temperature.

**17**. The system of claim **12** further comprising:

multiple microprocessors interconnected via a communication fabric; and

a distribution application specific integrated circuit (ASIC) to distribute the system reference oscillator clock frequency and the digital frequency characteristic data to the microprocessors.

**18**. The system of claim **16** wherein the multiple microprocessors are grouped to form a multi-chip module (CM).

**19**. The system of claim **18** wherein multiple MCMs are interconnected in a node supporting intra-MCM communication, and the node is one of a master processor node and a non-master processor node, the master processor node including:

a master reference oscillator to generate the system reference oscillator clock frequency; and

a master nonvolatile memory device to hold the digital frequency characteristic data for the MCMs; and

the non-master processor node including:

a reference oscillator distributor to distribute the system reference oscillator clock frequency; and

a data distributor to distribute the digital frequency characteristic data to the MCMs.

**20**. The system of claim **12** wherein the local oscillator is adjusted to perform power management via outputting the core clock frequency as a function of processing workload.

* * * * *

# EXHIBIT  E



US 20090138737A1

(19) **United States**

(12) **Patent Application Publication** (10) Pub. No.: **US 2009/0138737 A1**

Kim et al. (43) **Pub. Date: May 28, 2009**

(54) **APPARATUS, METHOD AND PROGRAM PRODUCT FOR ADAPTIVE REAL-TIME POWER AND PERFOMANCE OPTIMIZATION OF MULTI-CORE PROCESSORS**

(75) Inventors: **Daeik Kim**, White Plains, NY (US); **Jonghae Kim**, Fishkill, NY (US); **Moon J. Kim**, Wappingers Falls, NY (US); **James R. Moulic**, Poughkeepsie, NY (US)

Correspondence Address:
**SILVY ANNA MURPHY**
**100 TURNBERRY LANE**
**CARY, NC 27518 (US)**

(73) Assignee: **INTERNATIONAL BUSINESS MACHINES CORPORATION**, Armonk, NY (US)

(21) Appl. No.: **11/946,522**

(22) Filed: **Nov. 28, 2007**

**Publication Classification**

(51) **Int. Cl.**
*G06F 1/32* (2006.01)

(52) **U.S. Cl.** ...................................................... **713/322**

(57) **ABSTRACT**

An apparatus, method and program product for optimizing core performance and power in of a multi-core processor. The apparatus includes a multi-core processor coupled to a clock source providing a clock frequency to one or more cores, an independent power supply coupled to each core for providing a supply voltage to each core and a Phase-Locked Loop (PLL) circuit coupled to each core for dynamically adjusting the clock frequency provided to each core. The apparatus further includes a controller coupled to each core and being configured to collect performance data and power consumption data measured for each core and to adjust, using the PLL circuit, a supply voltage provided to a core, such that, the operational core frequency of the core is greater than a specification core frequency preset for the core and, such that, core performance and power consumption is optimized.



Patent Application Publication     May 28, 2009  Sheet 1 of 10        US 2009/0138737 A1



FIG. 1



FIG. 2



FIG. 3A



FIG. 3B



FIG. 4A



FIG. 4B



FIG. 5A



FIG. 5B



FIG. 5C



FIG. 5D



FIG. 6



FIG. 7



FIG. 8



FIG. 9

US 2009/0138737 A1

May 28, 2009

1

# APPARATUS, METHOD AND PROGRAM PRODUCT FOR ADAPTIVE REAL-TIME POWER AND PERFOMANCE OPTIMIZATION OF MULTI-CORE PROCESSORS

## FIELD OF THE INVENTION

[0001]   The present invention relates to the field of electronic components, and more particularly to an apparatus, method and program product for adaptive real-time power and performance optimization of multi-core processors.

## BACKGROUND OF THE INVENTION

[0002]   Current microprocessor chips with multiple cores typically use a single power supply voltage and a fixed clock frequency for the multiple cores on a chip. Given wafer-level and die-level process variations in microprocessor chip manufacturing one core on a microprocessor chip can have different performance characteristics than another core on the chip, which can result in low processor chip yield due to the fact that some cores do not perform faster than a given frequency specification required for all cores on a chip. As the number of cores on a chip increase, the chip yield becomes a critical bottleneck for microprocessor chip manufacturing. As such, there is a need for a cost effective and efficient way to improve microprocessor chip yield during manufacturing.

## SUMMARY OF THE INVENTION

[0003]   In a first aspect of the invention, there is provided an apparatus for optimizing performance and power consumption of a multi-core processor. The apparatus comprises a multi-core processor having a plurality of cores, the multi-core processor being coupled to a clock source configured to provide a reference input clock frequency to the plurality of cores in the multi-core processor, each of the cores of the plurality of cores having a specification core frequency preset for the multi-core processor. The apparatus further comprises at least one power supply voltage connected to the multi-core processor for providing a supply voltage to the plurality of cores, a respective core of the plurality of cores having a respective operational core frequency that is proportional to the supply voltage provided by at least one power supply voltage, at least one PLL (Phase Locked Loop) having one or more voltage-controlled oscillators (VCOs) and one or more dividers, the one PLL being coupled to the multi-core processor and being configured to dynamically adjust the reference input clock frequency provided to a respective core of the plurality of cores to ensure that a respective operational core frequency of the respective core is at least equal to the reference input clock frequency. The apparatus further comprises a main controller coupled to the plurality of cores, the main controller being configured to collect core performance data and core power consumption data measured for the plurality of cores, the main controller being configured to adjust either the supply voltage provided by at least one power supply voltage connected to the respective core or being configured to adjust the reference input clock frequency provided to the respective core, wherein adjustment of either the supply voltage provided or the respective input clock frequency provided to the respective core optimizes a respective core performance and a respective core power consumption by the respective core, and wherein the main controller dynamically adjusts the supply voltage provided by at least

one power supply voltage to the plurality of cores in real-time mode. The apparatus further comprises a voltage level-translating communication transceiver configured to enable communications between the main controller and the plurality of cores and configured to enable communications between each of the plurality of cores. In an embodiment, the apparatus further comprises at least two PLLs (Phase Locked Loops) coupled to the multi-core processor, each of the at least two PLLs having one or more voltage-controlled oscillators (VCOs) and one or more dividers, a PLL of the at least two PLLs being configured to dynamically adjust the reference input clock frequency supplied to one or more cores of the plurality of cores in order to ensure that a respective operational core frequency of the respective core is greater than the specification core frequency preset for the respective core. In an embodiment, the apparatus further comprises a plurality of power supply voltages connected to the multi-core processor, a respective individual power supply voltage of the plurality of power supply voltages being configured to provide a respective supply voltage to an individual core of the plurality of cores, wherein the main controller dynamically adjusts the respective supply voltage provided by the respective individual power supply voltage to the individual core to increase the respective operational core frequency of the respective core, and wherein the main controller dynamically adjusts the respective supply voltage provided by the respective individual power supply voltage to the individual core in real-time mode. In an embodiment, the main controller is configured to distribute instruction blocks to the plurality of cores in a manner that achieves a balancing criterion with respect to the plurality of cores, wherein the balancing criterion comprises at least one of: equal performance balancing, maximum performance balancing, power consumption balancing and instruction count balancing. In an embodiment, the core performance data measured for the multi-core processor comprises computing a sum of a respective core performance data measured for each core of the plurality of cores, and wherein the core power consumption data measured for the multi-core processor comprises computing a sum of a respective core power consumption data measured for each core of the plurality of cores.

[0004]   In another aspect of the invention, there is provided an apparatus for compensating semiconductor manufacturing process-induced variation in core performance of a multi-core processor. The apparatus comprises a multi-core processor including a plurality of cores, the multi-core processor being coupled to a clock source configured to provide a reference input clock frequency to the plurality of cores in the multi-core processor, a respective power supply voltage coupled to a respective core of the plurality of cores for providing a respective supply voltage to the respective core, wherein a respective operational core frequency of the respective core is proportional to the respective supply voltage provided by the respective power supply voltage, a phase locked loop (PLL) circuit coupled to each core of the plurality of cores, the PLL circuit having one or more voltage-controlled oscillators (VCOs) and one or more dividers, the PLL circuit being configured to dynamically adjust the reference input clock frequency provided to the respective core of the plurality of cores, and a main controller coupled to each core of the plurality of cores, the main controller being configured to collect core performance data and core power consumption data measured for each core of the plurality of cores, the main controller being configured to adjust, using the PLL circuit

coupled to the respective core, the respective supply voltage provided to the respective core in order to ensure that the respective operational core frequency of the respective core is greater than a specification core frequency preset for the respective core and to optimize the power consumption by the respective core, wherein core performance of the respective core is optimized. The apparatus further comprises a voltage level-translating communication transceiver configured to enable communications between the main controller and the plurality of cores and configured to enable communications between each of the plurality of cores. In an embodiment, the PLL circuit further comprises one or more voltage-controlled oscillators (VCOs) and one or more dividers, the PLL circuit being configured to dynamically adjust the reference input clock frequency provided to the respective core to ensure that the respective operational core frequency of the respective core is at least equal to the reference input clock frequency. In an embodiment, the main controller dynamically adjusts the respective supply voltage provided by the respective power supply voltage to the respective core in real-time mode. In an embodiment, the main controller is configured to distribute instruction blocks to the plurality of cores in a manner that achieves a balancing criterion with respect to the plurality of cores, and wherein the balancing criterion comprises at least one of: equal performance balancing, maximum performance balancing, power consumption balancing and instruction count balancing. In an embodiment, the core performance data measured for the multi-core processor comprises computing a sum of the respective core performance data measured for each core of the plurality of cores and, in an embodiment, the core power consumption data measured for the multi-core processor comprises computing a sum of a respective core power consumption data measured for each core of the plurality of cores.

[0005] In another aspect of the invention, there is provided a method for optimizing performance and power consumption of a multi-core processor. The method comprises providing a multi-core processor having a plurality of cores, the multi-core processor being coupled to a clock source configured to provide a reference input clock frequency to the plurality of cores in the multi-core processor, connecting a separate voltage power source configured to provide a respective supply voltage to each core of the plurality of cores in the multi-core processor, wherein a respective core operational clock frequency is proportional to the respective supply voltage provided to a respective core, and wherein a respective core power consumption by the respective core is proportional to the reference input clock frequency and to the respective supply voltage squared, collecting, using a main controller coupled to each core of the plurality of cores, core performance data and core power consumption data measured for each core of the plurality of cores and adjusting, using the main controller, either the respective supply voltage provided to the respective core of the plurality of cores or the reference input clock frequency provided to the respective core of the plurality of cores, based on a respective core performance data and a respective core power consumption data collected for the respective core of the plurality of cores, wherein adjustment of either the respective power provided to the respective core ensures that the respective operational core frequency of the respective core is greater than a respective specification core frequency preset for the respective core, and wherein adjustment of the reference input clock frequency ensures that the respective operational core fre-

quency of the respective core is at least equal to the reference input clock frequency, and whereby the respective core performance and the respective core power consumption by the respective core is optimized. The method further comprises enabling, utilizing a voltage level-translating communication transceiver, communications between the main controller and the plurality of cores and enabling communications between each of the plurality of cores. In an embodiment, the adjusting step further comprises supplying each core of the plurality of cores with at least one PLL (Phase Locked Loop) having one or more voltage-controlled oscillators (VCOs) and one or more dividers, at least one PLL with the one or more VCOs and the one or more dividers being configured to dynamically adjust the input clock frequency provided to the respective core, wherein the respective operational core frequency is at least equal to the reference input clock frequency, and wherein the respective power consumption by the respective core is adjusted. In an embodiment, the adjusting step further comprises dynamically adjusting either the output power supply voltage or the input clock frequency provided to the respective core in real-time mode. In an embodiment, the adjusting step further comprises distributing, using the main controller, instruction blocks to each core of the plurality of cores in a manner that achieves a balancing criterion with respect to the plurality of cores, wherein the balancing criterion comprises at least one of: equal performance balancing, maximum performance balancing, power consumption balancing and instruction count balancing. In an embodiment, a core performance data measured for the multi-core processor comprises computing a sum of the respective core performance data measured for each core of the plurality of cores in the multi-core processor, and wherein the core power consumption data measured for the multi-core processor comprises computing a sum of a respective core power consumption data measured for each core of the plurality of cores.

[0006] In another aspect of the invention, there is provided a computer program product for optimizing performance and power consumption of a multi-core processor. The computer program product comprises a computer readable medium, first program instructions to supply a reference input clock frequency to a plurality of cores of a multi-core processor, the plurality of cores in the multi-core processor being coupled to a main controller, the first program instructions including instructions to supply a respective supply voltage to a respective core of the plurality of cores in the multi-core processor, wherein a respective core operational clock frequency is proportional to the respective supply voltage supplied to the respective core, and wherein a respective core power consumption by the respective core is proportional to the reference input clock frequency and to the respective supply voltage squared, second program instructions to collect, using the main controller, core performance data and core power consumption data measured for the plurality of cores, third program instructions to adjust, using the main controller, either the respective supply voltage supplied to the respective core or the reference input clock frequency supplied to the respective core, based on a respective core performance data and a respective core power consumption data collected for the respective core of the plurality of cores, wherein adjustment of either the supply voltage provided to the respective core or the reference input clock frequency supplied optimizes the respective core performance and the respective core power consumption by the respective core. The computer program product further comprises fourth program instructions to

enable communications between the main controller and the plurality of cores and to enable communications between each of the plurality of cores, utilizing a voltage level-translating communication transceiver. In an embodiment, the first program instructions include instructions to couple each core of the plurality of cores with at least one phase locked loop (PLL) circuit having one or more voltage-controlled oscillators (VCOs) and one or more dividers, at least one PLL circuit with the one or more VCOs and the one or more dividers being configured to dynamically adjust the reference input clock frequency of the respective core, wherein a respective operational core frequency of the respective core is at least equal to the reference input clock frequency, and wherein the respective power consumption by the core is adjusted. In an embodiment, the second program instructions include instructions to distribute, using the main controller, instruction blocks to each core of the plurality of cores in a manner that achieves a balancing criterion with respect to the plurality of cores, the balancing criterion comprises at least one of: equal performance balancing, maximum performance balancing, power consumption balancing and instruction count balancing. In an embodiment, the third program instructions include instructions to dynamically adjust the supply voltage provided to the respective core to ensure that the respective operational core frequency of the respective core is greater than a respective specification core frequency preset for the respective core, wherein the respective core performance and the respective power consumption of the respective core is optimized. In an embodiment, the third program instructions include instructions to dynamically adjust either the supply voltage provided or the reference input clock frequency supplied to the respective core in real-time mode. In an embodiment, a core performance data measured for the multi-core processor comprises computing a sum of the respective core performance data measured for each core of the plurality of cores in the multi-core processor, and wherein a core power consumption data measured for the multi-core processor comprises computing a sum of a respective core power consumption data measured for each core of the plurality of cores. In an embodiment, each of the first, second, third and fourth program instructions are recorded on the computer readable medium.

## BRIEF DESCRIPTION OF THE DRAWINGS

[0007] The accompanying drawings, which are incorporated in and form a part of this specification, illustrate embodiments of the invention and, together with the description, serve to explain the principles of the invention:

[0008] FIG. 1 is a schematic block diagram of an apparatus for optimizing performance and power consumption of a multi-core processor, in accordance with an embodiment of the invention.

[0009] FIG. 2 is a schematic block diagram of an apparatus for optimizing performance and power consumption of a multi-core processor, in accordance with an embodiment of the invention.

[0010] FIGS. 3A-3B are graphs illustrating an example of adjusting the supply voltage supplied to one or more cores to balance the operational core frequency of the cores in a multi-core processor, in accordance with an embodiment of the invention.

[0011] FIGS. 4A-4B are graphs illustrating an example of adjusting the supply voltage supplied to one or more cores to

balance the power consumption in the one or more cores in the multi-core processor, in accordance with an embodiment of the invention.

[0012] FIGS. 5A-5C are graphs illustrating an example of adjusting the supply voltage to provide minimum operational power or performance in a multi-core processor, in accordance with an embodiment of the invention.

[0013] FIGS. 5B-5D are graphs illustrating an example of adjusting the supply voltage to provide maximum operational power or performance in a multi-core processor, in accordance with an embodiment of the invention.

[0014] FIG. 6 is a flowchart illustrating a clock adjustment scheme for testing the cores in a multi-core processor, in accordance with an embodiment of the invention.

[0015] FIG. 7 is a flowchart illustrating a clock frequency adjustment scheme for optimizing the operational core frequency of a core in a multi-core processor, in accordance with an embodiment of the invention.

[0016] FIG. 8 is a flowchart illustrating a voltage adjustment scheme for maximizing an operational core frequency of a core in a multi-core processor in order to ensure that the core passes the required specification core frequency, in accordance with an embodiment of the invention.

[0017] FIG. 9 is a schematic block system diagram illustrating an embodiment of a system having deployed thereon a core power and performance optimization tool or code for optimizing power and performance of multi-core processor, in accordance with an embodiment of the present invention.

## DETAILED DESCRIPTION OF THE INVENTION

[0018] Many of the functional units described in this specification have been labeled as modules, in order to more particularly emphasize their implementation independence. For example, a module may be implemented as a hardware circuit comprising custom VLSI circuits or gate arrays, off-the-shelf semiconductors such as logic chips, transistors, or other discrete components. A module may also be implemented in programmable hardware devices such as field programmable gate arrays, programmable array logic, programmable logic devices or the like. Modules may also be implemented in software for execution by various types of processors. An identified module or component of executable code may, for instance, comprise one or more physical or logical blocks of computer instructions which may, for instance, be organized as an object, procedure, or function. Nevertheless, the executables of an identified module need not be physically located together, but may comprise disparate instructions stored in different locations which, when joined logically together, comprise the module and achieve the stated purpose for the module.

[0019] Further, a module of executable code could be a single instruction, or many instructions, and may even be distributed over several different code segments, among different programs, and across several memory devices. Similarly, operational data may be identified and illustrated herein within modules, and may be embodied in any suitable form and organized within any suitable type of data structure. The operational data may be collected as a single data set, or may be distributed over different locations including over different storage devices, over disparate memory devices, and may exist, at least partially, merely as electronic signals on a system or network. Furthermore, modules may also be implemented as a combination of software and one or more hardware devices. For instance, a module may be embodied in the

4

combination of a software executable code stored on a memory device. In a further example, a module may be the combination of a processor that operates on a set of operational data. Still further, a module may be implemented in the combination of an electronic signal communicated via transmission circuitry.

[0020] Reference throughout this specification to "one embodiment," "an embodiment," or similar language means that a particular feature, structure, or characteristic described in connection with the embodiment is included in at least one embodiment of the present invention. Thus, appearances of the phrases "in one embodiment," "in an embodiment," and similar language throughout this specification may, but do not necessarily, all refer to the same embodiment.

[0021] It will be apparent to those skilled in the art that various modifications and variations can be made to the present invention without departing from the spirit and scope of the invention. Thus, it is intended that the present invention cover the modifications and variations of this invention provided they come within the scope of the appended claims and their equivalents. Reference will now be made in detail to the preferred embodiments of the invention.

[0022] In one embodiment, the present invention provides an apparatus for optimizing performance and power consumption of a multi-core processor. The apparatus comprises a multi-core processor having a plurality of cores, the multi-core processor being coupled to a clock source configured to provide a reference input clock frequency to the plurality of cores in the multi-core processor, each of the cores of the plurality of cores having a specification core frequency preset for the multi-core processor. The apparatus further comprises at least one power supply voltage connected to the multi-core processor for providing a supply voltage to the plurality of cores, a respective core of the plurality of cores having a respective operational core frequency that is proportional to the supply voltage provided by at least one power supply voltage, at least one PLL (Phase Locked Loop) having one or more voltage-controlled oscillators (VCOs) and one or more dividers, the one PLL being coupled to the multi-core processor and being configured to dynamically adjust the reference input clock frequency provided to a respective core of the plurality of cores to ensure that a respective operational core frequency of the respective core is at least equal to the reference input clock frequency. The apparatus further comprises a main controller coupled to the plurality of cores, the main controller being configured to collect core performance data and core power consumption data measured for the plurality of cores, the main controller being configured to adjust either the supply voltage provided by at least one power supply voltage connected to the respective core or being configured to adjust the reference input clock frequency provided to the respective core, wherein adjustment of either the supply voltage provided or the respective input clock frequency provided to the respective core optimizes a respective core performance and a respective core power consumption by the respective core, and wherein the main controller dynamically adjusts the supply voltage provided by at least one power supply voltage to the plurality of cores in real-time mode. The apparatus further comprises a voltage level-translating communication transceiver configured to enable communications between the main controller and the plurality of cores and configured to enable communications between each of the plurality of cores. In an embodiment, the apparatus further comprises at least two PLLs (Phase Locked Loops)

coupled to the multi-core processor, each of the at least two PLLs having one or more voltage-controlled oscillators (VCOs) and one or more dividers, a PLL of the at least two PLLs being configured to dynamically adjust the reference input clock frequency supplied to one or more cores of the plurality of cores in order to ensure that a respective operational core frequency of the respective core is greater than the specification core frequency preset for the respective core. In an embodiment, the apparatus further comprises a plurality of power supply voltages connected to the multi-core processor, a respective individual power supply voltage of the plurality of power supply voltages being configured to provide a respective supply voltage to an individual core of the plurality of cores, wherein the main controller dynamically adjusts the respective supply voltage provided by the respective individual power supply voltage to the individual core to increase the respective operational core frequency of the respective core, and wherein the main controller dynamically adjusts the respective supply voltage provided by the respective individual power supply voltage to the individual core in real-time mode. In an embodiment, the main controller is configured to distribute instruction blocks to the plurality of cores in a manner that achieves a balancing criterion with respect to the plurality of cores, wherein the balancing criterion comprises at least one of: equal performance balancing, maximum performance balancing, power consumption balancing and instruction count balancing. In an embodiment, the core performance data measured for the multi-core processor comprises computing a sum of a respective core performance data measured for each core of the plurality of cores, and wherein the core power consumption data measured for the multi-core processor comprises computing a sum of a respective core power consumption data measured for each core of the plurality of cores.

[0023] In another aspect of the invention, there is provided an apparatus for compensating semiconductor manufacturing process-induced variation in core performance of a multi-core processor. The apparatus comprises a multi-core processor including a plurality of cores, the multi-core processor being coupled to a clock source configured to provide a reference input clock frequency to the plurality of cores in the multi-core processor, a respective power supply voltage coupled to a respective core of the plurality of cores for providing a respective supply voltage to the respective core, wherein a respective operational core frequency of the respective core is proportional to the respective supply voltage provided by the respective power supply voltage, a phase locked loop (PLL) circuit coupled to each core of the plurality of cores, the PLL circuit having one or more voltage-controlled oscillators (VCOs) and one or more dividers, the PLL circuit being configured to dynamically adjust the reference input clock frequency provided to the respective core of the plurality of cores, and a main controller coupled to each core of the plurality of cores, the main controller being configured to collect core performance data and core power consumption data measured for each core of the plurality of cores, the main controller being configured to adjust, using the PLL circuit coupled to the respective core, the respective supply voltage provided to the respective core in order to ensure that the respective operational core frequency of the respective core is greater than a specification core frequency preset for the respective core and to optimize the power consumption by the respective core, wherein core performance of the respective core is optimized. The apparatus further comprises a voltage

5

level-translating communication transceiver configured to enable communications between the main controller and the plurality of cores and configured to enable communications between each of the plurality of cores. In an embodiment, the PLL circuit further comprises one or more voltage-controlled oscillators (VCOs) and one or more dividers, the PLL circuit being configured to dynamically adjust the reference input clock frequency provided to the respective core to ensure that the respective operational core frequency of the respective core is at least equal to the reference input clock frequency. In an embodiment, the main controller dynamically adjusts the respective supply voltage provided by the respective power supply voltage to the respective core in real-time mode. In an embodiment, the main controller is configured to distribute instruction blocks to the plurality of cores in a manner that achieves a balancing criterion with respect to the plurality of cores, and wherein the balancing criterion comprises at least one of: equal performance balancing, maximum performance balancing, power consumption balancing and instruction count balancing. In an embodiment, the core performance data measured for the multi-core processor comprises computing a sum of the respective core performance data measured for each core of the plurality of cores and, in an embodiment, the core power consumption data measured for the multi-core processor comprises computing a sum of a respective core power consumption data measured for each core of the plurality of cores.

[0024]  Reference is now made to FIGS. 1 and 2, which depict various embodiments of an apparatus for optimizing performance and power consumption in a multi-core processor. Turning to FIG. 1, reference numeral 100 depicts an embodiment of an apparatus comprising of a multi-core processor having a plurality of cores 110, 120, 130 and 140, where each of the cores 110, 120, 130 and 140 is coupled to a main controller or main control core 150, discussed further herein below with respect to FIG. 2, and each core K is connected to its own separate power supply voltage ($V_{DDK}$). In particular, as shown in FIG. 1, core 110 is connected via wiring 112 to its own separate power supply voltage ($V_{DD1}$), reference numeral 114, whereas, core 120 is connected via wiring 122 to its own separate power supply voltage ($V_{DD2}$), reference numeral 124. In a similar manner, core 130 is connected via wiring 132 to its own separate power supply voltage ($V_{DD3}$), reference numeral 134 and core 140 is connected via wiring 142 to its own separate power supply voltage ($V_{DD4}$), reference numeral 144. In an embodiment, each of the respective wiring 112, 122, 132 and 142 is comprised of inductors, capacitors and resistors. In an embodiment, each of the power supply voltages 114, 124, 134 and 144 is also coupled to the controller 150. Further, each of the cores 110, 120, 130 and 140 and each of the power supply voltages 114, 124, 134 and 144 are connected to a voltage level-translating communication transceiver 180, that is configured to enable communication between the main controller 150 and each of the cores 110, 120, 130 and 140 as well as is configured to enable communications between and among each of the cores 110, 120, 130 and 140 in the multi-core processor. Further, in an embodiment, the multi-core processor is coupled to a main PLL (Phase-Locked Loop), reference numeral 160 that is configured to receive (indicated by arrow 172) an input clock frequency or clock rate or speed ($F_{CLK}$) from a clock source (reference numeral 170), such as, a crystal oscillator. In an embodiment, the main PLL 160 comprises a voltage-controlled oscillator (VCO), one or more frequency dividers

(preferably, at least one divider for each core in the multi-core processor), a phase detector or phase-frequency detector and a low-pass filter configured in a feedback loop for multiplying the input clock frequency received from the clock source in order to provide a reference input clock frequency that is delivered to each of the cores in the multi-core processor. The main PLL 160 comprises at least four dividers, one divider coupled to each of the respective cores 110, 120, 130 and 140, such that, a respective reference input clock frequency (indicated by arrows 162, 164, 166 and 168) is provided to each of the cores in the multi-core processor. For instance, if the input reference clock frequency ($F_{CLK}$) received from the clock source 170, such as a crystal oscillator is 100 MHz (megahertz), the main PLL 160 may be configured to adjust the input reference clock frequency ($F_{CLK}$) to deliver a core frequency ($F_K$) of 3.2 GHz (gigahertz) to each of the plurality of cores, for instance, by using a frequency divider ratio of 32. In an embodiment, a specification core frequency ($F_{SPEC}$) is preset or pre-specified for each of the cores 110, 120, 130 and 140 in the multi-core processor, such that, an operational core frequency ($F_K$) at which a core K of the cores 110, 120, 130 and 140 performs or operates has to exceed the preset specification core frequency in order for the multi-core processor to pass testing. Further, in an embodiment, the operational or operating core frequency ($F_K$) of a core among the plurality of cores in the multi-core processor is proportional to the respective supply voltage provided or supplied by the respective power supply voltage. Furthermore, a maximum operational or operating core frequency of a core ($F_{MAX}$) is defined as the core frequency or rate at which the core functions correctly with a given power supply voltage ($V_{DDK}$) supplied to the core. In an embodiment, the supply voltage supplied or provided to a core by a power supply voltage is adjustable by the controller 150. For instance, the supply voltage ($V_{DD1}$) supplied by the power supply voltage 114 to the core 110 is adjustable by the controller 150. Similarly, the supply voltage ($V_{DD2}$) supplied by the power supply voltage 124 to the core 120, the supply voltage ($V_{DD3}$) supplied by the power supply voltage 134 to core 130 and the supply voltage ($V_{DD4}$) supplied by the power supply voltage 144 to core 140 are each adjustable by the controller 150, as discussed herein further with respect to FIG. 2. Moreover, increasing a supply voltage supplied to a core increases the operating or operational core frequency, $F_K$, since $F_K$ for a core K is given by: $F_K = \beta V_{DDK}$, such that performance is optimized in the core, which is discussed further herein below. In an embodiment, the apparatus further comprises a voltage level-translating communication transceiver 180 that is configured to enable communications between the main controller 150 and the plurality of cores 110, 120, 130 and 140. In an embodiment, the voltage level-translating communication transceiver 180 communicates the voltage $V_{DD1}$, $V_{DD2}$, $V_{DD3}$ and $V_{DD4}$ supplied to each of the respective cores 110, 120, 130 and 140, such that, the controller 150 may adjust the individual voltage supplied to a particular core, if necessary. Further, the voltage level-translating communication transceiver 180 is configured to enable communications between each of the plurality of cores 110, 120, 130 and 140.

[0025]  Referring to FIG. 2, reference numeral 200 shows another embodiment of an apparatus for optimizing performance and power consumption in a multi-core processor. As shown in FIG. 2, each of the cores 210, 220, 230 and 240 in a multi-core processor is coupled to a main controller 250. Further, as shown in FIG. 2, core 210 is connected via wiring

212 to its own separate power supply voltage ($V_{DD1}$), reference numeral 214, whereas, core 220 is connected via wiring 222 to its own separate power supply voltage ($V_{DD2}$), reference numeral 224. In a similar manner, core 230 is connected via wiring 232 to its own separate power supply voltage ($V_{DD3}$), reference numeral 234 and core 240 is connected via wiring 242 to its own separate power supply voltage ($V_{DD4}$), reference numeral 244. In an embodiment, each of the respective wiring 212, 222, 232 and 242 is comprised of inductors, capacitors and resistors. Further, in an embodiment, the multi-core processor is coupled to a main PLL (Phase-Locked Loop), reference numeral 260, which is configured to receive an input clock frequency from a clock source 270, such as, a crystal oscillator (as shown in FIG. 1). In an embodiment, the main PLL 260 comprises a voltage-controlled oscillator (VCO), one or more frequency dividers, a phase detector or phase-frequency detector and a low-pass filter configured in a feedback loop for multiplying the input clock frequency to provide an output clock frequency that is provided to the multi-core processor. Further, in an embodiment, the multi-core processor comprises additional PLLs, which receive an input from the main PLL 260. In an embodiment, at least one PLL is coupled to each core in the multi-core processor, with the PLL being configured to further multiply the output clock frequency received from the main PLL 260 in order to deliver a reference input clock frequency that is higher than the input clock frequency received from the main PLL 260. As shown in FIG. 2, each of PLL1 (reference numeral 216), PLL2 (reference numeral 226), PLL3 (reference numeral 236) and PLL4 (reference numeral 246) receives an input clock frequency from the main PLL 260 (indicated by respective arrows 262, 264, 266 and 268), which provides a first multiple of the clock frequency provided by the clock source 270. Further, each of the PLLs, PLL1 (reference numeral 216), PLL2 (reference numeral 226), PLL3 (reference numeral 236) and PLL4 (reference numeral 246), delivers a reference input clock frequency (indicated by arrows 218, 228, 238 and 248) that is a further multiple of the clock frequency provided (arrow 272) by the clock source 270. Accordingly, in an embodiment, a respective PLL is configured to provide a reference input clock frequency ($F_{CLK}$) to a respective core K to ensure that a respective operational or operating core frequency ($F_K$) of the respective core is at least equal to the adjusted reference input clock frequency. Further, as mentioned herein above with respect to FIG. 1, a specification core frequency ($F_{SPEC}$) is preset or pre-specified for each of the cores 210, 220, 230 and 240 in the multi-core processor, such that, an operational core frequency ($F_K$) at which a core K of the cores 210, 220, 230 and 240 performs or operates has to exceed the preset specification core frequency in order for the multi-core processor to pass testing. In an embodiment, the controller 250 is configured to collect core performance data and core power consumption data measured for the plurality of cores. Further, the main controller is configured to adjust either a respective supply voltage ($V_{DDK}$) provided by the respective power supply voltage connected to a respective core K or is configured to adjust the reference input clock frequency provided to the respective core, such that, adjustment of either the supply voltage provided or the respective input clock frequency provided to the respective core optimizes a respective core performance and a respective core power consumption by the respective core, and wherein the main controller dynamically adjusts the supply voltage provided by the power supply

voltage to each of the plurality of cores in real-time mode. The apparatus 200 further comprises a voltage level-translating communication transceiver (shown in FIG. 1) that is configured to enable communications between the main controller 250 and the plurality of cores 210, 220, 230 and 240. In an embodiment, the voltage level-translating communication transceiver communicates the voltage $V_{DD1}$, $V_{DD2}$, $V_{DD3}$ and $V_{DD4}$ supplied to each of the respective cores 210, 220, 230 and 240, such that, the controller 250 may adjust the individual voltage supplied to a particular core, if necessary. Further, the voltage level-translating communication transceiver is configured to enable communications between each of the plurality of cores 210, 220, 230 and 240.

[0026] Moreover, given that the operational or operating core frequency ($F_K$) of a core K in the multi-core processor is proportional to the respective supply voltage provided or supplied by the respective power supply voltage ($V_{DDK}$), increasing the power supply voltage increases the operational or operating core frequency of the core. For instance, the supply voltage supplied by the power supply voltage 214 ($V_{DD1}$) to the core 210 is adjustable by the controller 250. Similarly, the supply voltage supplied by the power supply voltage 224 ($V_{DD2}$) to the core 220, the supply voltage supplied by the power supply voltage 234 ($V_{DD3}$) to core 230 and the power supply supplied by the power supply voltage 244 ($V_{DD4}$) to core 240 are each adjustable by the controller 250, as discussed herein further with respect to FIGS. 3A-3B, 4A-4B and 5A-5D. Moreover, increasing a supply voltage supplied to a core K increases performance by increasing the operating or operational core frequency, since $F_K$ for a core K is given by: $F_K = \beta V_{DD}$, where $V_{DD}$ is the supply voltage supplied to a core K and $F_K$ is the operational core frequency achievable by adjusting the supply voltage, which is further discussed herein below. Moreover, increasing the supply voltage ($V_{DDK}$) supplied to a core K increases power consumption ($P_K$) of the core K, which is given by the formula: $P_K = \alpha V_{DD}^2 F_{CLK}$, where $V_{DD}$ is the supply voltage supplied to a core K and $F_{CLK}$ is the clock frequency supplied to the core K. As such, the controller is configured to balance power consumption within the core while balancing the operational core frequency of a core based on goals or targets to be achieved for the multi-core processor.

[0027] Reference is now made to FIGS. 3A-3B, 4A-4B and 5A-5D, which provide examples of the apparatus described herein above that can be utilized for adjusting either supply voltage or the clock frequency and/or power consumption of a respective core to optimize the operational core frequency of a core and/or optimize the power consumption of a core. Turning to FIGS. 3A and 3B, reference numeral 300A and 300B, illustrate an example of adjusting the supply voltage ($V_{DD}$) supplied to one or more cores in a multi-core processor, such that, the operational core frequency ($F_K$) of a core is within an Equi-Frequency Tuning Range 380 (EFTR), and the overall power consumption is minimized within the multi-core processor, as shown by reference numeral 300B of FIG. 3B. It is understood that although the examples in FIGS. 3A and 3B discuss the invention in terms of a multi-core processor having six cores, the multi-core processor may have more or less cores. As shown in the graph of FIG. 3A, the horizontal axis depicts the supply voltage 360 (VDD or $V_{DD}$) in volts (V), whereas, the vertical axis depicts an operational core frequency 350 ($F_K$) in gigahertz (GHZ) achievable in a core in a multi-core processor by adjusting the supply voltage (VDD). In particular, if a uniform VDD, for instance, a supply

7

voltage of 1.0 V (reference numeral **330**) is supplied to each core **302**, **304**, **306**, **308**, **310** and **312** (depicted by round circles initially and then as squares when their voltage levels have been adjusted), it may turn out that cores **302**, **304**, **306** and **308** are operating at an operational core frequency that is faster than the required specification frequency ($F_{SPEC}$), whereas, cores **310** and **312** are operating at an operational core frequency that is slower than the required specification frequency ($F_{SPEC}$), represented by reference line **340**, due to within die or chip variation. Instead of the entire multi-core processor or chip failing testing because of the two slower cores **310** and **312**, which do not meet the required specification frequency ($F_{SPEC}$), the inventive apparatus (shown in FIGS. **1** and **2**) provides individual supply voltages for each of the cores, such that, a respective voltage supplied to a core can be adjusted by a main controller or main control core, as discussed in FIGS. **1** and **2** herein above. As such, in FIG. **3**A, the voltage supplied to cores **302**, **304**, **306** and **308** can be decreased, such that, each of the cores operational core frequency (as represented by line **370**) is still above the required specification frequency ($F_{SPEC}$) **340**. In particular, the supply voltage of core **302** is decreased from 1.0 V to around 0.81 V (the core now shown as square **314**), whereas, the supply voltage of core **304** is decreased from 1.0 V to around 0.91 V (the core now shown as square **316**). Similarly, the supply voltage of core **306** is decreased from 1.0 V to around 0.92 V (the core now shown as square **318**) and the supply voltage of core **308** is decreased from 1.0 V to around 0.95V (the core now shown as square **322**). On the other hand, the supply voltage for the two slower cores **310** and **312** is increased, such that the supply voltage of core **310** is increased from 1.0 V to around 1.04 V (the core now shown as square **324**) and the supply voltage of core **312** is increased from 1.0 V to around 1.08 V (the core now shown as square **326**). As such, the operational core frequency of the cores is optimized. Moreover, the adjusted voltage level of each core is still within a technical voltage limit of 0.8 V to 1.1 V, such that, operational functionality of the multi-core processor is not impacted by going beyond this voltage limit. Accordingly, the voltage supplied to the cores can be adjusted so that each core has a certain core frequency or speed that is within the Equi-Frequency Tuning Range (EFTR), reference numeral **380** in FIG. **3**A, for obtaining a maximum operating core frequency ($F_K$), reference line **370**, that is above the minimum specification core frequency requirement ($F_{SPEC}$) **340** for the cores in the multi-core processor, while minimizing overall power consumption ($P_K$) in the multi-core processor, as discussed below.

[0028] Turning to FIG. **3**B, reference numeral **300**B, illustrates changes in power consumption when the supply voltage ($V_{DD}$ or VDD) of each of the cores is adjusted, as discussed herein above with respect to FIG. **3**A. As mentioned herein above, the operating or operational core frequency, $F_K$ for a core K is given by: $F_K = \beta V_{DD}$, where $V_{DD}$ is the supply voltage supplied to a core K, thus, the maximum operational core frequency $F_K$ achievable being proportional to the supply voltage $V_{DD}$ and where adjusting the supply voltage supplied to a core adjusts the maximum operational core frequency of the core. Moreover, given that the power consumption ($P_K$) of the core K is given by the formula: $P_K = \alpha V_{DD}{}^2 F_{CLK}$, where $V_{DD}$ is the supply voltage supplied to a core K and $F_{CLK}$ is the clock frequency supplied to the core K, such that, increasing the supply voltage increases the power consumption given that power consumption of a core is proportional to the supply

voltage squared. As shown in the graph of FIG. **3**B, the horizontal axis depicts the supply voltage **365** ($V_{DD}$) in volts (V), whereas, the vertical axis depicts a core's power consumption **355** ($P_K$) in watts (W). In particular, if a uniform VDD, for instance, a supply voltage of 1.0 V (now reference numeral **335**) is supplied to each core **303**, **305**, **307**, **309**, **311** and **313** (depicted by round circles initially and then as squares when their voltage levels are changed, which leads to power adjustment), it may turn out that some of the cores (cores **307** and **313** in FIG. **3**B) are operating at an operational core frequency that is slower than the required specification frequency ($F_{SPEC}$), whereas, the rest of the cores **303**, **305**, **309**, **311** are operating at an operational core frequency that is faster than the required specification frequency ($F_{SPEC}$), discussed in FIG. **3**A. As such, when the supply voltage to the faster cores **303**, **305**, **309**, **311** is decreased (shown by squares **315**, **317**, **323** and **325**, respectively), the power consumption is also decreased in these four cores. On the other hand, when the supply voltage to the slower cores **307** and **313** is increased (shown by squares **321** and **329**, respectively), the power consumption is also increased in these two cores. However, since the power consumption of four of the six cores has been decreased, overall performance of the multi-core processor is achieved. Accordingly, the controller can measure a core's operational core frequency and can determine whether or not the supply voltage to a respective core needs to be adjusted in order to improve the core frequency or speed of one or more cores in the multi-core processor, and hence, improve the overall power consumption and performance of the multi-core processor.

[0029] Turning to FIGS. **4**A and **4**B, reference numeral **400**A and **400**B, illustrate an example of adjusting the supply voltage ($V_{DD}$) to one or more cores in a multi-core processor (shown by reference numeral **400**A of FIG. **4**A), such that, the power consumption is maintained within an Equi-Power Tuning Range **480** (EPTR), shown by reference numeral **400**B of FIG. **4**B, for minimizing overall power consumption. In an embodiment, the EPTR **480** (in FIG. **4**B) represents a power consumption range that is greater than the minimum power consumption specification requirement, indicated by reference line **470** and less than a maximum power consumption level, indicated by reference line **460**, that could lead to an increase in temperature and, which could lead to eventual malfunctioning of a core in the multi-core processor. It is understood that although the examples in FIGS. **4**A and **4**B discuss the invention in terms of a multi-core processor having eight cores, the multi-core processor may have more or less cores. As shown in the graph of FIG. **4**A, the horizontal axis depicts the supply voltage, reference numeral **460** ($V_{DD}$) in volts (V), whereas, the vertical axis depicts an operational core frequency, reference numeral **450** ($F_K$) in gigahertz (GHZ) achievable in a core in a multi-core processor by adjusting the supply voltage ($V_{DD}$). In particular, if a uniform VDD, for instance, a supply voltage of 1.0 V (reference numeral **430**A) is supplied to each core **402**, **404**, **406**, **408**, **410**, **412**, **414** and **416** (depicted by round circles initially and then as squares when their voltage levels have been adjusted), it may turn out that cores **402**, **404**, **408**, **410**, **412** and **416** are operating at an operational core frequency that is faster than the required specification frequency ($F_{SPEC}$), reference line **440**, whereas, cores **406** and **416** are operating at an operational core frequency that is slower than the required specification frequency ($F_{SPEC}$), represented by reference line **440**. Again, instead of discarding the

entire chip or multi-core processor because of the two slower cores **406** and **416**, the inventive apparatus (shown in FIGS. **1** and **2**) provides individual supply voltages for each of the cores, such that, a respective voltage supplied to a core can be adjusted by a main controller or main control core, as discussed in FIGS. **1** and **2** herein above. As such, in FIG. **4**A, the voltage supplied to cores **402**, **404**, **406**, **408**, **410**, **412**, **414** and **416** can be increased or decreased, such that, the operational core frequency of the cores is still above the required specification frequency ($F_{SPEC}$) **440** shown in FIG. **4**A, while the power consumption of each of the cores falls within the Equi-Power Tuning Range (EPTR), reference numeral **480**, shown in FIG. **4**B. As mentioned herein above, the operation or operational core frequency, $F_K$ for a core K is given by: $F_K=\beta V_{DD}$, where $V_{DD}$ is the supply voltage supplied to a core K, thus, the operational core frequency $F_K$ achievable is proportional to the supply voltage $V_{DD}$ and by adjusting the supply voltage supplied to a core the operational core frequency of the core is adjusted. In particular, as shown in FIG. **4**A, the supply voltage of cores **402**, **404**, **408**, **410**, **412** and **416** is decreased (now shown as squares **418**, **420**, **422**, **424**, **426** and **432**, respectively), whereas, the supply voltage of core **406** and **414** is increased (now shown as squares **418** and **428**, respectively). Turning to FIG. **4**B, reference numeral **400**B, illustrates how the power consumption can be adjusted when the supply voltage ($V_{DD}$) is adjusted, given the formula $P_K=\alpha V_{DD}{}^2 F_{CLK}$, where $V_{DD}$ is the supply voltage supplied to a core K and $F_{CLK}$ is the clock frequency supplied to the core K, such that, increasing the supply voltage increases the power consumption since power consumption of a core is proportional to the supply voltage squared and is proportional to the clock frequency supplied to the cores, as discussed herein above with respect to FIGS. **1** and **2**. As shown in FIG. **4**B, the horizontal axis depicts the supply voltage ($V_{DD}$) in volts (V), reference numeral **465**, whereas, the vertical axis depicts a core's power consumption ($P_K$) in watts (W), reference numeral **455**. In particular, if a uniform VDD, for instance, a supply voltage of 1.0 V (now reference numeral **430**B) is supplied to each core **403**, **405**, **407**, **409**, **411**, **413**, **415** and **417** (depicted by round circles initially and then as squares when their voltage levels and, thus, power have been adjusted), it may turn out that some of the cores (cores **403**, **405**, **407**, **409**, **411** and **413** in FIG. **4**B) are operating at a power consumption that is higher than within the Equi-Power Tuning Range (EPTR) **480** that is desired. As such, the supply voltage supplied to each of the cores **403**, **405**, **407**, **409**, **411** and **413** is decreased (now represented by squares **419**, **421**, **423**, **427** and **429**, respectively), whereas, the supply voltage supplied to each of the cores **415** and **417** is increased (now represented by squares **431** and **433**, respectively), so that the power consumption of each of the cores in the multi-core processor is brought within the Equi-Power Tuning Range **480**. Accordingly, the controller can balance the power consumption of cores in a multi-core processor in order to improve power consumption of the core.

[0030] Reference is now made to FIGS. **5**A-**5**D, where FIGS. **5**A and **5**B illustrate adjusting the supply voltage to achieve minimum operational power in a multi-core processor, and where FIGS. **5**C and **5**D illustrate adjusting the supply voltage to achieve maximum performance of a multi-core processor. It is understood that although the examples in FIGS. **5**A through **5**D discuss the invention in terms of a multi-core processor having eight cores, the multi-core processor may have more or less cores. Turning to FIG. **5**A,

reference numeral **500**A illustrates an example of how adjusting, namely, decreasing the supply voltage ($V_{DD}$), reference numeral **560**A supplied to each of eight cores in a multi-core processor, reference numerals **502**A, **504**A, **506**A, **508**A, **510**A, **512**A, **514**A, **516**A to a minimum supply voltage, reference numerals **518**A, **520**A, **522**A, **524**A, **526**A, **528**A, **530**A and **532**A, respectively, decreases the operational core frequency **550**A of some of the eight cores below a maximum operational core frequency **540**A, but still above a minimum or specification core frequency and hence minimizes the optimum performance of the multi-core processor. In particular, a controller in a multi-core processor can be configured to decrease a uniform $V_{DD}$ supplied to each of the eight cores, for instance, from a supply voltage of 1.0 V to a supply voltage of 0.8V. Moreover, as shown in FIG. **5**B, reference numeral **500**B, decreasing the supply voltage ($V_{DD}$), reference numeral **560**B supplied to each of the eight cores in a multi-core processor, reference numerals **502**B, **504**B, **506**B, **508**B, **510**B, **512**B, **514**B, **516**B, respectively, decreases the power consumption ($P_K$), reference numeral **555**B of these eight cores in the multi-core processor. In particular, decreasing the supply voltage ($V_{DD}$) supplied to each of the eight cores, reference numerals **502**B, **504**B, **506**B, **508**B, **510**B, **512**B, **514**B, **516**B to a minimum supply voltage, reference numerals **518**B, **520**B, **522**B, **524**B, **526**B, **528**B, **530**B and **532**B, respectively, decreases the power consumption in each of these eight cores as well. Accordingly, a controller in a multi-core processor can be configured to decrease a uniform $V_{DD}$ supplied to each of the eight cores, for instance, from a supply voltage of 1.0 V to a supply voltage of 0.8V in order to achieve minimal operational power or minimum performance, as shown in FIGS. **5**A and **5**B.

[0031] Turning to FIG. **5**C, reference numeral **500**C illustrates an example of how adjusting, namely, increasing the supply voltage ($V_{DD}$), reference numeral **560**C supplied to each of eight cores in a multi-core processor, reference numerals **502**C, **504**C, **506**C, **508**C, **510**C, **512**C, **514**C, **516**C to a maximum supply voltage, reference numeral **518**C, **520**C, **522**C, **524**C, **526**C, **528**C, **530**C and **532**C, respectively, increases the operational core frequency **550**C of these eight cores above a maximum operational core frequency **540**C, and hence increases the performance of the multi-core processor. In particular, a controller in a multi-core processor can be configured to increase a uniform $V_{DD}$ supplied to each of the eight cores, for instance, from a supply voltage of 0.8V to a supply voltage of 1.0V. Accordingly, increasing the supply voltage ($V_{DD}$), increases the operating core frequency ($F_K$), which in turns improves or maximizes the overall performance of the microprocessor. Moreover, as shown in FIG. **5**D, reference numeral **500**D, increasing the supply voltage ($V_{DD}$), reference numeral **560**D supplied to each of eight cores in a multi-core processor, reference numerals **502**D, **504**D, **506**D, **508**D, **510**D, **512**D, **514**D, **516**D, respectively, also increases the power consumption ($P_K$), reference numeral **555**D of these eight cores in the multi-core processor. In particular, increasing the supply voltage ($V_{DD}$) supplied to each of the eight cores, reference numerals **502**D, **504**D, **506**D, **508**D, **510**D, **512**D, **514**D, **516**D to **518**D, **520**D, **522**D, **524**D, **526**D, **528**D, **530**D and **532**D, respectively, increases the power consumption in each of these eight cores as well. Accordingly, a controller in a multi-core processor can be configured to increase a uniform $V_{DD}$ supplied to each of the eight cores, for instance, from a supply voltage

9

of 0.8V to a supply voltage of 1.0 V in order to achieve maximum performance or operational power, as shown in FIGS. **5**C and **5**D.

[0032] In another embodiment, the invention provides a method for optimizing performance and power consumption of a multi-core processor. The method comprises providing a multi-core processor having a plurality of cores, the multi-core processor being coupled to a clock source configured to provide a reference input clock frequency to the plurality of cores in the multi-core processor, connecting a separate voltage power source configured to provide a respective supply voltage to each core of the plurality of cores in the multi-core processor, wherein a respective core operational clock frequency is proportional to the respective supply voltage provided to a respective core, and wherein a respective core power consumption by the respective core is proportional to the reference input clock frequency and to the respective supply voltage squared, collecting, using a main controller coupled to each core of the plurality of cores, core performance data and core power consumption data measured for each core of the plurality of cores and adjusting, using the main controller, either the respective supply voltage provided to the respective core of the plurality of cores or the reference input clock frequency provided to the respective core of the plurality of cores, based on a respective core performance data and a respective core power consumption data collected for the respective core of the plurality of cores, wherein adjustment of either the respective power provided to the respective core ensures that the respective operational core frequency of the respective core is greater than a respective specification core frequency preset for the respective core, and wherein adjustment of the reference input clock frequency ensures that the respective operational core frequency of the respective core is at least equal to the reference input clock frequency, whereby the respective core performance and the respective core power consumption by the respective core is optimized. The method further comprises enabling, utilizing a voltage level-translating communication transceiver, communications between the main controller and the plurality of cores and enabling communications between each of the plurality of cores. In an embodiment, the adjusting step further comprises supplying each core of the plurality of cores with at least one PLL (Phase Locked Loop) having one or more voltage-controlled oscillators (VCOs) and one or more dividers, at least one PLL with the one or more VCOs and the one or more dividers being configured to dynamically adjust the input clock frequency provided to the respective core, wherein the respective operational core frequency is at least equal to the reference input clock frequency, and wherein the respective power consumption by the respective core is adjusted. In an embodiment, the adjusting step further comprises dynamically adjusting either the output power supply voltage or the input clock frequency provided to the respective core in real-time mode. In an embodiment, the adjusting step further comprises distributing, using the main controller, instruction blocks to each core of the plurality of cores in a manner that achieves a balancing criterion with respect to the plurality of cores, wherein the balancing criterion comprises at least one of: equal performance balancing, maximum performance balancing, power consumption balancing and instruction count balancing. In an embodiment, a core performance data measured for the multi-core processor comprises computing a sum of the respective core performance data measured for each core of the plurality of cores in

the multi-core processor, and wherein the core power consumption data measured for the multi-core processor comprises computing a sum of a respective core power consumption data measured for each core of the plurality of cores.

[0033] Turning to FIG. **6**, reference numeral **600** depicts a flowchart outlining a method for determining a maximum operational core frequency ($F_K$) for a core in a multi-core processor by adjusting the clock frequency provided to the multi-core processor, such that, a maximum operational core frequency is achieved at a given supply voltage $V_{DD}$. In an embodiment, the controller is configured to determine a maximum operational core frequency for a core, as described herein below. The method begins with step **602**, where the chip or microprocessor is powered up. In step **604**, the clock frequency ($F_{CLK}$) is initialized, where $F_{CLK}$ is set to $F_0$, an initial clock frequency. A test is executed in step **606** to determine in step **608** whether or not the chip or multi-core processor passes the test when set to the initial $F_{CLK}$. If the multi-core processor fails the test in step **608**, then the clock frequency is decreased in step **618** and the test is re-executed in step **620**. Again, a determination is made in step **622** as to whether or not the multi-core processor passes the test. If the multi-core processor fails the test in step **622**, then the process returns to step **618**, where the clock frequency is decreased and the test is re-executed in step **620**. Steps **618** through **622** are repeated until the multi-core processor passes the test in step **622**. If the multi-core processor passes the test in step **622**, $F_K$ is set to $F_{CLK}$ in step **624**, ending the process at step **626**. On the other hand, in step **608**, if the multi-core processor passes the test in step **608**, then the clock frequency is increased in step **610** and the test is re-executed in step **612**. Again, a determination is made in step **614** as to whether or not the multi-core processor passes the test. If the multi-core processor passes the test in step **614**, then the process returns to step **610**, where the clock frequency is increased and the test is re-executed in step **612**. Steps **610** through **614** are repeated until the multi-core processor fails the test in step **614**. If the multi-core processor fails the test in step **614**, $F_K$ is set in step **616** to the last $F_{CLK}$ that passed the test in step **614**, ending the process at step **626**. In another embodiment, a program or code running on an operating system may be run on an external system for adjusting either the clock frequency or the supply voltage supplied to the multi-core processor, as described further herein below with respect to FIG. **9**.

[0034] Turning to FIG. **7**, reference numeral **700** depicts a flowchart outlining a method for determining whether an operational core frequency ($F_K$) for a core is greater than a specification core frequency ($F_{SPEC}$) preset for a core in a multi-core processor, such that, the supply voltage $V_K$ to a core can be adjusted to ensure that the core passes the minimum specification core frequency required. The method begins with step **702**, where the chip or microprocessor is powered up. In step **704**, the supply voltage to a core ($V_K$) is initialized to the initial supply voltage, $V_{DD0}$. Further, in step **706**, the $F_K$ of a core is measured and a determination is made in step **708** as to whether or not the operational core frequency $F_K$ ($F_{MAX}$) is greater than $F_{SPEC}$. If the operational core frequency $F_{MAX}$ is greater than the preset specification core frequency $F_{SPEC}$, then the supply voltage $V_K$ to the core is decreased in step **710**. A determination is made in step **712**, as to whether or not the supply voltage $V_K$ is greater than a predetermined lower bound voltage $V_{LIMIT, LO}$. If the supply voltage $V_K$ is greater than a predetermined lower bound voltage $V_{LIMIT, LO}$, then the operational core frequency is mea-

sured in step **714** to determine in step **716** whether or not the operational core frequency is greater than the specification core frequency. If the operational core frequency is greater than the specification core frequency in step **716** (that is, fails) then the last successful supply voltage $V_K$ is used in step **718**, ending the process at step **732**. However, if the operational core frequency is greater than the specification core frequency in step **716**, then the process returns back to step **710** and steps **710** through **716** are repeated, as necessary. Going back to step **708**, if the operational core frequency $F_{MAX}$ is not greater than the preset specification core frequency $F_{SPEC}$ (fails), then the supply voltage $V_K$ to the core is increased in step **720**. A determination is made in step **722**, as to whether or not the supply voltage $V_K$ is less than a predetermined upper bound voltage $V_{LIMIT, HP}$. If the supply voltage $V_K$ is less than the predetermined upper bound voltage $V_{LIMIT, HP}$ then the core fails the minimum $F_{SPEC}$ requirement in step **730**, ending the process at step **732**. However, if the supply voltage $V_K$ is not less than a predetermined voltage limit $V_{TH}$, then the operational core frequency is measured in step **724** to determine in step **726** whether or not the operational core frequency is greater than the specification core frequency. If the operational core frequency is not greater than the specification core frequency in step **726** (that is, fails) then the supply voltage $V_K$ is increased in step **720** and the steps **720** through **726** are repeated, as necessary until $F_{MAX}$ is greater than $F_{SPEC}$. However, if the operational core frequency $F_{MAX}$ is greater than the specification core frequency $F_{SPEC}$ in step **726** (that is, passes), then the process ends at step **732**.

[0035]   Turning to FIG. **8**, reference numeral **800** depicts a flowchart outlining a method for adjusting the supply voltage in order to ensure that a core meets the minimum specification core frequency ($F_{SPEC}$). The method begins with step **802**, where the chip or microprocessor is powered up. In step **804**, n=1 (current or first core), and in step **806**, the supply voltage $V_n$ for the first core is adjusted in step **806** for the preset specification core frequency. A determination is made in step **808** as to whether or not the core passes the preset specification core frequency at the adjusted supply voltage for that core ($V_n$). If the core does not pass in step **808**, the set up is deemed a failure in step **810**, ending the process at step **818**. However, if the core passes in step **808**, then n is set to n=n+1 in step **812** and the next core in the multi-core processor is examined. Further, a determination is made in step **814** as to whether or not n<=N, where n is the current core and N is the total number of cores in the multi-core processor. If it is determined in step **814** that n>N (that is, n is not less than or equal to N), then the set up is complete in step **816** and the process ends in step **818**. However, if in step **814**, it is determined that n<=N, then the process continues with step **806** where the supply voltage for the current core is adjusted and the steps **806** through **814** in the process are repeated until each core is examined and there are no more cores whose supply voltage needs to be adjusted, thus, completing the set up in step **816** and ending the process in step **818**.

[0036]   In yet another embodiment, the invention provides a computer program product for optimizing performance and power consumption of a multi-core processor. The computer program product comprises a computer readable or computer-usable medium, first program instructions to supply a reference input clock frequency to a plurality of cores of a multi-core processor, the plurality of cores in the multi-core processor being coupled to a main controller, the first program instructions including instructions to supply a respec-

tive supply voltage to a respective core of the plurality of cores in the multi-core processor, wherein a respective core operational clock frequency is proportional to the respective supply voltage supplied to the respective core, and wherein a respective core power consumption by the respective core is proportional to the reference input clock frequency and to the respective supply voltage squared, second program instructions to collect, using the main controller, core performance data and core power consumption data measured for the plurality of cores, third program instructions to adjust, using the main controller, either the respective supply voltage supplied to the respective core or the reference input clock frequency supplied to the respective core, based on a respective core performance data and a respective core power consumption data collected for the respective core of the plurality of cores, wherein adjustment of either the supply voltage provided to the respective core or the reference input clock frequency supplied optimizes the respective core performance and the respective core power consumption by the respective core, and wherein the first, second and third program instructions are recorded on the computer readable medium. The computer program product further comprises fourth program instructions to enable communications between the main controller and the plurality of cores and to enable communications between each of the plurality of cores, utilizing a voltage level-translating communication transceiver. In an embodiment, the first program instructions include instructions to couple each core of the plurality of cores with at least one phase locked loop (PLL) circuit having one or more voltage-controlled oscillators (VCOs) and one or more dividers, at least one PLL circuit with the one or more VCOs and the one or more dividers being configured to dynamically adjust the reference input clock frequency of the respective core, wherein a respective operational core frequency of the respective core is at least equal to the reference input clock frequency, and wherein the respective power consumption by the core is adjusted. In an embodiment, the second program instructions include instructions to distribute, using the main controller, instruction blocks to each core of the plurality of cores in a manner that achieves a balancing criterion with respect to the plurality of cores, the balancing criterion comprises at least one of: equal performance balancing, maximum performance balancing, power consumption balancing and instruction count balancing. In an embodiment, the third program instructions include instructions to dynamically adjust the supply voltage provided to the respective core to ensure that the respective operational core frequency of the respective core is greater than a respective specification core frequency preset for the respective core, wherein the respective core performance and the respective power consumption of the respective core is optimized. In an embodiment, the third program instructions include instructions to dynamically adjust either the supply voltage provided or the reference input clock frequency supplied to the respective core in real-time mode. In an embodiment, a core performance data measured for the multi-core processor comprises computing a sum of the respective core performance data measured for each core of the plurality of cores in the multi-core processor, and wherein a core power consumption data measured for the multi-core processor comprises computing a sum of a respective core power consumption data measured for each core of the plurality of cores. In an embodiment, each of the first, second, third and fourth program instructions are recorded on the computer readable medium.

[0037]    Turning to FIG. **9**, reference numeral **900** depicts a schematic block system diagram illustrating one embodiment of a computer system **900**, such as, a standalone or personal computer or a server that has deployed thereon or is coupled to a system that has deployed thereon a core power and performance optimization tool **920** that is configured to manage the controller, as described herein above. The core power and performance optimization tool or code or program **920** can be loaded into the system **900** from a computer readable media, such as, a magnetic tape or disk, optical media, DVD, memory stick, semiconductor memory, etc. or downloaded from the Internet via a network adapter or card, such as, a TCP/IP adapter card. Although the invention is discussed herein below in terms of a server, it is understood that the invention can be practiced on a personal computer running a core power and performance optimization tool **920**.

[0038]    As shown in FIG. **9**, the server or system **900** comprises a central processing unit (CPU) **904**, a local storage device **902**, a network interface **906** and a memory **910**. The CPU **904** is configured generally to execute operations within the system/server **900**, such as, the core power and performance optimization tool or code **920**. The network interface **906** is configured, in one embodiment, to facilitate network communications of the system **900** over a communications channel of a network. In one embodiment, as shown in FIG. **9**, the core power and performance optimization tool **920**, which, in an embodiment, runs on a multi-core processor testing server or system **900**, comprises a logic unit that contains a plurality of modules configured to functionally execute the necessary steps of adjusting either the supply voltage provided to a respective core or the respective input clock frequency provided to the respective core, such that, the adjustment optimizes a respective core performance and a respective core power consumption by the respective core. In particular, the core power and performance optimization tool or code **920** comprises a clocking module **922**, a data collection module **924**, a load or instruction distribution module **926**, a testing module **928**, a supply voltage adjustment module **930**, a clock frequency adjustment module **932**, and a communication module **934**.

[0039]    Referring to FIG. **9**, the clocking module **922** of the core power and performance optimization tool **920** is configured to measure a reference input clock frequency supplied to one or more cores in a multi-core processor. The data collection module **924** is configured to collect core performance data and core power consumption data for the one or more cores in the multi-core processor. In an embodiment, the core performance data **912** collected is stored in storage **902**, whereas, the core power consumption data **914** is stored in storage **902**. Further, the load or instruction distribution module **926** is configured to distribute instruction blocks to the one or more cores in the multi-core processor based on analysis of the data collected by the data collection module **924**. In an embodiment, the load or instruction distribution module **926** is configured to distribute instruction blocks to the plurality of cores in a manner that achieves a balancing criterion with respect to the plurality of cores, such as, achieving either equal performance balancing, maximum performance balancing, power consumption balancing or instruction count balancing. The testing module **928** is configured to run one or more tests **908** stored in memory **910** of the system **900** for testing the one or more cores in the multi-core processor, as discussed herein above with respect to FIGS. **6**-**8**. The supply voltage adjustment module **930** is configured to adjust the supply voltage supplied to a core based on analysis of the data collected by the data collection module **924**. Further the clock frequency adjustment module **932** is configured to adjust the clock frequency supplied to a core based on analysis of the data collected by the data collection module **924**. The communications module **934** is configured to permit communication between the various modules of the power and optimization tool or code **920** and other systems, such as, the storage **902**.

[0040]    Accordingly, by providing an independent power supply for each core or at least to a group of cores, the controller can control each power supply to achieve specific core performances or power consumptions to provide a higher yield of multi-core processor chips that pass a specified or preset core frequency or specification speed test. Moreover, given that the core frequency is proportional to the power supply voltage, by increasing the supply voltage, the speed of the core and, hence, the multi-core processor performance is increased. Additionally, since the core power consumption is proportional to the clock frequency and to the supply voltage squared, by adjusting the supply voltage to one or more cores that are performing at a slower frequency, the power consumption of these cores can be adjusted (as long as the cores meet the specified frequency requirement); thus, providing an increase in processor chip yield. Accordingly, the controller can equalize power consumption in each core, which reduces mechanical stresses due to thermal changes in a multi-core processor, as the multi-core processor is heated and cooled over time. Additionally, since the controller can adjust the power supply in real time, the performance of each core and the power consumption of each core can be adjusted in real time.

[0041]    The foregoing descriptions of specific embodiments of the present invention have been presented for the purpose of illustration and description. They are not intended to be exhaustive or to limit the invention to the precise forms disclosed, and obviously many modifications and variations are possible in light of the above teaching. The embodiments were chosen and described in order to best explain the principles of the invention and its practical application, to thereby enable others skilled in the art to best utilize the invention and various embodiments with various modifications as are suited to the particular use contemplated. It is intended that the scope of the invention be defined by the claims appended hereto and their equivalents.

What is claimed is:

1. An apparatus for optimizing performance and power consumption of a multi-core processor, comprising:

a multi-core processor including a plurality of cores, said multi-core processor being coupled to a clock source configured to provide a reference input clock frequency to said plurality of cores in said multi-core processor, each of said cores of said plurality of cores having a specification core frequency preset for said multi-core processor;

at least one power supply voltage connected to said multi-core processor for providing a supply voltage to said plurality of cores, a respective core of said plurality of cores having a respective operational core frequency that is proportional to said supply voltage provided by said at least one power supply voltage;

at least one PLL (Phase Locked Loop) having one or more voltage-controlled oscillators (VCOs) and one or more dividers, said at least one PLL being coupled to said

multi-core processor and being configured to dynamically adjust said reference input clock frequency provided to a respective core of said plurality of cores to ensure that a respective operational core frequency of said respective core is at least equal to said reference input clock frequency; and

a main controller coupled to said plurality of cores, said main controller being configured to collect core performance data and core power consumption data measured for said plurality of cores, said main controller being configured to adjust either said supply voltage provided by said at least one power supply voltage connected to said respective core or being configured to adjust said reference input clock frequency provided to said respective core, wherein adjustment of either said supply voltage provided or said respective input clock frequency provided to said respective core optimizes a respective core performance and a respective core power consumption by said respective core, and wherein said main controller dynamically adjusts said supply voltage provided by said at least one power supply voltage to said plurality of cores in real-time mode.

2. The apparatus according to claim 1, further comprising:

a voltage level-translating communication transceiver configured to enable communications between said main controller and said plurality of cores and configured to enable communications between each of said plurality of cores.

3. The apparatus according to claim 2, further comprising:

at least two PLLs (Phase Locked Loops) coupled to said multi-core processor, each of said at least two PLLs having one or more voltage-controlled oscillators (VCOs) and one or more dividers, a PLL of said at least two PLLs being configured to dynamically adjust said reference input clock frequency supplied to one or more cores of said plurality of cores in order to ensure that a respective operational core frequency of said respective core is greater than said specification core frequency preset for said respective core.

4. The apparatus according to claim 3, further comprising:

a plurality of power supply voltages connected to said multi-core processor, a respective individual power supply voltage of said plurality of power supply voltages being configured to provide a respective supply voltage to an individual core of said plurality of cores, wherein said main controller dynamically adjusts said respective supply voltage provided by said respective individual power supply voltage to said individual core to increase said respective operational core frequency of said respective core, and wherein said main controller dynamically adjusts said respective supply voltage provided by said respective individual power supply voltage to said individual core in real-time mode.

5. The apparatus according to claim 4, wherein said main controller is configured to distribute instruction blocks to said plurality of cores in a manner that achieves a balancing criterion with respect to said plurality of cores, wherein said balancing criterion comprises at least one of: equal performance balancing, maximum performance balancing, power consumption balancing and instruction count balancing.

6. The apparatus according to claim 5, wherein said core performance data measured for said multi-core processor comprises computing a sum of a respective core performance data measured for each core of said plurality of cores, and

wherein said core power consumption data measured for said multi-core processor comprises computing a sum of a respective core power consumption data measured for each core of said plurality of cores.

7. An apparatus for compensating semiconductor manufacturing process-induced variation in core performance of a multi-core processor, comprising:

a multi-core processor including a plurality of cores, said multi-core processor being coupled to a clock source configured to provide a reference input clock frequency to said plurality of cores in said multi-core processor;

a respective power supply voltage coupled to a respective core of said plurality of cores for providing a respective supply voltage to said respective core; wherein a respective operational core frequency of said respective core is proportional to said respective supply voltage provided by said respective power supply voltage;

a phase locked loop (PLL) circuit coupled to said each core of said plurality of cores, said PLL circuit having one or more voltage-controlled oscillators (VCOs) and one or more dividers, said PLL circuit being configured to dynamically adjust said reference input clock frequency provided to said respective core of said plurality of cores; and

a main controller coupled to said each core of said plurality of cores, said main controller being configured to collect core performance data and core power consumption data measured for said each core of said plurality of cores, said main controller being configured to adjust, using said PLL circuit coupled to said respective core, said respective supply voltage provided to said respective core in order to ensure that said respective operational core frequency of said respective core is greater than a specification core frequency preset for said respective core and to optimize said power consumption by said respective core, wherein core performance of said respective core is optimized.

8. The apparatus according to claim 7, further comprising:

a voltage level-translating communication transceiver configured to enable communications between said main controller and said plurality of cores and configured to enable communications between each of said plurality of cores.

9. The apparatus according to claim 8, wherein said PLL circuit further comprises one or more voltage-controlled oscillators (VCOs) and one or more dividers, wherein said PLL circuit having said one or more VCOs and said one or more dividers is configured to dynamically adjust said reference input clock frequency provided to said respective core to ensure that said respective operational core frequency of said respective core is at least equal to said reference input clock frequency.

10. The apparatus according to claim 9, wherein said main controller dynamically adjusts said respective supply voltage provided by said respective power supply voltage to said respective core in real-time mode.

11. The apparatus according to claim 10, wherein said main controller is configured to distribute instruction blocks to said plurality of cores in a manner that achieves a balancing criterion with respect to said plurality of cores, and wherein said balancing criterion comprises at least one of: equal performance balancing, maximum performance balancing, power consumption balancing and instruction count balancing.

US 2009/0138737 A1

May 28, 2009

13

**12**. The apparatus according to claim **11**, wherein said core performance data measured for said multi-core processor comprises computing a sum of said respective core performance data measured for said each core of said plurality of cores, and wherein said core power consumption data measured for said multi-core processor comprises computing a sum of a respective core power consumption data measured for each core of said plurality of cores.

**13**. A method for optimizing performance and power consumption of a multi-core processor, said method comprising the steps of:

provinding a multi-core processor having a plurality of cores, said multi-core processor being coupled to a clock source configured to provide a reference input clock frequency to said plurality of cores in said multi-core processor;

connecting a separate voltage power source configured to provide a respective supply voltage to said each core of said plurality of cores in said multi-core processor, wherein a respective core operational clock frequency is proportional to said respective supply voltage provided to a respective core, and wherein a respective core power consumption by said respective core is proportional to said reference input clock frequency and to said respective supply voltage squared;

collecting, using a main controller coupled to said each core of said plurality of cores, core performance data and core power consumption data measured for said each core of said plurality of cores; and

adjusting, using said main controller, either said respective supply voltage provided to said respective core of said plurality of cores or said reference input clock frequency provided to said respective core of said plurality of cores, based on a respective core performance data and a respective core power consumption data collected for said respective core of said plurality of cores, wherein adjustment of either said respective power provided to said respective core ensures that said respective operational core frequency of said respective core is greater than a respective specification core frequency preset for said respective core, and wherein adjustment of said reference input clock frequency ensures that said respective operational core frequency of said respective core is at least equal to said reference input clock frequency, whereby said respective core performance and said respective core power consumption by said respective core is optimized.

**14**. The method according to claim **13**, further comprising the step of:

enabling, utilizing a voltage level-translating communication transceiver, communications between said main controller and said plurality of cores and enabling communications between each of said plurality of cores.

**15**. The method according to claim **14**, wherein said adjusting step further comprises the step of:

supplying each core of said plurality of cores with at least one PLL (Phase Locked Loop) having one or more voltage-controlled oscillators (VCOs) and one or more dividers, said at least one PLL with said one or more VCOs and said one or more dividers being configured to dynamically adjust said input clock frequency provided to said respective core, wherein said respective operational core frequency is at least equal to said reference

input clock frequency, and wherein said respective power consumption by said respective core is adjusted.

**16**. The method according to claim **15**, wherein said adjusting step further comprises the step of:

dynamically adjusting either said output power supply voltage or said input clock frequency provided to said respective core in real-time mode.

**17**. The method according to claim **16**, wherein said adjusting step further comprises the step of:

distributing, using said main controller, instruction blocks to said each core of said plurality of cores in a manner that achieves a balancing criterion with respect to said plurality of cores, wherein said balancing criterion comprises at least one of: equal performance balancing, maximum performance balancing, power consumption balancing and instruction count balancing.

**18**. The method according to claim **17**, wherein a core performance data measured for said multi-core processor comprises computing a sum of said respective core performance data measured for said each core of said plurality of cores in said multi-core processor, and wherein said core power consumption data measured for said multi-core processor comprises computing a sum of a respective core power consumption data measured for each core of said plurality of cores.

**19**. A computer program product for optimizing performance and power consumption of a multi-core processor, said computer program product comprising:

a computer readable medium;

first program instructions to supply a reference input clock frequency to a plurality of cores of a multi-core processor, said plurality of cores in said multi-core processor being coupled to a main controller, said first program instructions including instructions to supply a respective supply voltage to a respective core of said plurality of cores in said multi-core processor, wherein a respective core operational clock frequency is proportional to said respective supply voltage supplied to said respective core, and wherein a respective core power consumption by said respective core is proportional to said reference input clock frequency and to said respective supply voltage squared;

second program instructions to collect, using said main controller, core performance data and core power consumption data measured for said plurality of cores;

third program instructions to adjust, using said main controller, either said respective supply voltage supplied to said respective core or said reference input clock frequency supplied to said respective core, based on a respective core performance data and a respective core power consumption data collected for said respective core of said plurality of cores, wherein adjustment of either said supply voltage provided to said respective core or said reference input clock frequency supplied optimizes said respective core performance and said respective core power consumption by said respective core, and wherein said first, second and third program instructions are recorded on said computer readable medium.

**20**. The computer program product according to claim **19**, further comprising:

fourth program instructions to enable communications between said main controller and said plurality of cores and to enable communications between each of said

14

plurality of cores, utilizing a voltage level-translating communication transceiver, wherein said fourth program instructions are recorded on said computer readable medium.

**21**. The computer program product according to claim **20**, wherein said first program instructions include instructions to couple each core of said plurality of cores with at least one phase locked loop (PLL) circuit having one or more voltage-controlled oscillators (VCOs) and one or more dividers, said at least one PLL circuit with said one or more VCOs and said one or more dividers being configured to dynamically adjust said reference input clock frequency of said respective core, wherein a respective operational core frequency of said respective core is at least equal to said reference input clock frequency, and wherein said respective power consumption by said core is adjusted.

**22**. The computer program product according to claim **21**, wherein said second program instructions include instructions to distribute, using said main controller, instruction blocks to said each core of said plurality of cores in a manner that achieves a balancing criterion with respect to said plurality of cores, said balancing criterion comprises at least one of: equal performance balancing, maximum performance

balancing, power consumption balancing and instruction count balancing.

**23**. The computer program product according to claim **22**, wherein said third program instructions include instructions to dynamically adjust said supply voltage provided to said respective core to ensure that said respective operational core frequency of said respective core is greater than a respective specification core frequency preset for said respective core, wherein said respective core performance and said respective power consumption of said respective core is optimized.

**24**. The computer program product according to claim **23**, wherein said third program instructions include instructions to dynamically adjust either said supply voltage provided or said reference input clock frequency supplied to said respective core in real-time mode.

**25**. The method according to claim **24**, wherein a core performance data measured for said multi-core processor comprises computing a sum of said respective core performance data measured for said each core of said plurality of cores in said multi-core processor, and wherein a core power consumption data measured for said multi-core processor comprises computing a sum of a respective core power consumption data measured for each core of said plurality of cores.

\* \* \* \* \*

# EXHIBIT  F

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 12/713,220 | 02/26/2010 | Andrew WOLFE | 121-0019-US-REG | 4243 |

83446        7590        08/29/2012
REN-SHENG INTERNATIONAL IP MANAGEMENT LTD.
GENE I. SU
7F, NO. 57, SEC. 2, DUN HUA S. ROAD
TAIPEI, 106
TAIWAN

| EXAMINER |
|---|
| BUTLER, DENNIS |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2115 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 08/29/2012 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

gsu@suipconsulting.com
filing@suipconsulting.com
gene.i.su@gmail.com

PTOL-90A (Rev. 04/07)

| **Office Action Summary** | Application No. | Applicant(s) |
|---|---|---|
| | 12/713,220 | WOLFE ET AL. |
| | Examiner | Art Unit | |
| | DENNIS M. BUTLER | 2115 | |

-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --

## Period for Reply

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE _3_ MONTH(S) OR THIRTY (30) DAYS, WHICHEVER IS LONGER, FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
  Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

## Status

1)☒ Responsive to communication(s) filed on _26 February 2010_.

2a)☐ This action is **FINAL**.    2b)☒ This action is non-final.

3)☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

4)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under _Ex parte Quayle_, 1935 C.D. 11, 453 O.G. 213.

## Disposition of Claims

5)☒ Claim(s) _1-23_ is/are pending in the application.

    5a) Of the above claim(s) _____ is/are withdrawn from consideration.

6)☐ Claim(s) _____ is/are allowed.

7)☒ Claim(s) _1-23_ is/are rejected.

8)☐ Claim(s) _____ is/are objected to.

9)☐ Claim(s) _____ are subject to restriction and/or election requirement.

## Application Papers

10)☐ The specification is objected to by the Examiner.

11)☒ The drawing(s) filed on _26 February 2010_ is/are: a)☒ accepted or b)☐ objected to by the Examiner.

    Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).

    Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

12)☐ The oath or declaration is objected to by the Examiner. Note the attached Office Action or form PTO-152.

## Priority under 35 U.S.C. § 119

13)☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

    a)☐ All  b)☐ Some * c)☐ None of:

        1.☐ Certified copies of the priority documents have been received.

        2.☐ Certified copies of the priority documents have been received in Application No. _____.

        3.☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

    * See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1)☒ Notice of References Cited (PTO-892)

2)☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)

3)☒ Information Disclosure Statement(s) (PTO/SB/08)
    Paper No(s)/Mail Date _8/2/2011_.

4)☐ Interview Summary (PTO-413)
    Paper No(s)/Mail Date. _____ .

5)☐ Notice of Informal Patent Application

6)☐ Other: _____.

Application/Control Number: 12/713,220                                          Page 2
Art Unit: 2115

This action is in response to the application filed on February 26, 2010. Claims 1-

23 are pending.

### *Claim Objections*

Applicant is advised that should claims 10 and 11 be found allowable, claims 22

and 23 will be objected to under 37 CFR 1.75 as being a substantial duplicate thereof.

When two claims in an application are duplicates or else are so close in content that

they both cover the same thing, despite a slight difference in wording, it is proper after

allowing one claim to object to the other as being a substantial duplicate of the allowed

claim.  See MPEP § 706.03(k).

### *Claim Rejections - 35 USC § 101*

35 U.S.C. 101 reads as follows:

> Whoever invents or discovers any new and useful process, machine, manufacture, or composition of
> matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the
> conditions and requirements of this title.

Claims 18-20 are rejected under 35 U.S.C. 101 because the claimed invention is

directed to non-statutory subject matter.

The claims are directed to a medium that has been defined in the

specification as a transmission type medium such as a wireless communication

channel or link (at paragraph 22) that is a signal. Signals are not statutory under

35 USC 101 because they do not fit any of the four statutory categories. The

Application/Control Number: 12/713,220                                    Page 3
Art Unit: 2115

claim language would be improved if applicant amended the claims to recite " a

non-transitory computer readable medium".

### Claim Rejections - 35 USC § 112

The following is a quotation of the second paragraph of 35 U.S.C. 112:

The specification shall conclude with one or more claims particularly pointing out and distinctly
claiming the subject matter which the applicant regards as his invention.

Claims 15-20 are rejected under 35 U.S.C. 112, second paragraph, as being

indefinite for failing to particularly point out and distinctly claim the subject matter which

applicant regards as the invention.

Regarding claims 15 and 18, the claims are vague and indefinite as to the

relationship between idling/resuming communications with one or more of the plurality

of processor cores and the first and second sets of processor cores. The claims are

unclear whether the communications are between one or more cores and some internal

or external component, between cores of the same set or between cores of different

sets.

Claims 16-17 and 19-20 are rejected because they incorporate the deficiencies

of claims 15 and 18 respectively.

### Claim Rejections - 35 USC § 102

The following is a quotation of the appropriate paragraphs of 35 U.S.C. 102 that

form the basis for the rejections under this section made in this Office action:

Application/Control Number: 12/713,220                                      Page 4
Art Unit: 2115

A person shall be entitled to a patent unless –

(e) the invention was described in (1) an application for patent, published under section 122(b), by another filed in the United States before the invention by the applicant for patent or (2) a patent granted on an application for patent by another filed in the United States before the invention by the applicant for patent, except that an international application filed under the treaty defined in section 351(a) shall have the effects for purposes of this subsection of an application filed in the United States only if the international application designated the United States and was published under Article 21(2) of such treaty in the English language.

.

Claims 1, 5-6, 8-9, 14 and 21 are rejected under 35 U.S.C. 102(e) as being

anticipated by Jacobowitz et al., U.S. Patent Application Publication 2009/0106576.

Per claim 1:

A)      Jacobowitz et al teach the following claimed items:

1.       a first set of processor cores of the multi-core processor configured to

dynamically receive a first supply voltage and a first clock signal with the V0

cores 102 (top set) of figure 6 and paragraphs 32, 34, 37-38 and 43;

2.      a second set of processor cores of the multi-core processor configured to

dynamically receive a second supply voltage and a second clock signal with the

V1 cores 102 (bottom set) of figure 6 and paragraphs 32, 34, 37-38 and 43;

3.      an interface block coupled to the first and second sets of cores and

configured to facilitate communication between the first and second sets of cores

with internal cluster fabric 206, MCM fabric controller 208 and fabric 210 of figure

2 and paragraph 28.

Per claims 5-6, 8-9 and 14:

Jacobowitz discloses that the first and second sets of cores are configured to

receive control signals from one or more control blocks located in a periphery of

the multi-core processor with the 2ND level distribution function block and/or the local store vData and distribution block. Jacobowitz discloses locating the first set of cores in a first region/row and the second set of cores in a second region/row, the regions are non-overlapping with figure 6. Jacobowitz discloses that the first and second sets of cores are configured to receive control signals from one or more control blocks located in a common region of the multi-core processor with the 2ND level distribution function block 502.

Per claim 21:

A)      Jacobowitz et al teach the following claimed items:

1.       a first set of processor cores of the multi-core processor configured to dynamically receive a first supply voltage from a power control block (local power grid controller) and a first clock signal from a clock control block (local core clock controller) with the V0 cores 102 (top set) of figure 6 and paragraphs 32, 34, 37-38 and 43;

2.      a second set of processor cores of the multi-core processor configured to dynamically receive a second supply voltage from a power control block (local power grid controller) and a second clock signal from a clock control block (local core clock controller) with the V1 cores 102 (bottom set) of figure 6 and paragraphs 32, 34, 37-38 and 43;

3.      an interface block coupled to the first and second sets of cores and configured to facilitate communication between the first and second sets of cores

Application/Control Number: 12/713,220                                              Page 6
Art Unit: 2115

with internal cluster fabric 206, MCM fabric controller 208 and fabric 210 of figure

2 and paragraph 28.

### *Claim Rejections - 35 USC § 103*

The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all

obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

This application currently names joint inventors.  In considering patentability of the

claims under 35 U.S.C. 103(a), the examiner presumes that the subject matter of the

various claims was commonly owned at the time any inventions covered therein were

made absent any evidence to the contrary.  Applicant is advised of the obligation under

37 CFR 1.56 to point out the inventor and invention dates of each claim that was not

commonly owned at the time a later invention was made in order for the examiner to

consider the applicability of 35 U.S.C. 103(c) and potential 35 U.S.C. 102(e), (f) or (g)

prior art under 35 U.S.C. 103(a).

Claims 2-4, 7, 12 and 13 are rejected under 35 U.S.C. 103(a) as being

unpatentable over Jacobowitz et al., U.S. Patent Application Publication 2009/0106576

in view of Kim et al., U.S. Patent Application Publication 2009/0138737.

Per claims 2 and 3:

Jacobowitz discloses a multi-core processor including an interface block configured to facilitate communication as described above in connection to the rejection of claim 1. Jacobowitz does not disclose first and second level shifters adapted to translate logic levels as claimed. Kim teaches that it is known to include first and second level shifters adapted to translate logic levels in a multi-core processor with voltage level translating communication transceiver 180 of figure 1 and at paragraph 24. It would have been obvious to one having ordinary skill in the art at the time the invention was made to include first and second level shifters adapted to translate logic levels in a multi-core processor, as taught by Kim, in order to enable communication between each of the cores that are operating at different voltage levels.

Per claims 4, 7, 12 and 13:

It would have been obvious to one having ordinary skill in the art at the time the invention was made to include a synchronizer in the multi-core processor of Jacobowitz because Jacobowitz discloses providing dynamically programmable local oscillators for each set of cores and synchronizing the core clock signals would allow for synchronous communication of data between the cores. Jacobowitz discloses placing sets of cores in non-overlapping regions of the processor. However,  placing sets of cores in overlapping regions of the processor is an obvious design choice and would have been obvious to one of ordinary skill in the art in view of Jacobowitz's disclosure of including a plurality of sets of cores in a multi-core processor. Kim discloses maintaining a differential

relationship between the first and second supply voltages with voltage level

translating communication transceiver 180 of figure 1 and at paragraph 24.


Claims 10-11,15-20 and 22-23 are rejected under 35 U.S.C. 103(a) as being

unpatentable over Jacobowitz et al., U.S. Patent Application Publication 2009/0106576

in view of Kim et al., U.S. Patent Application Publication 2009/0138737 and further in

view of von Kaenel, U.S. Patent Application Publication 2010/0188115.

Per claims 10-11,15, 18 and 22-23:

Jacobowitz discloses a multi-core processor including first and second sets of

cores and an interface block configured to facilitate communication between

cores as described above in connection to the rejection of claim 1. Jacobowitz

does not disclose idling communications and resuming communications as

claimed. Kim discloses that it is known to use first and second PLLs for

managing communications in a multi-core processor with PLL1-4  of figure 2 and

paragraph 25. While Kim does not explicitly disclose idling communications in

response to a change in frequency request and resuming communications when

the PLLs have locked/stabilized the requested clock, von Kaenel discloses that it

is known to stop core activity when changing frequency and waiting until lock

before resuming activity with figure 9 and paragraphs 73-76. It would have been

obvious to one having ordinary skill in the art at the time the invention was made

to idle communications with one or more of the plurality of cores in response to a

clock frequency change request for the first set of cores and  resume

communications with one or more of the plurality of cores after having
determined that a first phase lock loop operation associated with the first set of
cores has acquired a first lock signal and a second phase lock loop operation
associated with the second set of cores has also acquired a second lock signal in
order to avoid the unpredictable effects of communicating while the PLL is being
programmed with the new frequency and has not locked on the new frequency.

Per claims 16-17 and 19-20:

It would have been obvious to one having ordinary skill in the art at the time the
invention was made to add a third PLL for a third set of processor cores in order
to gain the cumulative effect of increasing processing power and/or flexibility by
increasing the number of sets of processor cores. Jacobowitz discloses locating
sets of cores adjacent to each other with figures 2 and 6.

## *Conclusion*

Any inquiry concerning this communication or earlier communications from the
examiner should be directed to DENNIS M. BUTLER whose telephone number is
(571)272-3663.  The examiner can normally be reached on M-F from 9:00 to 5:30.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's
supervisor, Thomas Lee, can be reached on 571-272-3667.  The fax phone number for
the organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of an application may be obtained from the
Patent Application Information Retrieval (PAIR) system.  Status information for

Application/Control Number: 12/713,220                                    Page 10
Art Unit: 2115

published applications may be obtained from either Private PAIR or Public PAIR.

Status information for unpublished applications is available through Private PAIR only.

For more information about the PAIR system, see http://portal.uspto.gov/external/portal.

Should you have questions on access to the Private PAIR system, contact the

Electronic Business Center (EBC) at 866-217-9197 (toll-free).


/DENNIS M BUTLER/                              DENNIS M BUTLER
Primary Examiner, Art Unit 2115               Primary Examiner
                                              Art Unit 2115

# EXHIBIT  G

UNITED STATES PATENT AND TRADEMARK OFFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 12/713,220 | 02/26/2010 | Andrew WOLFE | 121-0019-US-REG | 4243 |

83446        7590        12/03/2012
REN-SHENG  INTERNATIONAL IP MANAGEMENT LTD.
GENE I. SU
7F, NO. 57, SEC. 2, DUN HUA S. ROAD
TAIPEI, 106
TAIWAN

| EXAMINER |
|---|
| BUTLER, DENNIS |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2115 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 12/03/2012 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

gsu@suipconsulting.com
filing@suipconsulting.com
gene.i.su@gmail.com

PTOL-90A (Rev. 04/07)

| ***Applicant-Initiated Interview Summary*** | Application No.<br>12/713,220 | Applicant(s)<br>WOLFE ET AL. | |
| | Examiner<br>DENNIS M. BUTLER | Art Unit<br>2115 | |

All participants (applicant, applicant's representative, PTO personnel):

(1) *Dennis Butler (examiner 2115)*.　　　　　　　　(3)_____.

(2) *Gene Su (applicant's representative)*.　　　　　　(4)_____.

Date of Interview: <u>27 November 2012</u>.

Type:　　☒ Telephonic　　☐ Video Conference
　　　　　☐ Personal [copy given to: ☐ applicant　　☐ applicant's representative]

Exhibit shown or demonstration conducted:　☐ Yes　☒ No.
　　If Yes, brief description: _____.

Issues Discussed　☐101　☒112　☒102　☒103　☐Others
(For each of the checked box(es) above, please describe below the issue and detailed description of the discussion)

Claim(s) discussed: <u>1,10-13,15 and 18</u>.

Identification of prior art discussed: <u>Jacobowitz (2009/0106576), Kim (2009/0138737) and von Kaenel (2010/0188115)</u>.

Substance of Interview
(For each issue discussed, provide a detailed description and indicate if agreement was reached. Some topics may include: identification or clarification of a reference or a portion thereof, claim interpretation, proposed amendments, arguments of any applied references etc...)

*Claims 15 and 18 were discussed regarding the 112, second paragraph rejection. Applicant's representative agreed to amend the claims to clarify that communication is between the first and second sets of processor cores. Claims 1, 10-13, 15 and 18 were discussed regarding the art rejections under 35 USC 102 and 103. Applicant's representative referred to figure 3 of the specification and stated that clock signals 1 through 3 were different/independent clock signals input to the PLLs while Jacobowitz disclosed using a single reference clock. The examiner agreed that Jacobowitz discloses using a single reference clock and that clock signals 1 through 3 of figure 3 are different than disclosed by Jacobowitz. However, the broadest reasonable interprtation of the recited claim language (i.e., claim 1: first set of processor cores configured to dynamically receive a first clock signal) reads on the clock output of the local oscillators of Jacobowitz and also reads on the output of the PLLs shown in applicant's figure 3. Applicant's representative stated that he would discuss amends to the claims with applicant regarding clock signals 1 through 3 of figure 3.*

**Applicant recordation instructions:** The formal written reply to the last Office action must include the substance of the interview. (See MPEP section 713.04. If a reply to the last Office action has already been filed, applicant is given a non-extendable period of the longer of one month or thirty days from this interview date, or the mailing date of this interview summary form, whichever is later, to file a statement of the substance of the interview

**Examiner recordation instructions:** Examiners must summarize the substance of any interview of record. A complete and proper recordation of the substance of an interview should include the items listed in MPEP 713.04 for complete and proper recordation including the identification of the general thrust of each argument or issue discussed, a general indication of any other pertinent matters discussed regarding patentability and the general results or outcome of the interview, to include an indication as to whether or not agreement was reached on the issues raised.

☐ Attachment

| /DENNIS M BUTLER/<br>Primary Examiner, Art Unit 2115 | |

# EXHIBIT  H

PATENT
Atty. Dkt. No. 121-0019-US-REG

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of: §
   Andrew WOLFE §
§  Group Art Unit: 2115
Serial No.: 12/713,220 §
§
Confirmation No.: 4243 §
§  Examiner: BUTLER, DENNIS
§
Filed: February 26, 2010 §
§
For:  PROCESSOR CORE §
   COMMUNICATION IN MULTI- §
   CORE PROCESSOR §

**MAIL STOP AMENDMENT**
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Dear Sir:

### RESPONSE TO OFFICE ACTION DATED AUGUST 29, 2012

  In response to the non-final Office Action dated August 29, 2012 having a shortened statutory period for response set to expire on November 29, 2012, please enter this response and reconsider the claims pending in the application for the reasons discussed below. Although Applicant believes that no fees are due in connection with this response, the Commissioner is hereby authorized to charge Counsel's Deposit Account No. 50-4588/121-0019-US-REG for any fees, including extension of time fees or excess claims fees, required to make this response timely and acceptable to the Office.

  **Amendments to the Specification** are reflected on page 2 of this paper.

**Amendments to the Claims** are reflected in the listing of claims which begins on page 3 of this paper. **Remarks** begin on page 8 of this paper.

PATENT
Atty. Dkt. No. 121-0019-US-REG

**IN THE SPECIFICATION:**

The following paragraph will replace paragraph [0017] in the as filed application:

**[0017]**  Processing for the transition processing routine [[300]]400 may begin at operation [[302]]402, "receive clock frequency change request."  Operation [[302]]402 may be followed by operation [[304]]404, "idle communication between stripes."  Operation [[304]]404 may be followed by operation [[306]]406, "examine PLL blocks of requesting stripe and adjacent stripe(s)."  Operation [[306]]406 may be followed by operation [[308]]408, "does each of PLL blocks acquire a lock?" Operation [[308]]408 may be followed by either operation [[306]]406 when the decision logic tested at block [[308]]408 fails to be satisfied (NO), or operation [[310]]410, "determine whether to resume communication between stripes", when the decision logic tested at block [[308]]408 is satisfied (YES).  Processing for the routine may terminate after block [[310]]410.

PATENT
Atty. Dkt. No. 121-0019-US-REG

**IN THE CLAIMS:**

The listing of claims will replace all prior versions, and listings, of claims in the application.

1.      (Currently Amended) A multi-core processor, comprising:

a first set of processor cores of the multi-core processor, wherein each processor core from the first set of processor cores is configured to dynamically receive a first supply voltage and a first output clock signal of a first phase lock loop (PLL) having a first clock signal as input;

a second set of processor cores of the multi-core processor, wherein each processor core from the second set of processor cores is configured to dynamically receive a second supply voltage and a second output clock signal of a second PLL having a second clock signal as input, wherein the first supply voltage is independent from the second supply voltage, and the first clock signal is independent from the second clock signal; and

an interface block coupled to the first set of processor cores and also coupled to the second set of processor cores, wherein the interface block is configured to facilitate communication between the first set of processor cores and the second set of processor cores.

2.      (Original) The multi-core processor of claim 1, the interface block further comprising a first level shifter that is referenced to the second supply voltage and adapted to translate first logic levels associated with the first set of processor cores to second logic levels associated with the second set of processor cores for a first signal traveling from the first set of processor cores to the second set of processor cores.

3.      (Original) The multi-core processor of claim 1, the interface block further comprising a second level shifter that is referenced to the first supply voltage and adapted to translate second logic levels associated with the second set of processor cores to first logic levels associated with the first set of processor cores for a second signal traveling from the second set of processor cores to the first set of processor cores.

4.      (Original) The multi-core processor of claim 1, wherein the interface block further comprises a synchronizer configured to synchronize the first clock signal and the second clock

PATENT
Atty. Dkt. No. 121-0019-US-REG

signal for communication between one or more processor cores of the first set of processor cores and one or more processor cores of the second set of processor cores.

5.        (Original) The multi-core processor of claim 1, wherein the first set of processor cores and the second set of processor cores are configured to receive one or more control signals from one or more control blocks located in a periphery of the multi-core processor.

6.        (Original) The multi-core processor of claim 1, wherein the first set of processor cores are located in a first region of the multi-core processor, and the second set of processor cores are located in a second region of the multi-core processor.

7.        (Original) The multi-core processor of claim 6, wherein the first region and the second region are overlapping regions of the multi-core processor.

8.        (Original) The multi-core processor of claim 6, wherein the first region and the second region are non-overlapping regions of the multi-core processor.

9.        (Original) The multi-core processor of claim 6, wherein the first region corresponds to a first row of the multi-core processor, and wherein the second region corresponds to a second row of the multi-core processor.

10.      (Currently Amended) The multi-core processor of claim 1, wherein the interface block is configured to idle communications between the first set of processor cores and the second set of processor cores when one or more of the first <u>output </u>clock signal and/or the second <u>output</u> clock signal is determined to have changed.

11.      (Currently Amended) The multi-core processor of claim 10, wherein the interface block is configured to resume communication between the first set of processor cores and the second set of processor cores after one or more of the first <u>output </u>clock signal and/or the second <u>output</u> clock signal is determined to have stabilized.

12.      (Original) The multi-core processor of claim 5, wherein the first set of processor cores is adjacent to the second set of processor cores, and the one or more control blocks are

PATENT
Atty. Dkt. No. 121-0019-US-REG

configured to select the first supply voltage and the second supply voltage to maintain a differential relationship between the first supply voltage and the second supply voltage.

13.      (Original) The multi-core processor of claim 12, wherein the differential relationship is based on having an output voltage level associated with the first set of processor cores to be within an acceptable input voltage level associated with the second set of processor cores.

14.      (Original) The multi-core processor of claim 1, wherein the first set of processor cores and the second set of processor cores are configured to receive one or more control signals from one or more control blocks located in a common region that is substantially central to the first set of processor cores and the second set of processor cores.

15.      (Currently Amended) A method for managing communications in a multi-core processor that includes a plurality of processor cores having a first set of processor cores and a second set of processor cores, the method comprising:

      idling communications ~~with one or more of the plurality of processor cores~~<u>between the first set of processor cores and the second set of processor cores</u> in response to a clock frequency change request for the first set of processor cores; and

      resuming communications ~~with one or more of the plurality of processor cores~~<u>between the first set of processor cores and the second set of processor cores</u> after having determined that a first phase lock loop operation associated with <u>a first clock signal for </u>the first set of processor cores has acquired a first lock signal and a second phase lock loop operation associated with <u>a second clock signal for </u>the second set of processor cores has also acquired a second lock signal<u>, wherein the first clock signal is independent from the second clock signal</u>.

16.      (Original) The method of claim 15, wherein resuming communications further comprising having determined that a third phase lock loop operation associated with a third set of processor cores in the multi-core processor has acquired a third lock signal, wherein the third set of processor cores is adjacent to the first set of processor cores.

17.      (Original) The method of claim 16, wherein the second set of processor cores is adjacent to the first set of processor cores.

PATENT
Atty. Dkt. No. 121-0019-US-REG

18.    (Currently Amended) A <u>non-transistory</u> computer-readable medium containing a sequence of instructions for managing communications in a multi-core processor that includes a plurality of processor cores having a first set of processor cores and a second set of processor cores, which when executed by a computing device, causes the computing device to:

      issue a first command to idle communications ~~with one or more of the plurality of processor cores~~<u>between the first set of processor cores and the second set of processor cores</u> in response to a clock frequency change request for the first set of processor cores;

      issue a second command to resume communications ~~with one or more of the plurality of processor cores~~<u>between the first set of processor cores and the second set of processor cores</u> after having determined that a first phase lock loop operation associated with <u>a first clock signal for</u> the first set of processor cores has acquired a first lock signal and a second phase lock loop operation associated with <u>a second clock signal for</u> the second set of processor cores has also acquired a second lock signal<u>, wherein the first clock signal is independent from the second clock signal</u>.

19.    (Currently Amended) The <u>non-transistory</u> computer-readable medium of claim 18, further including a sequence of instructions, which when executed by the computing device, causes the computing device to determine whether a third phase lock loop operation associated with a third set of processor cores in the multi-core processor has acquired a third lock signal before issuing the second command, wherein the third set of processor cores is adjacent to the first set of processor cores.

20.    (Currently Amended) The <u>non-transistory</u> computer-readable medium of claim 19, wherein the second set of processor cores is adjacent to the first set of processor cores.

21.    (Currently Amended) A multi-core processor, comprising:

      a first set of processor cores of the multi-core processor, wherein each processor core from the first set of processor cores is configured to dynamically receive a first supply voltage from a power control block and a first <u>output</u> clock signal from a <u>first phase lock loop (PLL) having a first clock signal as input in a</u> clock control block;

      a second set of processor cores of the multi-core processor, wherein each processor core from the second set of processor cores is configured to dynamically receive

PATENT
Atty. Dkt. No. 121-0019-US-REG

a second supply voltage from the power control block and a second <u>output</u> clock signal from <u>a second PLL having a second clock signal as input in</u> the clock control block<u>, wherein the first supply voltage is independent from the second supply voltage, and the first clock signal is independent from the second clock signal</u>; and

an interface block coupled to the first set of processor cores and also coupled to the second set of processor cores, wherein the interface block is configured to facilitate communication between the first set of processor cores and the second set of processor cores.

22.    (Currently Amended) The multi-core processor of claim [[1]]<u>21</u>, wherein the interface block is configured to idle communications between the first set of processor cores and the second set of processor cores when one or more of the first <u>output</u> clock signal and/or the second <u>output</u> clock signal is determined to have changed.

23.    (Currently Amended) The multi-core processor of claim [[21]]<u>22</u>, wherein the interface block is configured to resume communication between the first set of processor cores and the second set of processor cores after one or more of the first <u>output</u> clock signal and/or the second <u>output</u> clock signal is determined to have stabilized.

PATENT
Atty. Dkt. No. 121-0019-US-REG

## REMARKS

  This is intended as a full and complete response to the Office Action dated August 29, 2012, having a shortened statutory period for response set to expire on November 29, 2012.  By way of this reply, Applicant is amending claims 1, 10-11, 15, and 18-23.  Claims 1 – 23 are pending.  Applicant is also amending paragraph [0017] in the as filed application, which describes FIG. 4, to correct typographical errors.  No new matter has been added.

### Examiner Interview

  Applicant thanks Examiner Butler for the November 27, 2012 telephone interview.  The interview included discussions of the 35 U.S.C. § 101 rejections, 35 U.S.C. § 112 rejections, 35 U.S.C. § 102, and 35 U.S.C. § 103 rejections in view of the references cited in the Office Action.  An agreement was reached regarding the 35 U.S.C. § 101 rejections and the 35 U.S.C. § 112 rejections.  Pending the Examiner's further searches, the Examiner acknowledges that the architecture shown and described in the present disclosure differs from the currently cited references.

  Applicant respectfully submits that the claims as presented in this response substantially reflect the discussions during the interview.

### Claim Objections

  Claims 22 – 23 are objected to under 37 CFR 1.75 as allegedly being substantial duplicates of claims 10 and 11.  Claims 22 – 23 have been amended to depend on claims 21 and 22, respectively.  Claim 21 also recites different elements than claim 1 (e.g., a power control block and a clock control block).  Applicant respectfully requests the withdrawal of the claim objections.

### 35 U.S.C. § 101 Rejection

  Claims 18 – 20 are rejected under 35 U.S.C. §101, because the claimed invention is allegedly directed to non-statutory subject matter.  The suggested "non-transitory" language has been added, and Applicant respectfully requests the withdrawal of the rejections under 35 U.S.C. §101.

### 35 U.S.C. § 112 Rejection

  Claims 15 – 20 are rejected under 35 U.S.C. §112, second paragraph for being allegedly indefinite and failing to particularly point out and distinctly claim the subject matter which Applicant regards as the invention.  As discussed during the interview, Applicant has amended

PATENT
Atty. Dkt. No. 121-0019-US-REG

independent claims 15 and 18 to clarify that the communication is "between the first set of processor cores and the second set of processor cores." The amendments are at least supported by paragraph [0018] and FIG. 1, FIG. 3, and FIG. 4 of the as filed application. Applicant respectfully requests the withdrawal of the rejections under 35 U.S.C. §112.

### 35 U.S.C. § 102 Rejections

Claims 1, 5 – 6, 8 – 9, 14 and 21 are rejected under 35 U.S.C. §102(e) as being allegedly anticipated by U.S. Patent Application Publication 2009/0106576 (hereinafter *Jacobowitz*).

Applicant does not concede that the above reference is prior art and reserves the right to challenge the reference at a later date. Further, Applicant respectfully submits that the rejections are overcome for at least the reasons stated below.

To anticipate a claim, the alleged reference must teach each and every element of the claim. Applicant respectfully submits that *Jacobowitz* does not teach or suggest one or more elements of the amended independent claims 1 and 21. Specifically, *Jacobowitz* does not teach or suggest at least the elements of "a first set of processor cores… configured to dynamically receive a first supply voltage and a first output clock signal of a first phase lock loop (LLP) having a first clock signal as input," "a second set of processor cores… configured to dynamically received a second supply voltage and a second output clock signal of a second PLL having a second clock signal as input, wherein the first supply voltage is independent from the second supply voltage, and the first clock signal is independent from the second clock signal." The claim amendments are at least supported by paragraph [0015] and FIG. 3 of the as filed application.

First, *Jacobowitz* fails to disclose or teach a first set of processor cores and second set of processor cores configured to dynamically receive a first supply voltage and a second supply voltage, respectively. In addition, the first supply voltage is <u>independent from</u> the second supply voltage, as required in the amended independent claims 1 and 21. Paragraph [0043] of *Jacobowitz* merely mentions that "[f]urther power management can be realized by controlling the power supply voltage (Vdd) to each core and/or chip." In other words, *Jacobowitz* is silent with respect to least the recited different <u>sets of processor cores</u> configured to receive <u>independent</u> supply voltages.

Second, FIG. 6 and all other figures of *Jacobowitz* clearly show that the microprocessor chip (e.g., 600) receives a system reference oscillator clock frequency ($v_R$) and distributes $v_R$ to local oscillators 108. <u>See</u> *Jacobowitz*, paragraphs [0037]-[0038] and FIG. 6. *Jacobowitz* fails to

PATENT
Atty. Dkt. No. 121-0019-US-REG

disclose or teach a first set of processor cores and second set of processor cores configured to dynamically receive <u>a first output clock signal of a first PLL having a first clock signal as input</u> and <u>a second output clock signal of a second PLL having a second clock signal as input</u>, respectively. In addition, the first clock signal is independent from the second clock signal, as required in the amended independent claims 1 and 21.

For at least the reasons set forth above, the amended independent claims 1 and 21 and the related dependent claims 2 – 14 and 22 – 23 are patentable over *Jacobowitz*. Applicant respectfully requests the withdrawal of the rejections under 35 U.S.C. §102.

**35 U.S.C. § 103 Rejections**

Claims 2 – 4, 7, 12 and 13 are rejected under 35 U.S.C. §103(a) as being allegedly unpatentable over *Jacobowitz* in view of U.S. Patent Application Publication 2009/0138737 (hereinafter *Kim*).

Claims 10 – 11, 15 – 20 and 22 – 23 rejected under 35 U.S.C. §103(a) as being allegedly unpatentable over *Jacobowitz* in view of Kim and further in view of U.S. Patent Application Publication 2010/0188115 (hereinafter *von Kaenel*).

Applicant does not concede that the aforementioned references are prior art and reserves the right to challenge these references at a later date. Further Applicant respectfully submits that these rejections are overcome for at least the reasons stated below.

To establish a *prima facie* case of obviousness required for a §103(a) rejection, the references must teach or suggest all the claim elements.

<u>Claims 2 – 4, 7, 12 and 13</u>

As discussed during the interview, *Kim* discloses a different architecture than the one recited in the present disclosure. Specifically, as shown in FIG. 1 and FIG. 2 of *Kim*, *Kim* fails to disclose or teach a first set of processor cores and second set of processor cores configured to dynamically receive a first supply voltage and a second supply voltage, which is independent from the first supply voltage, respectively. Instead, *Kim* discloses having each core, <u>not</u> a set of processor cores, received a $V_{DD}$ (i.e., $V_{DD1}$, $V_{DD2}$, $V_{DD3}$, and $V_{DD4}$).

In addition, *Kim* also fails to disclose or teach a first set of processor cores and second set of processor cores configured to dynamically receive a first output clock signal of a first PLL having a first clock signal as input and a second output clock signal of a second PLL having a second clock signal, respectively. In addition, the first clock signal is independent from the second clock signal. Instead, *Kim* discloses the apparatus comprising a multi-core processor (i.e., 100 in FIG. 1 or 200 in FIG. 2) having a single clock source (i.e., 170 in FIG. 1 or 270 in

FIG. 2). The clock signal from this single clock source is then processed (i.e., divided or multiplied) and provided to each of the cores. See *Kim*, paragraphs [0024]-[0025] and FIGs 1 – 2.

Moreover, the Examiner acknowledges that *Jacobowitz* does not disclose the recited first and second level shifters in claims 2 and 3. See Office Action, page 7. *Kim* merely discloses a voltage level-translating communication transceiver 180 that is "configured to enable communications between each of the plurality of cores 110, 120, 130, and 140." See *Kim*, paragraph [0024]. *Kim* is silent with respect to the recited "first level shifter that is referenced to the second supply voltage" (which is independent from the first supply voltage) and "adapted to translate… for a first signal traveling from the first set of processor cores to the second set of processor cores" in claim 2. *Kim* is also silent with respect to the recited "second level shifter that is referenced to the first supply voltage" and "adapted to translate… for a second signal traveling from the second set of processor cores to the first set of processor cores."

For at least the reasons set forth above, *Kim* fails to cure the deficiencies of *Jacobowitz*.

Claims 10 – 11, 15, 18 and 22 – 23

The Examiner acknowledges neither *Jacobowitz* nor *Kim* discloses the recited operations of idling communications and resuming communications. See Office Action, page 8. Applicant respectfully submits that none of *Jacobowitz*, *Kim*, and *von Kaenel* discloses or teaches at least "resuming communications… after having determined that a first phase lock loop operation associated with a first clock signal for the first set of processor cores has acquired a first lock signal and a second phase lock loop operation associated with a second clock signal for the second set of processor cores has also acquired a second lock signal, wherein the first clock signal is independent from the second clock signal," as required in the amended independent claims 15 and 18.

As discussed above, neither *Jacobowitz* nor *Kim* discloses having sets of processor cores configured to receive multiple and independent clock signals. In conjunction with its FIG. 9, *von Kaenel* merely describes "wait[ing] for the clock generation circuit to lock to the new frequency (block 148)" in paragraph [0074]. *von Kaenel* is silent with respect to at least the recited elements of "idling communication… in response to a clock frequency change request" and "resuming communication" after having determined the acquisition of PLL lock signals associated with multiple independent clock signals.

For at least the reasons set forth above, *von Kaenel* fails to cure the deficiencies of *Jacobowitz* and *Kim*.

PATENT
Atty. Dkt. No. 121-0019-US-REG

Thus, claims 2 − 4, 7, 10 − 13, 15 − 20, and 22 - 23 are patentable over *Jacobowitz*, *Kim*, and *von Kaenel*.  Applicant respectfully requests the withdrawal of the rejections under 35 U.S.C. §103.

**PATENT**
Atty. Dkt. No. 121-0019-US-REG

## CONCLUSION

Having addressed all issues set out in the office action, Applicant respectfully submits that the claims are in condition for allowance and respectfully requests that the claims be allowed. If there are any questions about any of the foregoing, please contact Applicant's undersigned representative.

Respectfully submitted,

/Gene Su/
Gene Su
Attorney for Applicant(s)
Registration No. 45,140

Telephone:   (886) 2.2700.7882
Facsimile 1:  (886) 2.2700.7856
Facsimile 2:  (650) 644.3217
Email: filing@suipconsulting.com

# **EXHIBIT  2**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### MIDLAND/ODESSA DIVISION

REDSTONE LOGICS LLC,

                   Plaintiff,

     v.

                               Case No.  7:24-cv-00028-DC-DTG

NXP SEMICONDUCTORS N.V., et al..

---

**PLAINTIFF'S RESPONSIVE CLAIM CONSTRUCTION BRIEF**

## I.    Introduction

U.S. Patent No. 8,549,339 (the "'339 Patent") teaches an innovative multi-core processor with sets of processor cores. In particular, the '339 Patent teaches various means of coordinating not just the individual cores of the multi-core processor but the sets of processor cores that operate as a unit. While previous techniques focused on coordination among individual cores, the '339 Patent focuses on coordination as to sets of cores.

Defendant's arguments ignore this focus. Despite agreeing that "set of processor cores" means a "group of two or more processor cores," Defendant fails to apply this definition properly. Instead, Defendant reads a disavowal of any single-reference-oscillator architecture, where the Applicant explains how the prior art does not teach *sets* of processor cores. Both references only teach sending a single, unprocessed clock signal to anything that could be considered a "set" of processors. The Applicant explained as much. Thus, Defendant's purported "word-for-word" construction is drawn from disparate descriptions of the prior art to create a limitation the applicant never intended.

Defendant's indefiniteness arguments fare no better. First, a POSITA would readily understand the meaning of "configure[] to dynamically receive." Second, the term "periphery" has sufficient meaning and is not a term of degree. Third, the phrase "a common region that is substantially central" is well-disclosed by the specification.

1

## II.    Disputed Terms Requiring Construction

### a.    Term 1: "the first clock signal is independent from the second clock signal"

| '339 Patent Claims | Redstone's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| Claims 1, 21 | Plain and ordinary meaning | Plain and ordinary, meaning, where the plain and ordinary meaning requires that the first and second clock signals are provided by or processed (i.e., divided or multiplied) from different reference oscillator clocks |

The claim term "the first clock signal is independent from the second clock signal" is straightforward and does not require additional construction beyond its plain and ordinary meaning. Defendant, however, proposes an unnecessary and restrictive construction which contradicts both the plain meaning of the term and the prosecution history. Defendant's "word-for-word" construction is nowhere to be found in the prosecution history. Instead, the applicant made it clear that the use of "independent" is best understood as simply meaning "different." Defendant draws its flawed construction from a misunderstanding of both the claim language and the prior art.

During prosecution, the applicant amended the claims to clarify the relationship between the clock signals and the PLLs, specifying that the first and second clock signals are inputs to separate PLLs associated with different sets of processor cores. The examiner initially rejected claims reciting "a first set of processor cores … configured to dynamically receive … a first clock signal; a second set of processor cores … configured to dynamically receive … a second clock

signal," in view of Jacobowitz and Kim[1]. Dkt. No. 39-7. In response, the applicant made several amendments including to add the disputed term. Notably, however, the first and second clock signals of the original claim are not the same signals as in the disputed term. Rather, the original first and second clock signals became the first and second *output* clock signals of the first and second PLLs while the new first and second clock signals of the disputed term are the *inputs* to the PLLs. Dkt. 39-9 at 3.

| Original Claim Language | Amended Language |
|---|---|
| 1: A multi-core processor, comprising:<br>A first set of processor cores of the multi-core processor, wherein each dynamically receive a first supply voltage and a first clock signal;<br>A second set of processor cores of the multi-core processor, wherein each processor core form the second set of processor cores is configured to dynamically receive a second supply voltage and a second clock signal; and<br>An interface block coupled to the first set of processor cores and also coupled to the second set of processor cores, wherein the interface block is configured to facilitate communication between the first set of processor cores and the second set of processor cores. | 1: A multi-core processor, comprising:<br>A first set of processor cores of the multi-core processor, wherein each processor core from the first set of processor cores is configured to dynamically receive a first supply voltage and a first output clock signal of a first phase lock loop (PLL) having a first clock signal as input;<br>A second set of processor cores of the multi-core processor, wherein each processor core from the second set of processor cores is configured to dynamically receive a second supply voltage and a second output clock signal of a second PLL having a second clock signal as input, wherein the first supply voltage is independent from the second supply voltage, and the first clock signal is independent from the second clock signal; and<br>An interface block coupled to the first set of processor cores and also coupled to the second set of processor cores, wherein the interface block is configured to facilitate communication between the first set of processor cores and the second set of processor cores. |

---

[1] Jacobowitz refers to U.S. Publication No. 2009/0106576 (Dkt. No. 39-5). Kim refers to U.S. Publication No. 2009/0138737 (Dkt. No. 39-6).

Put in terms of Figure 3 from the specification, the clock signal of the original claim referred to the arrow entering Core 152 while the clock signal of the disputed term refers to Clock Signal 1, 2, and/or 3. *See* Dkt. No. 39-8 ("However, the broadest reasonable interpretation of the recited claim language (i.e., claim 1: first set of processor cores configured to dynamically receive a first clock signal) reads on the clock output of the local oscillators of Jacobowitz and also reads on the output of the PLLs shown in applicant's figure 3.") In terms of Jacobowitz[2], the original clock signal was $V_0$ or $V_1$ while the clock signals of the disputed terms refer to $V_R$:



**FIG. 3**          FIG. 6

'339 Patent at Figure 3; Jacobowitz at Figure 3. Because there was no distinction in the claim between the input and output signals of the PLLs, at least under the broadest reasonable interpretation, the examiner rejected any distinction that Clock Signal 1, 2, 3 were "different/independent" while $V_R$ was only a single signal. Dkt. No. 39-8.

---

[2] Jacobowitz, of course, does not teach the claims and thus mapping the claimed terms to Jacobowitz is of only limited illustrative value.

Nowhere during prosecution did Applicant ever clearly disavow a single clock system, as Defendant contends. Applicant's remarks were focused on the clock signal as an *input*. Dkt. No. 39-9 at 9-10 ("Jacobowitz clearly show[s] that the microprocessor chip (e.g., 600) receives a system reference oscillator clock frequency ($V_R$) and distributes $V_R$ to local oscillators 108. [] Jacobowitz fails to disclose or teach … <u>a first output clock signal of a first PLL having a first clock signal as input</u> and <u>a second output clock signal of a second PLL having a second clock signal as input</u>, respectively." (emphasis in original)). As to Kim, the applicant did not even argue independence of the signals was distinguishing, merely acknowledging it as a limitation. *See Id.* at 10 ("In addition , Kim also fails to disclose or teach a first set of processor cores and second set of processor cores configured to dynamically receive a first output clock signal of a first PLL having a first clock signal as input and a second output clock signal of a second PLL having a second clock signal, respectively. In addition, the first clock signal is independent from the second clock signal.")

What the Applicant did describe was the absence of any "set of processor cores" in either Jacobowitz or Kim. That is the first and most important distinction over both pieces of prior art— not a single clock system. The Applicant explained that, while Jacobowitz mentions that "[f]urther power management can be realized by controlling supply voltage (Vdd) to each core and/or chip," this statement does not provide any reference to "sets of processor cores"—only to individual cores. *Id.* at 9. Likewise for Kim, the applicant explained: "Kim discloses having each core, <u>not a set of processor cores</u>, received a $V_{DD}$ (i.e., $V_{DD1}$, $V_{DD2}$, $V_{DD3}$, and $V_{DD4}$)." *Id.* at 10. This *was* clear disavowal, and Plaintiff and Defendant accordingly have agreed to a construction of "set of processor cores."

Despite Defendant failing to demonstrate any clear disavowal as to "independent," it nonetheless still contends that construing the disputed term is necessary to avoid permitting the claims to cover the "exact arrangement" of Jacobowitz and Kim. Dkt. No. 39 at 10. However, neither reference teaches the "arrangement" supposedly motivating Defendant's proposed construction. In particular, there is no basis to insert the phrase "or processed (i.e. divided or multiplied) from a single reference oscillator clock." No prior art considered in the prosecution teaches providing such a first and second clock signals to a respective first and second PLLs associated with a first and second set of processor cores. First, Jacobowitz does not discuss processing the signal of the reference clock before reaching the first and second PLLs. Instead Jacobowitz provides the unprocessed signal directly to the Local Oscillators. *See* Jacobowitz at ¶¶ [0037] - [0038]. In contrast, while Kim does teach processing a single reference oscillator clock with a main PLL having multiple frequency dividers prior to reaching further PLLs, only the main PLL is taught to be associated with multiple cores. Kim at ¶ [0024]. Kim does not teach providing processed signals from a single clock source to multiple sets of processor cores as claimed. Defendant's construction does not prevent "recapture" of any considered prior art.

Defendant's further discussion of "multiple and independent" is also unavailing. Even if "independent" is not coextensive with "multiple," it does not follow that "independent" must mean "provided by or processed (i.e., divided or multiplied) from [different] reference oscillator clocks." This logical leap has no basis in the prosecution history. Defendant ignores that the only occasion the Applicant used the phrase "multiple and independent" was in reference to the "resuming communications" limitation of claims 15 and 18 not claim 1. Dkt. No. 39-9 at 11. In any case the Applicant also reemphasized that neither Jacobowitz nor Kim teach "sets of processor cores." Dkt. No. 39-9 at 11. The Applicant explained neither reference "discloses having *sets* of processor cores

configured to receive multiple and independent clock signals." *Id.* (emphasis added). As Kim does not have sets of processor cores at all and is the only source for the "processed (i.e., divided or multiplied)" language, finding a clear disavowal here is improper.

If the Court finds that "independent" needs clarification—it does not—it merely means "different." This is the term that the applicant used interchangeably with "independent" and is what the examiner clearly understood it to mean. *See* Dkt. No. 39-8 ("Applicant's representative referred to figure 3 of the specification and stated that clock signals 1 through 3 were different/independent clock signals input to the PLLs…"(emphasis added)). Defendant's attempt to redefine "independent" is inconsistent with both the applicant's amendments and examiner's understanding.

   b. **Term 2: "each processor core from the first/second set of processor cores is configured to dynamically receive a first/second supply voltage [from a power control block] and a first/second output clock signal"**

| '339 Patent Claims | Redstone's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| Claims 1, 21 | Plain and ordinary meaning | Indefinite[3] |

Defendant argues because "configured to dynamically receive" does not have a common understanding in the field and "dynamically" is "vague," the disputed term is indefinite. This argument is unfounded.

First, the phrase "configured to dynamically receive" is plainly understandable to a POSITA. Both the advantages and difficulties of dynamically providing voltage and clock signals

---

[3] Plaintiff notes that while Defendant MediaTek and Defendant NXP argue the next three terms are indefinite and make similar arguments, the arguments are not identical and are supported by different experts.

# EXHIBIT 3

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### MIDLAND-ODESSA DIVISION

| | | |
|---|---|---|
| **REDSTONE LOGICS LLC,** | § | |
| *Plaintiff,* | § | |
| | § | |
| –v– | § | 7:24-CV-000028-DC-DTG |
| | § | |
| **NXP SEMICONDUCTORS N.V., NXP B.V., AND NXP USA, INC.,** | § | |
| *Defendants.* | § | |
| | § | |

## CLAIM CONSTRUCTION ORDER

Before the Court are the Parties' claim construction briefs: Defendants NXP Semiconductors N.V., NXP B.V., and NXP USA, Inc.'s Opening Claim Construction Brief (ECF No. 39), Plaintiff Redstone Logics LLC Responsive Claim Construction Brief (ECF No. 41), Defendants' Reply Claim Construction Brief (ECF No. 43), Plaintiff's Sur-Reply Claim Construction Brief (ECF No. 44), and the parties' Joint Claim Construction Statement (ECF No. 45). On February 18, 2025, the Court provided the parties with its Preliminary Claim Constructions, and on February 19, 2025, the Court held a *Markman* hearing. The Court issues this Order to memorialize the Court's final claim construction rulings for the parties, and to inform the parties that the Court will issue a more-detailed Order explaining its analysis in due course. The deadline to file any objections to the undersigned's claim construction rulings (pursuant to Federal Rules of Civil Procedure 59 and 72) does not begin to run until the more-detailed Order is entered on the docket.

1

## I.    AGREED CONSTRUCTIONS:

| Term No. | Term | Agreed Upon Construction |
|---|---|---|
| 1 | "a first/second set of processor cores"<br><br>U.S. Patent No. 8,549,339, Claims 1, 21 | "a first/second group of two or more processor cores" |

## II.    DISPUTED CONSTRUCTIONS:

| Term No. | Term | Redstone's Proposed Construction | NXP's Proposed Construction | Court's Final Construction |
|---|---|---|---|---|
| 1 | "the first clock signal is independent from the second clock signal"<br><br>U.S. Patent No. 8,549,339, Claims 1, 21 | Plain and ordinary meaning | Plain and ordinary meaning, where the plain and ordinary meaning requires that the first and second clock signals are provided by or processed (i.e., divided or multiplied) from different reference oscillator clocks. | Plain-and-ordinary meaning, wherein the plain and ordinary meaning does not require that the first and second clock signals depend from different reference oscillator clocks. |
| 2 | "each processor core from the first/second set of processor cores is configured to dynamically receive a first/second supply voltage [from a power control block] and a first/second output clock signal"<br><br>U.S. Patent No. 8,549,339, Claims 1, 21 | Plain and ordinary meaning | Indefinite | Not indefinite.  Plain-and-ordinary meaning. |

| 3 | "located in a periphery of the multi-core processor"  U.S. Patent No. 8,549,339, Claim 5 | Plain and ordinary meaning | Indefinite | Not indefinite. Plain-and-ordinary meaning. |
|---|---|---|---|---|
| 4 | "located in a common region that is substantially central to the first set of processor cores and the second set of processor cores"  U.S. Patent No. 8,549,339, Claim 14 | Plain and ordinary meaning | Indefinite | Indefinite. |

**SIGNED** this 21st day of February, 2025.

DEREK T. GILLILAND
UNITED STATES MAGISTRATE JUDGE

# EXHIBIT  4

# REDSTONE LOGICS, LLC

## v.

# NXP USA, INC.

**Case No. 7:24-cv-00028-DC-DTG**

# REDSTONE LOGICS, LLC

## v.

# MEDIATEK, INC. and MEDIATEK USA, INC.

**Case No. 7:24-cv-00029-DC-DTG**

## Redstone's *Markman* Presentation

**February 19, 2025**

# "the first clock signal is independent from the second clock signal"

| Redstones's Proposal | Preliminary Construction | NXP's Proposal |
|---|---|---|
| Plain and ordinary meaning | **Plain and Ordinary Meaning** | **Plain and Ordinary meaning where the plain and ordinary meaning requires that the first and second clock signals are provided by or processed (i.e., divided or multiplied) from different reference oscillator clocks.** |

3

# NXP's "Plain and Ordinary Meaning" is Wrong



Dkt. 43 at 2

17

# EXHIBIT 5

Case 7:25-cv-00401-ADA-DTG   Document 23-13   Filed 04/04/25   Page 198 of 202
Case 7:24-cv-00028-ADA-DTG   Document 75-13   Filed 04/04/25   Page 198 of 202

1

```
 1                 IN THE UNITED STATES DISTRICT COURT
                    FOR THE WESTERN DISTRICT OF TEXAS
 2                        MIDLAND-ODESSA DIVISION

 3   REDSTONE LOGICS LLC,                ) MO:24-CV-00028-ADA-DTG
                                         )
 4       Plaintiff,                      )
                                         )
 5   v.                                  ) WACO, TEXAS
                                         )
 6   NXP SEMICONDUCTORS N.V., NXP B.V.,  )
     NXP USA, INC.,                      )
 7                                       )
         Defendants.                     ) FEBRUARY 19, 2025
 8   _____)
                                         )
 9   REDSTONE LOGICS LLC,                ) MO:24-CV-00029-ADA-DTG
                                         )
10       Plaintiff,                      )
                                         )
11   v.                                  ) WACO, TEXAS
                                         )
12   MEDIATEK, INC., MEDIATEK USA, INC., )
                                         )
13       Defendants.                     ) FEBRUARY 19, 2025

14        ************************************************
                TRANSCRIPT OF CLAIMS CONSTRUCTION HEARING
15             BEFORE THE HONORABLE RONALD C. GRIFFIN
          ************************************************
16

17   FOR THE PLAINTIFF:    CHRISTIAN W. CONKLE
                           QI (PETER) TONG
18                         JOSHUA SCHEUFLER
                           RUSS AUGUST & KABAT
19                         12424 WILSHIRE BOULEVARD, 12TH FLOOR
                           LOS ANGELES, CALIFORNIA 90025
20
     FOR THE DEFENDANTS:   ERIC CONLEY GREEN
21                         BRETT A. MCKEAN
                           NORTON ROSE FULBRIGHT US LLP
22                         98 SAN JACINTO BOULEVARD, SUITE 1100
                           AUSTIN, TEXAS 78701
23
                           RICHARD S. ZEMBEK
24                         NORTON ROSE FULBRIGHT US LLP
                           1550 LAMAR STREET, SUITE 2000
25                         HOUSTON, TEXAS 77010
```

1  clarification on that with this definition so that the

2  parties will know how to frame both invalidity and

3  infringement briefs.  So, with that, Mr. Scheufler, are

4  you handling this?

5          MR. SCHEUFLER:  Yes, Your Honor.

6          THE COURT:  All right.  Very good.  Whenever

7  you're ready.

8          MR. SCHEUFLER:  All right.  Well, I'd like to

9  jump right in it, then.  You asked about whether a single

10  clock source -- whether we would need a single clock

11  source or multiple clock sources, and that being the

12  maybe rub.  And I think the claim language itself

13  provides us the answer.

14          The claim language says that first clock signal

15  is independent from the second clock signal.  Not that

16  they're independent from a common source, but it is with

17  respect to each other.

18          So looking at what NXP has argued, I call this

19  the mathematical version of "independence."  The purely

20  mathematical approach is to say that, well, if any part

21  of a component of your final outcome is common, then they

22  are not independent.

23          But looking at this example, I believe it's

24  just fundamentally wrong.  So in this example we have a

25  frequency F coming in to two handlers, the top being

 1  shown as X divided by 2, the bottom being X divided by 4.

 2            In *Kim*, for example, these are PLLs.  PLLs are

 3  not static like this.  They are in fact changing.  So

 4  it's not just X over 4.  It's going to be X over Y, X

 5  over Z, such that these can change what they're doing to

 6  the incoming frequency independently.  The Y does not

 7  depend on what you do with the Z, and vice versa.  So

 8  your outcome is going to be the frequency divided by Y

 9  frequency divided by Z.  And those can be changed

10  completely independently without regard to what you're

11  doing with the other.

12            You can have a common incoming.  Let's just

13  give an example and say it's 8.  You can choose Y to be 2

14  and Z to also be 2, or you could choose Z to be 4 and

15  keep Y as 2.  They can change completely independently of

16  one another, and your end signal is going to be whatever

17  you want it to be, completely irrespective of what you

18  have as your incoming signal F.

19            Now if we can jump back for a moment, jump back

20  to slide 6, and we can talk about what the applicant was

21  doing with this amendment.  Defendants agree that -- or

22  at least NXP agrees with this amendment, that the

23  applicant added several additional limitations.  It took

24  what was just the first output clock signal and the

25  second output clock -- or second clock signal and made it

1    the first output clock signal and added a phase lock

2    loop, first and second phase lock loop and a first and

3    second clock signal, as input to those phase lock loops,

4    and set those first and second clock signals as inputs to

5    be independent.

6            Now, why did the applicant do it?  Turning to

7    slide 7, here we have the interview with the examiner.

8    The applicant is talking about how the clock signals 1

9    through 3 of its figure are different, independent clock

10   signals going into the PLLs compared with *Jacobowitz*'

11   disclosure of just a single signal, the V sub R, going

12   into its local oscillators.

13           The examiner agreed that, yes, those things are

14   different but it's irrelevant.  It's irrelevant because

15   the broadest reasonable interpretation of the claims as

16   they were at the time, i.e., just that the first set of

17   processor cores is configured to dynamically receive a

18   first clock signal with no regard to PLLs or whether that

19   clock signal is an input to the PLL or an output to the

20   PLL, covers not V sub R, but V sub 1 and V sub 0.

21           So what -- what all does that add.  Well, let's

22   look at figure - the patent's figure 3 on the next slide,

23   slide 8.  So I have color coded things here to hopefully

24   make it a little easier to understand what all is now

25   added and claimed.  So we claim an output clock signal.

**REPORTER'S CERTIFICATE**

1

2    I, Arlinda Rodriguez, do hereby certify that the foregoing

3  was transcribed from an electronic recording made at the time

4  of the aforesaid proceedings and is a correct transcript, to

5  the best of my ability, made from the proceedings in the

6  above-entitled matter, and that the transcript fees and format

7  comply with those prescribed by the Court and Judicial

8  Conference of the United States.

9

10  /S/ Arlinda Rodriguez                    April 1, 2025

11  ARLINDA RODRIGUEZ                        DATE

12

13

14

15

16

17

18

19

20

21

22

23

24

25